IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

```
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                             :
UNITED STATES OF AMERICA     :
                             :
v.                           : Criminal No. 3:09CR452
                             :
ROBERT LEE PERNELL           : April 30, 2013
                             :
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
```

**DAY ONE**


TRANSCRIPT OF JURY TRIAL TESTIMONY
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT JUDGE




APPEARANCES:

OLIVIA L. NORMAN, Assistant United States Attorney
Office of the U.S. Attorney
600 E. Main Street, Suite 1800
Richmond, Virginia   23219

        Counsel for the United States

CHRISTOPHER J. COLLINS, Esquire
304 E. Main Street
Richmond, Virginia   23219

        Counsel for the Defendant


DIANE J. DAFFRON, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

2

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANWAN JONES | 4 | 51 | 63 | -- |
| KEONA PEOPLES | 72 | 91 | 97 | -- |
| MICHAEL MARGOTT | 102 | 111 | -- | -- |
| MARION REED | 112 | -- | -- | -- |
| TAJ GREGORY | 118 | 142 | 154/166 | 164 |

E X H I B I T S

Page

GOVERNMENT'S EXHIBITS

No. 46A,B,C & D                                        174

No. 47                                                174


DEFENDANT'S EXHIBITS


No. 1                                                  63

3

1          (The proceedings in this matter commenced at
2     9:38 a.m.)

3

4          THE CLERK:  Criminal No. 3:09CR00452-01, the
5     United States of America vs. Robert Lee Pernell.
6     Ms. Olivia Norman represents the United States.
7     Mr. Christopher J. Collins represents the defendant.
8          Are counsel ready to proceed?
9          MS. NORMAN:  The United States is ready, Your
10    Honor.
11         MR. COLLINS:  The defense is ready, Your
12    Honor.
13         (At this point the venire panel was called by
14    the Clerk.  The voir dire examination was conducted by
15    the Court.  The jury list was presented to counsel.
16    Counsel made their respective strikes.  A jury of 12
17    and two alternates were sworn to hear the case.)
18         THE COURT:  All right.  Call your first
19    witness.
20         MS. NORMAN:  Thank you, Your Honor.  The
21    United States first witness is Anwan Jones.

22

23

24

25         ANWAN JONES, called by the United States, first

JONES - DIRECT                          4

1    being duly sworn, testified as follows:

2

3         DIRECT EXAMINATION

4    BY MS. NORMAN:

5    Q    Good morning.

6    A    Good morning.

7    Q    Can you please tell the ladies and gentlemen of

8    the grand jury what your name is.

9              THE COURT:  This would be the jury.

10             MS. NORMAN:  I'm sorry.  The jury.  That's my

11   mistake.

12   Q    Tell the jury what your name is.

13   A    Anwan Jones.

14             THE COURT:  Excuse me.  Will you scoot up to

15   the microphone?  Speak up clearly.

16   A    Anwan Jones.

17             THE COURT:  Can you hear all right over

18   there, ladies and gentlemen?

19             Keep your voice up, please, sir.  Thank you.

20             All right.

21   Q    Now, Mr. Jones, how old are you?

22   A    Thirty-six.

23   Q    What area did you grow up in?

24   A    Southside Richmond.

25   Q    When we talk about the south side of Richmond,

JONES - DIRECT                                5

1  we're talking about the portion of the City of

2  Richmond that's south of the James River?

3  A   Yes, ma'am.

4  Q   And did you also live in other areas in and around

5  the south side of Richmond?

6  A   Yes.

7  Q   Where?

8  A   Chesterfield.

9  Q   Now, Mr. Jones, you seem like you're a little

10  nervous today.  Is that correct?

11  A   Yeah.

12  Q   Tell the ladies and gentlemen of the jury why

13  you're nervous.

14  A   Because I'm in court.

15  Q   What makes you so nervous about being in court?

16  A   Testifying on the guy who tried to kill me.

17          MR. COLLINS:  Objection, Judge.

18          THE COURT:  How am I going to deal with that

19  one?

20          MS. NORMAN:  Well, I would say the answer is

21  not for the truth of the matter but rather what's

22  motivating him to be scared.

23          THE COURT:  Well, ladies and gentlemen, he's

24  not charged with trying to kill anybody.  The

25  defendant in this case is not charged with killing

1   anybody.  Apparently, this witness thinks that may

2   have been what the motive was for what happened, and

3   you can consider that only in assessing the

4   credibility of his testimony.  And it certainly isn't

5   a charge against Mr. Pernell in this case at all.

6          Do you agree with that?

7          MS. NORMAN:  We agree.

8          THE COURT:  Is another instruction necessary,

9   Mr. Collins?

10          MR. COLLINS:  No, sir.  Thank you, Judge.

11  Q   Now, I want to direct your attention specifically

12  to the early morning hours of May 15, 2009.  Generally

13  speaking, in May of 2009 where were you living?

14  A   Chesterfield County.

15  Q   Do you remember the name of the subdivision?

16  A   Smoketree.

17  Q   Do you remember the road you lived on?

18  A   Lockett Ridge.

19  Q   What I'm going to do is I'm going to show you a

20  picture and ask you if you recognize it.  Okay?

21          THE COURT:  You have got some picture up

22  there or not?

23          MS. NORMAN:  I do, but I wanted to show the

24  picture to Mr. Jones first.

25          THE COURT:  All right.  Have you given copies

JONES - DIRECT                                      7

1    to Mr. Collins?

2              MR. COLLINS:  She has, Judge.

3              MS. NORMAN:  Yes, sir.

4              THE COURT:  All right.

5              Which exhibit are you showing him?

6    BY MS. NORMAN:

7    Q    I'm showing you what has been marked for

8    identification purposes as Government's Exhibit

9    768A-10.  Do you see that picture?

10   A    Yes, ma'am.

11   Q    Do you recognize that?

12   A    Yes.

13   Q    Tell the jury what that is.

14   A    It's my old house.

15             MS. NORMAN:  Your Honor, if I may publish

16   that to the jury.

17             THE COURT:  Any objection?

18             MR. COLLINS:  No, sir.

19             THE COURT:  All right.

20             THE CLERK:  Have you got somebody to publish

21   it?  I have it up.

22             MS. NORMAN:  Do you have it up?

23             THE CLERK:  I do, but it's not coming up.

24             THE COURT:  You need a computer operator to

25   get it up, I think.

JONES - DIRECT                    8

1          MS. NORMAN:  I think the light was just out.

2          THE COURT:  What's that?

3          Ms. Watson, are you going to take care of

4     that?

5          MS. WATSON:  Yes, sir.

6          MR. COLLINS:  Judge, for the sake of

7     efficiency, I won't be objecting to any of the

8     photographs.

9          THE COURT:  All right.

10         MS. NORMAN:  In that case, we would just, so

11    we don't have to do it each one individually, we would

12    just move the government's photographic -- there we

13    go -- evidence.

14         THE COURT:  That's Government's Exhibit

15    786 --

16         MS. NORMAN:  768, Your Honor.

17         THE COURT:  768.

18         THE CLERK:  A-10.

19         THE COURT:  What's all of it?  Just move it

20    all.

21         MS. NORMAN:  We would move into evidence all

22    of Government's Exhibits that start with 224, which is

23    224-6, 224-8.  And then Government's Exhibits --

24         THE COURT:  You're not doing that.  I mean,

25    you're doing 768.

JONES - DIRECT                      9

1          MS. NORMAN:  Yes, Your Honor.

2          THE COURT:  They don't start with --

3          MS. NORMAN:  I'm sorry.

4          THE COURT:  What are you doing?  All these

5    pictures start with 768.  There's no 224 in here.

6    That's what I'm saying.

7          MS. NORMAN:  There is.

8          THE COURT:  At least I don't see any 224s in

9    here.  I see everything is 786.  Have I got the wrong

10   book?  Okay.  Here.  I see.  You're back off what you

11   started.  Now you're going from all of them.

12         MS. NORMAN:  I was just going to do that

13   because Mr. Collins said he's not going to object to

14   any of the pictures.

15         THE COURT:  Okay.  Government's Exhibit 224.

16         THE CLERK:  Dash 6 and dash 8.

17         THE COURT:  Dash 6 and dash 8.  Is that it?

18         MS. NORMAN:  Yes.  And what I was going to

19   say is that all the exhibits that follow those are all

20   photographs.

21         THE COURT:  Well, but we need the numbers for

22   the record.

23         THE CLERK:  Well, the numbers would be

24   768A-10 through 773-8, I believe.

25         MS. NORMAN:  I can certainly read every one

1    of them into the record, Your Honor.

2              THE COURT:  If you've got inclusive numbers,

3    that's fine.  You don't need to read each one.

4              MS. NORMAN:  All right.  They're not

5    all-inclusive, so I'll just read the ones that are --

6              THE COURT:  Why don't we do this.  Why don't

7    you just make a list and put the list into evidence.

8              MS. NORMAN:  Yes, sir.

9              THE COURT:  And get that done so we don't

10   have to take up all this time.

11             MS. NORMAN:  Yes, sir.

12   Q   Okay.  So, Mr. Jones, that's basically a picture

13   of your house?

14   A   Yes.

15             THE COURT:  Can you all see on your screens

16   all right now?

17             THE JURY:  Yes.

18             THE COURT:  That's a picture of your house

19   where you lived on May the 15th, 2009; is that right?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  What exhibit is that?

22             MS. NORMAN:  That is 768A-10.

23             THE COURT:  All right.

24   Q   And when you look at that picture, Mr. Jones, you

25   see that there's like a little walkway to a front

JONES - DIRECT                                    11

1  door; is that correct?

2  A    Yes.

3  Q    As you also look at that picture, to your right

4  there's another house there; is that correct?

5  A    Yes.

6  Q    Now, how long do you think you lived at that house

7  before May 15, 2009?  More than a year?  Less than a

8  year?

9  A    About a year.  Maybe a year and a half at the

10 most.

11 Q    And you rented that house; is that correct?

12 A    Yes, ma'am.

13 Q    Was there anybody else living there with you at

14 that house?

15 A    Yes, ma'am.

16 Q    Who was that?

17 A    Taj Gregory.

18 Q    Who is Taj Gregory?

19 A    He was a friend of mine.

20 Q    How long were you guys friends?

21 A    I probably been knowing him since he was about

22 maybe 3 or 4 years old.

23 Q    In fact, your family or some of your family

24 members lived around across the street or around the

25 block from some of his family members; is that

JONES - DIRECT                    12

1  correct?

2  A    Yes.   His mom's backyard connected to my

3  grandmother's backyard.   So he basically lived right

4  behind my grandmother.

5  Q    So you have known him almost your whole life?

6  A    Yes, ma'am.

7  Q    And how long had Mr. Gregory been living at this

8  residence on Lockett Ridge Road with you?

9            THE COURT:   Before May 15, 2009?

10           MS. NORMAN:   Yes.   Before May 15, 2009.

11 A    Probably about 8 months.

12 Q    Now, tell the ladies and gentlemen of the jury

13 what happened on May 15, 2009, in the early morning

14 hours.

15 A    When I left the bar and I came home --

16 Q    Who was with you when you left the bar?

17 A    My girlfriend Keona Peoples.

18 Q    Which bar were you leaving?

19 A    The Forest on Forest Hill Avenue.

20 Q    And there's another kind of little bar or sports

21 club right around there, too, isn't there?

22 A    Yes.   There's one right across the parking lot

23 called The Locker Room.

24 Q    Did you ever go over there?

25 A    Yes, we went back and forth that night playing

1  pool and drinking or whatever.

2  Q   And drinking over at the Forest and then playing

3  pool at The Locker Room?

4  A   Yes.

5  Q   How long do you think you were there?

6       THE COURT:   Where?

7  Q   At The Locker Room or going back and forth

8  between.  How long were you out that night?

9  A   I probably was out maybe from 10 o'clock or 11

10  o'clock.  I'm not sure.

11       THE COURT:   Until when?

12       THE WITNESS:   Until 1.  One or 2.  I'm not

13  sure.

14  Q   Did you close the place?  Was it last call when

15  you left?

16  A   I think it was last call, but I don't know if we

17  stayed until they closed.  I'm not sure.

18  Q   So when you left the Forest, did you go directly

19  home or did you make some stops along the way?  Do you

20  remember?

21  A   No, we went up Jahnke Road, and we went -- got on

22  the highway and we went home.

23  Q   When you say "the highway," are you talking about

24  Chippenham?

25  A   No, 76.  I think it's Powhite.

JONES - DIRECT                    14

1    Q    So when you got home -- let's look at this picture

2    for a second.   And let me also show you another

3    picture, which has been marked Government's Exhibit

4    768A-14, and that picture should be the next picture

5    in your book.   Can you tell the jury a little bit --

6    what does this picture show the jury in front of that

7    house?

8    A    It's part of my driveway.

9    Q    So we can look at this picture and we see a

10   black -- what appears to be the front end of a black

11   car?

12   A    Yes.

13   Q    And it looks like the front end is almost touching

14   that tree.

15   A    Yes.

16   Q    Is that the parking area for your house?

17   A    Yes, ma'am.

18   Q    So when you came home that night and went to your

19   house, is that approximately the area where you

20   parked?

21   A    Yes.

22   Q    From there, where did you -- was Ms. Peoples with

23   you at that moment?

24   A    Yes, she was.

25   Q    From there where did you and Ms. Peoples go?

JONES - DIRECT                          15

1   A    To the front door.

2   Q    So I see that there appears to be like a little

3   step down and then like a walkway.  Did you-all go

4   down that walkway?

5   A    Yes.

6   Q    Do you have like an alarm system or something on

7   your house or did you back then?

8   A    Yes.

9   Q    Was it on that night?

10  A    Yes, I'm pretty sure it was.

11  Q    Did you have any way to turn it off remotely?

12  A    Yes, I had a remote on my key chain.

13  Q    So as y'all walked down there, did you notice

14  anything funny around your house?

15  A    No.

16  Q    Did you walk to that door that we see open in the

17  picture?

18  A    Yes.

19  Q    Is that the door you-all were going to go in?

20  A    Yes.

21  Q    Tell the ladies and gentlemen of the jury what

22  happened when you got down there to the door.

23  A    We got to the door and Keona had the keys.  She

24  was opening the door and some guys ran from the side

25  of the house.

JONES - DIRECT                16

1   Q   Which side?  As we look at the picture, which

2   side?

3   A   From the left side.

4   Q   When you say "the left," you're talking about if

5   you're facing the house, your left-hand side?

6   A   Yes.

7   Q   Where we see all the trees in that picture?

8   A   Yes.

9   Q   Okay.  Did they say anything?

10  A   Yes.  They was shouting something like, "You know

11  what time it is?  (Unintelligible) the money,"

12  whatever.

13          THE COURT:  What?

14  Q   I didn't hear that.

15  A   They were saying, like, "You know what time it

16  is?"

17  Q   What does that mean?  What does that mean to you?

18  Not to anybody else, but just to you.  What does, "You

19  know what time it is" mean to you?

20  A   I mean, at the time if they got guns and they're

21  running up on me from the side of my house, it means

22  that it's a robbery or whatever.

23          MR. COLLINS:  Objection.  Conclusion, Judge.

24          MS. NORMAN:  I asked him what his state of

25  mind was.  And I said, "Just to you, what does this

1   mean?"  And that's what he's explaining.

2         THE COURT:  Well, I understand that.  His

3   objection is that it's a conclusion and therefore an

4   improper testimony because it is a conclusion.  Why is

5   his perception relevant?

6         MS. NORMAN:  Well, because part of the issue

7   for a robbery, Your Honor, is the state of mind of the

8   victim and whether the victim has been threatened or

9   intimidated into relinquishing something of value.

10        THE COURT:  Why don't you ask him whether he

11  was fearful?  It's different from whether it was a

12  robbery.  You're asking him what they were doing, not

13  what his state of mind is.

14        That's your objection, isn't it?

15        MR. COLLINS:  Yes.

16        THE COURT:  Sustained.

17  BY MS. NORMAN:

18  Q   So you said that the two men that you saw, they

19  had guns?

20  A   Yes.

21  Q   And can you describe what the two men were

22  wearing?

23  A   It's been awhile.  I think that they had on black.

24  They were dressed in black.

25  Q   Do you remember whether they had their faces

JONES - DIRECT                    18

1   covered or hats or anything like that?

2   A    I don't remember their face being covered, but I

3   think they, like, had on, like, skullcaps or whatever.

4   I'm not sure.

5   Q    Something above their head, but you're not exactly

6   sure what it was?

7   A    Yes.   Might have been a bandanna.   I don't know.

8   Q    So as these guys come from the side of the house

9   and start coming at you and they're yelling something,

10  did you recognize either one of them?

11  A    No.

12  Q    And what did you do when you saw that happening?

13  A    I -- at that time Keona had unlocked the door, so

14  I pushed her inside, and I tried to go in behind her

15  and close the door.   And one of the guys jumped up on

16  the porch with the gun and stuck it in the door so I

17  couldn't close it.

18  Q    What kind of gun could you stick in a door so you

19  can't close it?

20  A    I'm not sure what exactly kind of gun it was, but

21  it was a fairly large gun.

22  Q    So was it like a handgun or was it like a long

23  gun?

24  A    It was long.

25  Q    So it had like a long barrel?

JONES - DIRECT                         19

1   A    Yes.

2   Q    It's not the kind of thing you can carry in your

3   hand?

4   A    No, it wasn't a pistol.

5   Q    When you say he stuck it in the door, can you

6   describe what you were doing and what the person was

7   doing?

8   A    I was trying to close the door and they stuck it

9   in so I couldn't close it.  So at that point I

10  realized, you know, the door wasn't going to close.

11  So I grabbed the gun and we got in a tussle in the

12  foyer and --

13          THE COURT:  You grabbed his gun?

14          THE WITNESS:  Yes.

15          THE COURT:  You grabbed the gun that was

16  sticking in the door?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  All right.

19  Q    But how much of the gun was sticking through the

20  door?  Like how much could you see through the door?

21  A    It was in the door enough so it wouldn't close.

22  And I could see what it was.  I knew what it was that

23  was in the door that he had stuck in the door.

24          THE COURT:  How much of the barrel was

25  sticking inside?

JONES - DIRECT                            20

1          THE WITNESS:  Probably about maybe 6 or

2     7 inches, I guess.  Enough for me to get a grip on it.

3          THE COURT:  It was enough for you to grab and

4     you grabbed the barrel of the gun?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.

7     BY MS. NORMAN:

8     Q   Now, when you got in the door -- I want to show

9     you what's been marked as 768A-25.  Is that the

10    doorway?

11    A   Yes.

12    Q   So when you go into the door, the door opens to

13    the right.  So when you went in, you were trying to

14    shut it; is that correct?

15    A   Yes.

16    Q   And we see that there's kind of like an orangy tan

17    colored tile there.

18    A   Yes.

19    Q   Is that what you mean by the foyer?

20    A   Yes, that's where we was tussling at.

21    Q   So you tried to grab the barrel of the gun.  What

22    happened after you did that?

23    A   After we was tussling for a little while, the

24    second guy came through, and when he came through he

25    kind of pushed both of us.  And the guy that I was

JONES - DIRECT                    21

1   tussling with, he yelled to the guy, Go get her.  She

2   ran to the back.

3       And at the time me and the other guy was still

4   rumbling or whatever.  And it led out to the front

5   porch.  And as it led out to the front porch, I

6   slipped off the porch and I fell.

7   Q   So let's go back a second so we understand which

8   way you're talking about.  Let's look at 768-10.  You

9   said it came back out onto the porch?

10  A   Yes.

11  Q   What did you do once it got out onto the porch?

12  Where did you go?  What did you do?

13  A   I fell off the porch.

14  Q   Then what happened once you fell off the porch?

15  A   As I was turning around to get up, that's when I

16  heard a gunshot.

17  Q   Now, looking at this house, and we'll go back to

18  14.  We might have a better shot for you.  If I can

19  get 14.  Which side of the porch were you on?

20  A   The side by the kitchen window.

21  Q   Just so we understand what the kitchen window is,

22  when we look at the house on the right-hand side, on

23  the lower level there's one, two, three like panes of

24  glass together.

25  A   Yes, that's it.

1    Q    That's the kitchen window?

2    A    Yes.

3    Q    So you were on that side.  You said you came off

4    the stairs.  What happened at that point?

5    A    I fell in the yard, and as I was getting up, I

6    heard a gunshot.  So I went to the neighbor's house.

7    Q    And that's the house if we look at 768A-10, that's

8    the neighbor's house we can see in the corner there?

9    A    Yes.

10   Q    You ran that way.  What did you do?

11   A    I went on the side of their porch, and I kneeled

12   down, and, you know, basically that's what I did.  I

13   went and I kneeled down for a while like on the side

14   of their porch.

15   Q    When you say "side of their porch," do you mean

16   their front porch or the back deck that we can see in

17   the picture?

18   A    They have a front porch sort of like mines.

19   Q    So you kind of went up under that area?

20   A    Yeah.

21   Q    Did you try to make contact with anybody?

22   A    Yes, I called my cousin.

23   Q    All right.  Did you say anything to the neighbors

24   like --

25   A    Well, after I tried to call my cousin, and I was

JONES - DIRECT                              23

1    there for like, I guess, a couple of minutes, yes, I

2    got up, and I knocked on their door, and I asked them

3    to call the police.

4    Q    Did you ask them to let you in or anything like

5    that or did you just --

6    A    Yeah, I asked them could I come in and call the

7    police.

8    Q    What did they say?

9    A    At the time it was like, "No, you can't come in."

10   Q    But did somebody indicate to you that the police

11   had been called or 911 had been called at this point?

12   A    Yes.  I think they said they was going to call,

13   but they wouldn't let me in.

14   Q    Now, you said there was two guys.  And you also

15   said that they both had guns.  You described one of

16   them as being like a long gun?

17   A    Yes.

18   Q    Could you tell whether the other guy had a long

19   gun that was the same way or was it something smaller?

20   A    I think his gun was long, too.  I think he had a

21   rifle or a shotgun or something.

22   Q    Was there any other guns that you saw that they

23   had, not that you had, but that they had?

24   A    No.

25   Q    Now, do you have a shotgun?

1    A    No.

2    Q    Have you ever owned a shotgun?

3    A    No.

4    Q    Do you have a shotgun in your house?

5    A    No.

6    Q    Have you ever even shot a shotgun?

7    A    No.

8    Q    But you did have a .45 in the house?

9    A    Yes, I did.

10   Q    Or had a pistol in the house; is that correct?

11   A    Yes.

12   Q    Where was that pistol kept?

13   A    In the bedroom.

14   Q    Now, I want to turn to what's been marked as

15   Government's Exhibit 768-15.  That's your house,

16   right?  That's the side of it?  That's the same house?

17   A    Yes.

18   Q    And I'm going to turn to what's been marked as

19   Government's Exhibit 224-6.  What is that area there?

20   I may have skipped ahead too fast.  I apologize.  What

21   is that?

22   A    That's my backyard.

23   Q    Through trees we can see there's like a door in

24   the backyard; is that correct?

25   A    Yes.

JONES - DIRECT                    25

1   Q    Then to the back of your house are there trees and

2   whatnot or is it all -- other than the trees we see,

3   is it all cleared or is there some woods or brush or

4   whatnot?

5   A    It's trees back there.

6   Q    Okay.  Now, I want to take you back into the house

7   momentarily to the living room.  And it's what been

8   marked as Government's Exhibit 768A-26.  And this is

9   back to the front door; is that correct?

10  A    Yes.

11  Q    And the front door leads into the living room; is

12  that correct?

13  A    Yes.

14  Q    There appears to be something on the floor there.

15  Do you know what those are?  What that is?

16  A    No.

17  Q    Is that your living room?

18  A    Yes.

19  Q    As you go into -- if you look at this picture,

20  that's standing on the foyer, is that correct, into

21  your living room?

22  A    Yes.

23  Q    And at the back there appears to be the outline of

24  a door.  Is that the back door we just saw on the back

25  of the house?

1    A    Yes.

2    Q    What kind of door is that?

3    A    It's a sliding glass door.

4    Q    That's your pool table?

5    A    Yes.

6    Q    In this room here, this living room, did you have

7    any big bullet holes or anything before this incident

8    occurred in that room?

9    A    No.

10   Q    This is just a different angle.  This is a picture

11   of the room taken from the back door; is that correct?

12   A    Yes.

13   Q    That's the back sliding glass door.

14        Now, if you look at that sliding glass door, how

15   did you keep that secure?

16   A    It was locked.

17   Q    Did it have one of those sort of security bars or

18   anything in the track?

19   A    Yes.

20   Q    I want to show you what's been marked as 768A-65.

21   Is that sort of the picture out your back door onto

22   the deck?

23   A    Yes.

24   Q    If we can look at what's been marked as

25   Government's Exhibit 768A-67.  Is that the bar that

1  you use to hold the door shut?

2  A    Yes, that's it.

3  Q    So it prevents -- not only do you have the lock on

4  the handle, but you also have that to prevent people

5  from sliding it open?

6  A    Yes, ma'am.

7  Q    Okay.  So when we looked at the picture before of

8  your house, you walk in, and immediately you're at the

9  foyer, and immediately you're in the living room?

10  A    Yes.

11  Q    Which way to the kitchen and master bath?

12  A    To the right.

13  Q    I want to show you what's been marked as

14  Government's Exhibit 768A-44.  So if I were standing

15  in the foyer, and we see the little table there, and

16  we turn to your right, that's the kitchen; is that

17  correct?

18  A    Yes.

19  Q    That's part of the kitchen?

20  A    Yes.

21  Q    If we look at 768A-43, that's just a different

22  view of the kitchen going down toward the hallway; is

23  that correct?

24  A    Yes.

25           THE COURT:  Ms. Norman, is this a convenient

1 place to stop for lunch.  The cafeteria downstairs

2 closes at 1:30 and it might be a good idea to let the

3 jury get down there if they want to.

4         MS. NORMAN:  I think we can stop here.  We're

5 just kind of setting up where everything is in the

6 house.

7         THE COURT:  Okay.

8         Well, you can take your notepads with you.

9 You can leave them in the jury room if you go

10 downstairs or you can go outside and then bring them

11 back when you come back.

12         We'll take one hour for lunch.  Mr. Langford

13 will tell you places to eat if you don't want to eat

14 at the cafeteria downstairs.

15         Just remain seated while the jury is being

16 excused.

17         (The jury is out at 1:00 p.m.)

18         THE COURT:  We'll take a recess for one hour.

19 Mr. Jones, you're still in the middle of your

20 testimony.  So you shouldn't be talking to anybody

21 about it.  You can't.  Except the lawyers, of course,

22 in the case.  All right?

23         THE WITNESS:  Yes.

24         THE COURT:  All right.  We'll be in recess.

25         (Luncheon recess taken from 1:00 p.m. to 2:05

1    p.m.)

2              THE COURT:  All right.  Mr. Jones, I remind

3    you, you are under the same oath you took earlier

4    today.

5    BY MS. NORMAN:

6    Q    Okay.  Where we left off, I believe, is this is a

7    picture I think you said of the hallway; is that

8    correct?

9    A    Yes.

10   Q    And the big white thing to our right is your

11   refrigerator at the end of the kitchen counter?

12   A    Yes.

13   Q    Then the hallway takes a sharp right.  What's down

14   that hallway?

15   A    Bedroom, bathroom and laundry room.

16   Q    Okay.  I'm going to show you what's been marked as

17   Government's Exhibit 768A-45.  Is that the rest of the

18   hallway?

19   A    Yes.

20   Q    Okay.  Now, when you guys left the house earlier

21   in the evening, basically the day before, was that

22   door laying in the hallway like that?

23   A    No.

24   Q    When you look down the hallway, you see the

25   bathroom with the light on.  What's the room to the

1  left?  You see a doorway there.  What's the room to

2  the left?

3  A    My bedroom.

4  Q    Is there anything else back there in that part of

5  the house?

6  A    Where?  To the left?

7  Q    Correct, to the left.

8  A    No, just my bedroom.

9  Q    So you said the laundry, the bath, and the

10  bedroom?

11  A    Yes.

12  Q    And that's it?  What we see there, laundry to the

13  right, bath in front of us, and bedroom to the left?

14  A    Yes.

15  Q    Now, I want to go back for one second to what was

16  marked as 768A-43.  There's a contraption there in the

17  hallway.  What is that, the red thing in the picture?

18  A    It's a press.

19  Q    A what?

20  A    A press.

21  Q    What use do you have of that press?  What's the

22  purpose of having that?

23  A    It can be used for a lot of things.

24  Q    It's got a bunch of different general uses; is

25  that correct?

JONES - DIRECT                                31

1   A    Yes.

2   Q    I want to ask you a question.  The police found a

3   lot of things up in your house.  Among them did they

4   find any drugs?

5   A    Yes.

6   Q    What kind of drugs did they find?

7   A    Cocaine.

8   Q    Did they find any money in your house?

9   A    Yes.

10  Q    Approximately, how much money did they find in

11  your house?

12  A    125,000.

13  Q    Can you tell the ladies and gentlemen of the jury,

14  please, there was cocaine and money in your house why?

15  A    Because I sold drugs.

16  Q    So were you selling drugs back then in 2009?

17  A    Yes.

18  Q    Who, if anybody, was your partner or somebody that

19  you operated with or put your money together with?

20  A    My roommate Taj.

21  Q    Taj.  What's his last name?

22  A    Gregory.

23  Q    And you both shared this house; is that correct?

24  A    Yes.

25  Q    You had leased it?

1   A    Yes.

2   Q    Taj came and moved in later?

3   A    Yes.

4   Q    Can you tell the ladies and gentlemen of the

5   jury -- of course there was drugs and money.  You said

6   you were a drug dealer.  Can you tell them a little

7   bit about what level of a drug dealer were you?  I

8   mean, were you selling a little bit here and a little

9   bit there?  Are we talking about big weights?  What

10  kind of weights are we talking about?

11  A    Ounces.

12  Q    So you would sell ounces?

13  A    Yeah.

14  Q    Would you sometimes sell more than just one ounce

15  at a time?

16  A    Maybe.

17  Q    When you say "maybe," is that because you remember

18  on occasion or --

19  A    Yeah, I remember on occasion maybe selling more

20  than one or two.

21  Q    But primarily it was one ounce at a time?

22  A    Yeah.

23  Q    In order to -- how would you get the cocaine that

24  you would sell?

25  A    We would go get it.

JONES - DIRECT                          33

1   Q    Who's we would go get it?

2   A    Me and Taj.

3   Q    When you and Taj would go get it, did you have

4   somebody nearby that you got it from or did you get it

5   from someplace else?

6   A    We would go out of town.

7   Q    When you would go out of town to get it, how much

8   would you guys try to get at one time to bring back to

9   sell?

10  A    Half a key or a key.

11       THE COURT:  Why don't you tell the jury what

12  that is because I don't think --

13       MS. NORMAN:  That was going to be my next

14  question.

15       THE COURT:  All right.

16  Q    So when you say "a key," what are you referring

17  to?  A key, what's a key?

18  A    A kilogram, a thousand grams.

19  Q    So one kilogram is equal to 1,000 grams of

20  cocaine?

21  A    Yes.

22  Q    So half a key could be 500 grams of cocaine?

23  A    Yes.

24  Q    Now, if you bought a whole kilo, would it be

25  packaged like compressed or would it be loose or would

JONES - DIRECT                                    34

1    it just depend?

2    A    It depends.

3    Q    When you got back -- when you went and picked this

4    up, where would you go back to?

5    A    To my house.

6    Q    This house on Lockett Ridge?

7    A    Yes.

8    Q    When you got back to that house, what would you do

9    with the cocaine to get it ready to sell, if anything?

10   A    Split it up.

11   Q    Repeat that because I don't think people

12   understood what you said.

13   A    Split it up like just break it down.

14   Q    Okay.  What do you mean when you say "break it

15   down"?

16   A    Break it down into like ounces.

17   Q    So when you go buy a half a kilo or if you go buy

18   a kilo, it's just one big quantity; is that right?

19   A    Yes.

20   Q    It's like one big either brick or bag or quantity?

21   A    Yes.

22   Q    And then you have to split it up to sell it?

23   A    Yes.

24   Q    And sometimes did you do something more than just

25   split it up?  Did you ever add anything to it or do

JONES - DIRECT                          35

1   anything to the cocaine before you sold it?

2   A    Yeah, sometimes we would cut it.

3   Q    Explain to the jury what that means.

4   A    Add Inositol to it.

5   Q    So Inositol is like a supplement of some sort?

6   A    Yes.

7   Q    Where do you buy that stuff?

8   A    The vitamin store.

9   Q    So you just go to a vitamin store and anybody can

10  buy Inositol?

11  A    Yes.

12  Q    Why would you use that?  What is it about Inositol

13  that makes it something you would put in your cocaine?

14  A    It was just cut.

15  Q    You call it cut because you're cutting the purity

16  of the cocaine?

17  A    Yes.

18  Q    The Inositol, what does it look like?

19  A    It looks like cocaine.

20  Q    So it's got that same sort of appearance to it?

21  A    Yes.

22  Q    Then sometimes did you guys use the press for

23  anything related to your cocaine trafficking?

24  A    Yeah.

25  Q    Tell the jury how that works.

JONES - DIRECT                     36

1    A    Well, when you cut it, you break it down.  So you

2    put it back on the press to make it one piece again.

3    Q    So what you're trying to do is compress it and

4    make it hard and caked together?

5    A    Yes.

6    Q    What's the purpose of doing that?

7    A    It sells easier.

8    Q    And it sells easier because of why?

9    A    Because people want their coke in one piece.  They

10   don't want it all chopped up.

11   Q    So they want something that's more pure?  They

12   don't want a bunch of cut in it; is that correct?

13   A    Yes.

14   Q    In your experience in drug trafficking, is cutting

15   something like that, is that common?

16   A    Yes.

17   Q    In fact, at just about every level when somebody

18   buys multiple keys, they cut it, then they sell it to

19   somebody else, and they cut it, and the next level

20   down, they cut it?

21   A    Yes.

22   Q    That's fairly common, isn't it?

23   A    Yes.

24   Q    So the press might be used to form it back to make

25   it look like it's compressed and not cut as much?

1    A    Exactly.

2    Q    Is that accurate?

3    A    Yes.

4    Q    Now, at that time, and, remember, we're talking

5    2009, back at that time, how much would a kilo cost if

6    you bought a kilo?

7    A    Anywhere from 28- to 30,000 if I can remember

8    correctly.

9    Q    During that time period, late 2008, early 2009,

10   was it easy to find cocaine?

11   A    I guess, pretty much.

12   Q    I mean, for you, did you have a hard time finding

13   it?

14   A    No.

15   Q    Now, just generally speaking, how long prior to

16   this incident, this incident occurred May 15 of 2009,

17   prior to that how long had you been selling cocaine?

18   Not necessarily just at that level.  I mean ever.  How

19   long had you been selling?

20   A    Since about 2002.

21   Q    So roughly about 6 1/2, 7 years?

22   A    Yes.

23   Q    Would that be accurate?

24   A    Yes.

25   Q    To the best of your knowledge, how long did you

JONES - DIRECT                            38

1  know that Taj Gregory was selling cocaine?

2  A    I guess around the same time.

3  Q    So you --

4  A    To my knowledge.

5  Q    To your knowledge of what he was doing?

6  A    Yes.

7  Q    And for how long did you and Taj Gregory sort of

8  partner up and work together?  How long had that been

9  going on prior to this incident?

10  A    Probably '06, '07.

11  Q    So somewhere two to three years?

12  A    Yes.

13  Q    Okay.  Now, when the police found the drugs and

14  the money in your house and they also recovered your

15  pistol from your house, is that correct?

16  A    Yes.

17  Q    What happened to you?

18  A    I was arrested.

19  Q    And you were charged, weren't you?

20  A    Yes.

21  Q    Well, can you tell the ladies and gentlemen of the

22  jury what you were charged with?

23  A    Distribution and a firearm.

24  Q    And you were charged with a felony, possess

25  cocaine with the intent to distribute, meaning it's

JONES - DIRECT                          39

1   distribution quantity?

2   A    Yes.

3   Q    And you were also charged with possession of a

4   firearm by a convicted felon; is that correct?

5   A    Yes.

6   Q    Also possession of a firearm while in possession

7   of cocaine?

8   A    Yes.

9   Q    And you were actually convicted of some of those

10  charges, weren't you?

11  A    Yes.

12  Q    Can you tell the jury which charges you were

13  convicted of?

14  A    Possession with intent and possession of a

15  firearm.

16       THE COURT:   Possession with intent to what?

17  Q    With intent to distribute?

18  A    To distribute.

19  Q    The cocaine?

20  A    Yes.

21  Q    And you were actually sentenced to serve some time

22  for that, weren't you?

23  A    Yes.

24  Q    Tell the jury how much time that you were

25  sentenced to and how much of it you had to serve.

JONES - DIRECT                           40

1   A    I was sentenced to I think it was 12 years and I

2   did 2 1/2.  I served 2 1/2.

3   Q    You actually served the 2 1/2 years?

4   A    Yes.

5   Q    When did you get out of prison for those charges?

6   A    September 17, 2012.

7   Q    And you were charged in the county of

8   Chesterfield; is that correct?

9   A    Yes.

10  Q    So you went through the state court system; is

11  that correct?

12  A    Yes.

13  Q    Now, did you receive any benefit or promises by

14  the Chesterfield Commonwealth's Attorney's Office with

15  regard to those charges if you cooperated in this

16  case?

17  A    Yes.

18  Q    Tell the jury about that.

19  A    They just said that my case wouldn't go federal if

20  I cooperated.

21  Q    Okay.  So your case would not go federal because

22  you were charged in the state already?

23  A    Yes.

24  Q    And as long as you were cooperating, your case

25  would not go federally?

JONES - DIRECT                     41

1    A    Yes.

2    Q    So you were actually convicted in the state?

3    A    Yes.

4              THE COURT:   What's the significance of a case

5    going federal to you?

6              THE WITNESS:   I guess being a convicted

7    felon, I would have received five years for the gun

8    charge.   I'm not sure.

9    Q    Generally speaking, did you think you would

10   receive more time if you went federally?

11   A    Yes.

12   Q    Now, I want to briefly show you a few more

13   pictures and would just like you to help us identify a

14   few things.   Okay?   I'm going to direct your attention

15   now to what's been marked as Government's Exhibit

16   768A-50.   There we go.   We were last looking at the

17   hallway.   Is this the doorway into your bedroom?

18   A    Yes.

19   Q    When you left the night before to go out, we

20   realize that you came in, according to your testimony,

21   early in the morning.   Was that the condition of your

22   bedroom before all of this happened?   Was your bed

23   made?   You didn't have things lying around?

24   A    Yeah, it looks pretty much like it was.

25   Q    Now, I want you to look at Government's Exhibit

JONES - DIRECT                          42

1   768A-51.  Is that pretty much the overview of your

2   room?

3   A    Yes.

4   Q    When we look at this picture, can you tell us

5   which side we're looking through the doorway?  Where

6   is the closet to the master bedroom?

7   A    To the right.

8   Q    So if you were standing where the person taking

9   the picture was, it would be right there to your

10  right?

11  A    Yes.

12  Q    Now, I want to show you what's been marked

13  768A-52.  And this appears to be a television.  If you

14  were, say, laying in the bed, you'd be looking at that

15  television, the wall there?

16  A    Yes.

17  Q    I want to direct your attention just to the left

18  of the television there.  There appears to be two

19  little plastic pieces on the wall and a line kind of

20  drawn in between.  What if anything used to be there?

21  A    I don't see what you're talking about.

22  Q    Do you see those two little pieces of plastic now

23  at the top on the wall?

24         THE COURT:  Point to them.  Won't it come up

25  on your screen?

JONES - DIRECT                    43

1   A    Yeah, I see them.

2   Q    Was there something hanging there?  As you were

3   walking out the door of your bedroom and to your right

4   as you were walking out, is that something there?

5   A    I can't even remember.  It might have been some

6   speakers.

7   Q    Let me direct your attention then to 768A-57.  Is

8   this the wall in your bedroom?

9   A    Yes.

10  Q    Now, when you look at that -- and we're going to

11  turn now to 768A-58.  If we look at that mirror, it

12  appears to be broken.  Was it like that before you

13  guys went out?

14  A    No.

15  Q    I'm going to turn now to what's been marked as

16  768A-60.  Is that the master bedroom closet?

17  A    Yes.

18  Q    So as we look at the closet, we look to the right.

19  That's the door into the bedroom?

20  A    Yes.

21  Q    And then we look and there's the closet.  Now,

22  does the closet just stop there or does it go further

23  back?  Is it a walk-in, big closet?

24  A    Yes, it's a walk-in.

25  Q    Now, I want to direct your attention to what's

1    been marked as 768A-162.  Is that your jersey?

2    A    Yes.

3    Q    It's got two holes in it.  Did they have holes in

4    it before that night?

5    A    No.

6    Q    Now I'm going to return to what's been marked as

7    Government's Exhibit 768A-190.  Sorry.  That was 192.

8    That black shoe up at the top of the closet, is that

9    your shoe at the top on the shelf, not hanging on the

10   door?

11   A    Yes, I guess.

12   Q    Yes, you guess, or if it's in there --

13   A    Yeah.  If it's in there, it's probably my shoe.

14   Q    All right.  Prior to that night, did any of your

15   shoes have bullet holes or bullets or anything like

16   that in them?

17   A    No.

18   Q    Now, I'm going to direct your attention to what's

19   been marked as Government's Exhibit 768-160.  What is

20   that, if you recognize it?

21   A    It's money.

22   Q    Do you recognize the piece of clothing it's in?

23   A    Yes.

24   Q    Is that your piece of clothing?

25   A    Yes.

JONES - DIRECT                        45

1    Q    Is that your money?

2    A    Yes.

3    Q    What did you do to raise that money or to

4    accumulate that money?

5    A    I sold drugs.

6    Q    All right.  Now I'm going to turn to what's been

7    marked as Government's Exhibit 768A-164.  That's the

8    same shirt hanging there, the plaid or checkered one?

9    A    Yes.

10   Q    Behind it there's a red jacket.  Is that your

11   jacket?

12   A    Yes.

13   Q    And the money that's in there, where did that come

14   from?

15   A    Same.

16   Q    The same as what?

17   A    Drugs.

18   Q    All right.  I'm going to turn to what's been

19   marked as Government's Exhibit 109.  What is that if

20   you can identify it?

21   A    It's an air vent.

22   Q    Is that air vent in your room or someplace else in

23   your house?

24   A    In my room.

25   Q    All right.  I'm going to show you what's been

JONES - DIRECT

1    marked as Government's Exhibit 768A-110.  What's that?

2    Do you recognize what that is?

3    A    A bag.

4    Q    Is it inside that air vent?

5    A    Yes.

6    Q    Do you know what's inside that bag?

7    A    Yes.

8    Q    Tell the ladies and gentlemen of the jury what's

9    inside that bag.

10   A    Money.

11   Q    I show you now what's been marked as Government's

12   Exhibit 768A-111.  That's the money inside the bag?

13   A    Yes.

14   Q    Where did that money come from?

15   A    Drugs.

16   Q    All right.  When you guys have all this money

17   inside your house or accumulating it, what do you do

18   with it?  Do you just spend it on clothes or do you do

19   something else with it?

20   A    Save it.

21   Q    Do you use it to restock or did you get -- in

22   other words, when you ran out of drugs to sell and you

23   went to get more, did you have to pay for those drugs

24   up front or did you get them some other way?

25   A    Pay for them.

JONES - DIRECT                47

1   Q    So if you went to buy a kilogram, you would have

2   to have $30,000 or so to go buy that kilogram; is that

3   true?

4   A    Yes.

5   Q    Now, I want to take you to what's been marked as

6   Government's Exhibit 101.

7           THE COURT:   Is that what you were going to

8   use this money for?

9           THE WITNESS:   Yes.

10  Q    All right.   Sorry.   I'm trying to get to what's

11  been marked as Government's Exhibit 768A-101.   Do you

12  recognize what part of the house this is?

13  A    It looks like by the front door.

14  Q    All right.   Let's take it a step back.   Let's look

15  at what's been marked as Government's Exhibit

16  7868A-100.   Is that --

17  A    Yes.

18  Q    That's the foyer area we were talking about

19  earlier today?

20  A    Yes.

21  Q    And that's another vent; is that correct?

22  A    Yes.

23  Q    There appears to be something in that vent as

24  well.   What is in that vent?

25  A    Money.

JONES - DIRECT                          48

1   Q    Looking at 768A-103, is that the money that was in

2   that vent?

3   A    Yes.

4   Q    Now let's go back for a second and look at

5   768A-100.  Above the vent there appears to be some

6   damage to the drywall right there.  Was that damage

7   there before this incident occurred?

8   A    No.

9   Q    Is that the area where you were struggling that

10  you testified earlier you said you were in the foyer

11  area when the guy came in?  Is that the area where the

12  struggling was taking place?

13  A    Yes.

14  Q    Now, let's go back for a moment.  We were talking

15  about your drug dealing.  Did you ever serve any

16  customers or sell with anybody inside this house?

17  A    No.

18  Q    So did you ever have friends come over at your

19  house, you know, while you were packaging or doing any

20  of those things?

21  A    No.

22  Q    So tell the ladies and gentlemen of the jury, how

23  did you try to keep this money and these drugs

24  protected?  What did you do?

25  A    Pretty much just stayed low key and out of the

JONES - DIRECT                          49

1   way.

2   Q    So when you say "low key and out of the way," you

3   mean tried not to make it obvious?

4   A    Yes.

5   Q    All right.  But, like, you did say that you had

6   been dealing since the early 2000s; is that correct?

7   So about six or seven years, right?

8   A    Yes.

9   Q    Estimate how many customers do you think you had?

10  A    I can't remember exactly.  A few.

11          THE COURT:  She asked you to estimate how

12  many.  Pick a number.  Seven, 12, 14?

13          THE WITNESS:  Between seven --

14          THE COURT:  What?

15          THE WITNESS:  Maybe about seven.

16  Q    Approximately seven?

17  A    Yes.

18  Q    During this time frame, the 2009 time frame?

19  A    Yes.

20  Q    Did you almost always deal with the same people?

21  A    Yes.

22  Q    Now, you had an alarm system?

23  A    Yes.

24  Q    During your drug trafficking experience while you

25  were drug trafficking, did you have other people rob

JONES - DIRECT                    50

1    you ever?

2    A    I've had my house broken into before.

3    Q    Was it this house or some other house?

4    A    It was another house.

5    Q    Did you ever have any issues with any of your

6    customers with regard to money or with regard to the

7    quality of the drugs you were selling?

8    A    No.

9    Q    So if you did have any issues -- you said you

10   didn't have any issues at all?  Nobody complained to

11   you?

12   A    No.

13   Q    During the course of your drug trafficking, did

14   you ever give somebody drugs to sell and then they

15   bring the money back to you or did you always sell

16   everything outright?

17   A    I sold everything outright.

18   Q    So, in other words, if you sold somebody an ounce,

19   they had to pay for the whole ounce?

20   A    Yes.

21   Q    You didn't just front it or give it to somebody

22   and say, Bring me the money back when you sell it?

23   A    No.

24   Q    One moment.

25        MS. NORMAN:  We have no further questions,

1   Your Honor.

2

3        CROSS-EXAMINATION

4   BY MR. COLLINS:

5   Q    Good afternoon, Mr. Jones.

6   A    Good afternoon.

7   Q    What else did you use that press for?

8   A    Nothing.

9   Q    So when in answer to Ms. Norman's question what is

10  a press for, you said you can use it for a lot of

11  things, that was a little disingenuous, wasn't it?

12          MS. NORMAN:  Objection, just because it's

13  argumentative and it is making commentary on the

14  testimony.

15          THE COURT:  He's on cross-examination.

16  Overruled.

17          Do you know what "disingenuous" means?

18          THE WITNESS:  No.

19          THE COURT:  Try again.

20  Q    It was a little bit of an attempt at a con, wasn't

21  it?

22  A    Not really.  She asked me what was it used for and

23  I told her it could be used for a number of things.

24  Q    What did you use it for?

25  A    I used it to press cocaine.

JONES - CROSS

1   Q   After it's been cut?

2   A   Yes.

3   Q   To make it look like it hasn't been cut?

4   A   Yes.

5   Q   To sort of con the people you're selling it to,

6   correct?

7   A   I wouldn't say con.

8   Q   Well, what would you say?

9   A   I mean, that's what they want.

10  Q   Do you tell them "I cut it with some Inositol"?

11  A   No.

12  Q   So you want them to believe it's not cut.  That's

13  why you go through the trouble of repressing it,

14  correct?

15  A   Sure.

16  Q   How many felonies have you been convicted of?

17  A   Three.

18  Q   30?

19  A   Prior to this or including this?

20  Q   Including this.

21  A   I think it's like five.

22  Q   Including other felony possession with intent to

23  distribute?

24  A   Yes.

25  Q   Other felony gun charges?

1  A    I think I do have another felony gun charge.

2          THE COURT:  Say it again.  Speak up.

3          THE WITNESS:  Yes.

4  Q    All right.  So after you get into a tussle with

5  one of these assailants, you call Michael Jones,

6  correct?

7  A    Yes.

8  Q    And was the purpose of that call to tell him to

9  come get the drugs and money out of your house?

10  A    No.

11  Q    Why did you call him?

12  A    Because I had heard gunshots and I needed somebody

13  to come up there.

14  Q    To do what?

15  A    Either to get me or see what's going on or I

16  didn't know what had happened on the inside of the

17  house.

18  Q    Why did you go to the neighbors' house?

19  A    To call the police.

20  Q    But they wouldn't let you come in and use their

21  phone?

22  A    No.

23  Q    You had a phone, did you not?

24  A    Yeah.

25  Q    Why couldn't you use that one?

JONES - CROSS                 54

1  A   I guess I just panicked and I ran and I knocked on

2  their door.

3  Q   Forgetting that you had a cell phone in your hand?

4  A   No, I didn't forget I had a cell phone in my hand.

5  I didn't have the cell phone in my hand as I was

6  running.  Once I got to the side of their porch, I

7  pulled the cell phone out and I called my cousin to

8  come up there.

9  Q   And then why was your next call not to 911?

10  A   Actually, it was.

11  Q   From your phone?

12  A   No.

13  Q   Okay.  Are you saying both of these individuals

14  had long guns?

15  A   Yes.

16  Q   Do you remember talking at some length to

17  Detective Conner?

18  A   Vaguely, yes.

19  Q   You told him, did you not, that the second one

20  that came in had a long gun, but you didn't know what

21  the other one had?  Do you remember that?

22  A   No.

23  Q   Were they both shotguns?

24  A   I can't remember, no.

25  Q   Were they both long guns?

1   A    They were big, yeah.

2   Q    Did either one have a pistol?

3   A    No.

4   Q    So then there's no reason that you can think of

5   that cartridge casings from a pistol should be found

6   outside of your house?

7   A    No.

8   Q    Eventually, you met the police at the road,

9   correct?

10  A    Yes.

11  Q    You told them two suspects had just broken into

12  your house with a gun, didn't you?

13  A    I guess that's what I said.  I don't remember

14  exactly what I said.

15  Q    Did you say anything about them saying, "You know

16  what time it is"?

17  A    Can't remember.

18  Q    You didn't mention that to those police, did you?

19  A    I can't remember.

20  Q    Then you talked with Officer Woolson, correct?

21  A    I talked to a number of police that night.

22  Q    Do you recall telling Officer Woolson two people

23  broke in your house?

24  A    I can't remember.

25  Q    You didn't tell him anyone said "You know what

1  time it is," did you?

2  A   I don't remember what was said.

3  Q   And you talked to Detective Conner, right?

4  A   Yeah.

5  Q   Talked with him for a long time, didn't you?

6  A   If that's the one I was sitting in the car with.

7  Q   Okay.  And he kept telling you you've got to tell

8  me the true story and quit BS'ing me.  It was that

9  one.  Do you remember that?

10 A   Not really.

11 Q   You didn't tell him anybody said "You know what

12 time it is," did you?

13 A   I don't remember.

14 Q   Do you remember testifying in front of the grand

15 jury?

16 A   Yes.

17 Q   You didn't tell the grand jury anybody said "You

18 know what time it is," did you?

19 A   Don't remember.

20 Q   This is the first time you've ever said that to

21 anyone that you remember, correct?

22 A   Maybe it's the first time it was asked.

23 Q   You mean all these police officers didn't ask you

24 what happened?

25 A   I mean, yeah, they asked me what happened, but

JONES - CROSS                    57

 1   they didn't ask me what was said.

 2   Q    You lied to Detective Conner repeatedly, did you

 3   not?

 4   A    Yes.

 5   Q    There even came a point, am I correct, that he

 6   called the Commonwealth's Attorney in Chesterfield and

 7   got you immunity from the charge of having a firearm

 8   after being a convicted felon, and all you had to do

 9   was tell him the truth, correct?

10   A    Got me immunity?

11   Q    Uh-huh.

12   A    What do you mean?

13   Q    Didn't he tell you that the Commonwealth's

14   Attorney in Chesterfield whom he had just talked to

15   had promised not to charge you for having a firearm

16   after being a convicted felon if you just told him the

17   truth?

18   A    I can't really remember all that.

19   Q    Well, even after that, you continued to lie to

20   him, didn't you?

21   A    Yeah.

22   Q    So is it fair to say you were conning him?

23   A    I guess.  I mean --

24   Q    You told police that a couple weeks before this

25   happened your business partner, Taj, had gotten into a

JONES - CROSS                    58

1  beef with a former dealer and gotten cut?

2          MS. NORMAN:  Objection, Your Honor.  Hearsay.

3  He's asking for an out-of-court statement by this

4  witness about something that there's no basis of even

5  having firsthand knowledge of.

6          MR. COLLINS:  It's something this witness

7  said.

8          THE COURT:  It still makes it hearsay.

9          MR. COLLINS:  The hearsay would be if I was

10 offering it for the truth of the fact that his partner

11 got cut.  I'm asking him if he mentioned that to the

12 police.

13         THE COURT:  What's the non-hearsay purpose?

14         MR. COLLINS:  To show that his impression at

15 the time was this event was retribution from a former

16 drug dealer of theirs.

17         THE COURT:  And that's what you're going to

18 connect it up with?

19         MR. COLLINS:  Yes.

20         THE COURT:  Objection overruled.

21 BY MR. COLLINS:

22 Q    So you told the police about that, correct?

23 A    About the fight with Taj and somebody else?

24 Q    Yes.

25 A    Yeah.

JONES - CROSS                    59

1   Q    And you told them you didn't know what his name

2   was, correct?

3          THE COURT:   What whose name was?

4   Q    The person who cut Taj, who you thought cut Taj.

5   You initially told the police you didn't know his

6   name; isn't that correct?

7   A    I don't remember telling him that.

8   Q    What do you remember telling them?

9   A    It's been like four years ago.  I don't remember

10  too much of -- a lot of things happened that night.

11  Q    I understand that.  Do you remember later telling

12  the police that the guy's baby mama lived in

13  Petersburg and you knew him as Meat?

14  A    Yeah, I'm pretty sure I told him that.

15  Q    And then later at the grand jury you told him the

16  guy's name was Demetrius something.

17  A    Same person.

18  Q    So you knew who it was when you said you didn't

19  know who it was, correct?

20  A    I don't remember telling him I didn't know who it

21  was.

22          THE COURT:   Are you saying that the person

23  named Meat and the person named Demetrius is the same

24  person?

25          THE WITNESS:  Yes, that's the same person

JONES - CROSS                          60

1   that Taj got in a fight with.

2   Q    Do you remember telling Detective Conner you

3   didn't think it was so bad that they would try to come

4   harm us.  Do you remember saying that?

5   A    No.

6   Q    Did you recognize either of the individuals?

7   A    No.

8   Q    Of your knowledge, had either of them been to your

9   house?

10  A    No.

11            THE COURT:  You're talking about on the night

12  of the 15th of May?

13            MR. COLLINS:  Yes, sir.  Thank you.

14  Q    You told the police you didn't know whose gun was

15  in the bedroom.  That wasn't correct, was it?

16  A    No.

17            THE COURT:  That's two questions really.  He

18  answered no, and we don't know which one the no

19  relates to.

20            Did you tell the police -- break it into two

21  questions.

22  Q    You told the police that you didn't know whose gun

23  was in the bedroom initially, correct?

24  A    Yes.

25  Q    And that was a lie, correct?

JONES - CROSS                                61

1    A    Yes.

2    Q    The police asked you, Did they say anything that

3    made you know why they were there, and you said, No.

4    Do you remember that?

5    A    No.

6    Q    You just don't remember?

7    A    No.

8    Q    Do you remember telling the police you thought the

9    guys were there because of your roommate?

10   A    Yeah, I might have said that.

11   Q    Do you remember making a written statement for the

12   Chesterfield County Police?

13   A    A written statement?  Are you sure?

14              THE COURT:  Do you have a written statement?

15              THE WITNESS:  I guess I did.  I don't

16   remember.

17              THE COURT:  Do you remember making a written

18   statement?

19              THE WITNESS:  No, I don't remember making it.

20   Q    (Handing the witness a document.)  Is that your

21   handwriting?

22   A    Yeah, that looks like my handwriting.

23   Q    What's your understanding of what that document

24   is?

25   A    Yeah.

1   Q    What is your understanding of what that document

2   is?

3   A    It's a written statement.

4   Q    All right.  Your written statement of what

5   happened?

6   A    Yes.

7   Q    Check it over carefully and let me know if you say

8   anything in there about "You know what time it is."

9   A    No.

10  Q    Thank you.

11          MR. COLLINS:  That's all I have, Judge.

12          THE COURT:  All right.

13          Any redirect?

14          MS. NORMAN:  Yes, Your Honor, briefly.

15          Are you offering that into evidence?

16          MR. COLLINS:  No.

17          Judge, I'm going to reconsider.  I am going

18  to offer this as Defendant's 1, if I may.

19          THE COURT:  Defendant's Exhibit 1 is what?

20  What is it?

21          MR. COLLINS:  Anwan Jones' written statement

22  made to the Chesterfield County Police.

23          THE COURT:  Any objection?

24          MS. NORMAN:  No objection, Your Honor.

25          THE COURT:  It's admitted as Exhibit 1 for

1    the defense.

2              (Defendant's Exhibit No. 1 is admitted into

3    evidence.)

4

5        REDIRECT EXAMINATION

6    BY MS. NORMAN:

7    Q    Mr. Jones, you just read over your written

8    statement that you made the night that all this

9    occurred; is that correct?

10   A    Yes.

11   Q    That written statement, was that made while you

12   were still at the house after this whole thing had

13   just happened?

14   A    I don't even remember when I wrote that, but it's

15   my handwriting.

16              MS. NORMAN:  Well, then if we may show the

17   witness again Defense Exhibit 1.

18   Q    If you look there at the top box, the very last

19   line of the top box, it says, "Date of incident," and

20   it says, "5-15-09," is that correct?

21   A    Yes.

22   Q    If you flip the page to page 2, down at the

23   bottom, is that your signature on it?

24   A    Well, on the second page?

25   Q    Yes, sir.

JONES - REDIRECT                     64

1   A    It's been crossed out.   I can't see.   There's no

2   name on it.

3   Q    Sorry.   Do you want to substitute --

4            MS. NORMAN:   Your Honor, he gave him a

5   redacted copy.   We can substitute an unredacted copy.

6            THE COURT:   Is that all right?

7            MR. COLLINS:   That would be my preference,

8   Judge.

9            THE COURT:   All right.   Just replace that

10  Defense Exhibit 1 with the one you've got there.

11           MS. NORMAN:   Yes, sir.

12  Q    Is that your signature at the bottom of that?

13  A    Yes.

14  Q    Beside that it has a date; is that correct?

15  A    Yes.

16  Q    What's the date there?

17  A    5-15-09.

18  Q    Then right below it, it says "witnessed," and it

19  has a date and a time.   What is the date and time?

20  A    5-15-09.   I think that's 03 or 05.   I can't really

21  make it out.

22  Q    So the time is sometime around either 05 or 03.

23  The document has the time on it?

24  A    Yes.

25  Q    So if it was three in the morning or five in the

1    morning, that would be just within a couple of hours

2    of this happening; is that correct?

3    A    Yes.

4    Q    And that statement that you made, does it ask any

5    specific questions?

6    A    No.

7    Q    It just asks what happened?

8    A    Yes.

9    Q    And it doesn't say anywhere on there what if

10   anything did the people say?

11   A    No.

12   Q    And it doesn't ask on there were you committing

13   any crimes at the time of the offense?

14   A    No.

15   Q    And it doesn't ask if you were convicted of a

16   felony?

17   A    No.

18   Q    It didn't ask whether or not you might think

19   somebody might have been motivated to do this, does

20   it?

21   A    No.

22   Q    Now, I want to take you back to what happened that

23   night.  How long do you think the whole thing lasted

24   from the time Keona Peoples was putting the key in the

25   front doors, the guys come around, you tussle, and you

1  make it to the neighbors' house?  How long did that

2  take?

3  A    A few minutes.  A couple minutes.  Not long at

4  all.

5  Q    And during the course of this happening, was there

6  ever a calm conversation between you and the two men

7  in black?

8  A    No.

9  Q    And from the moment that it occurred, was it

10  rushed and struggle or was it, hey, what's going on

11  and backing up and trying to --

12  A    No.

13  Q    Can you describe for us better like how fast this

14  all happened?

15  A    As soon as she put the key in the door, they ran

16  from the side of the house with guns drawn.

17  Q    So there was no chance to sort of whoa, stop,

18  what's going on, what's going on?

19  A    No.

20  Q    And the struggle was right there inside the door

21  where that damage was, right inside front door; is

22  that right?

23  A    Yes.

24  Q    You said you fell out of the house or back out the

25  front door that had been pushed open?

JONES - REDIRECT                            67

```
 1   A    Yes.

 2   Q    Or forced open?

 3   A    Yes.

 4   Q    And you were struggling and there was a gunshot?

 5   A    Yes.

 6   Q    You made it to the neighbors and you asked them to

 7   let you in, right?

 8   A    Yes.

 9   Q    So when you went over there, did you say, "Excuse

10   me.  Can I come in?  There's somebody in my house"?

11   Or were you more frantic than that?

12   A    I was probably a little bit more frantic than

13   that.

14   Q    So tell the jury, give them a little bit of an

15   idea of what it was you did when you went over to the

16   neighbors' house.

17   A    I think I might have even told them, Somebody is

18   trying to break in my house.  My girlfriend is in the

19   house and they've got guns.  Can I come in and call

20   the police?  And it was like, No, we can't let you in,

21   but we'll call the police.

22   Q    So they told you they were going to call the

23   police?

24   A    Yes, they did.

25   Q    So you're hiding on the deck?
```

JONES - REDIRECT                        68

1   A    Yes.

2              MR. COLLINS:  Objection to leading.

3              THE COURT:  We're going over everything that

4   was on direct, and I'm not sure that he covered all

5   that, opened all that up, and we don't need to go over

6   it again.

7              MS. NORMAN:  I believe the question I'm

8   trying to address is the question with regard to why

9   did you call your cousin, why didn't you call 911.

10             THE COURT:  Then ask him "Why didn't you call

11  your cousin?"

12             MS. NORMAN:  That question was asked.  So I'm

13  trying to clarify that the neighbors had already told

14  him they'd call.

15             THE COURT:  He said that.

16  Q    All right.  Then once the police did arrive, what

17  was the first thing you told them?

18  A    My girlfriend's in the house.

19  Q    So did you see the police go into the house?

20  A    Yes.

21  Q    Did you try to stop them from going into the

22  house?

23  A    No.

24  Q    But you sent them in, right?

25  A    Yes.

JONES - REDIRECT                        69

1   Q    At some point did they come back out?

2   A    Yes.

3   Q    Did they have your girlfriend with them?

4   A    Yes, she came out.

5   Q    Was she okay?

6   A    She was a little hysterical.

7   Q    Once they came back out, did they tell you that

8   the house was clear, nobody else was in there?

9   A    I don't remember.

10  Q    But they didn't bring anybody else out?

11  A    No, nobody else came out.

12  Q    So it was after that they asked if they could go

13  back in the house to collect evidence; is that

14  correct?

15  A    Yes.

16  Q    What did you tell them?

17  A    I remember asking them, "Evidence for what?"  And

18  they was like, "Oh, we just need to go in and get the

19  evidence for the scene of the crime" or whatever.  And

20  I was like, "okay."

21  Q    But did you want them to go in there and start

22  snooping through your house?

23  A    No, I didn't.

24  Q    Why?

25  A    Because I knew I had money in there.

1  Q    And what about drugs?

2  A    Yes.

3  Q    And what about a pistol?

4  A    Yes.

5  Q    As a convicted felon, you're not allowed to have a

6  pistol, are you?

7  A    No.

8  Q    During all those times that you talked to the

9  police, did anybody place you under oath at the scene

10  of your house and ask you questions?

11  A    No.

12  Q    And were you pretty shaken up after what had just

13  happened?

14  A    Yes.

15         MS. NORMAN:  We have nothing further, Your

16  Honor.

17         THE COURT:  Can he be excused permanently or

18  do you need him around for rebuttal?

19         MS. NORMAN:  Your Honor, before the trial

20  started, I spoke to Mr. Jones.  He would like to be

21  excused so he can go back to work, and I told him we

22  could do that as long as he was available to be

23  recalled for rebuttal.

24         MR. COLLINS:  That's fine with me, Judge.

25         THE COURT:  You're not excused.  You are free

JONES - REDIRECT                     71

1    to go back to your work, but you must be available for

2    immediate recall.  How far away are you from your

3    work?

4              THE WITNESS:  I didn't know it was going to

5    last this long.

6              THE COURT:  How far away is your work?

7              THE WITNESS:  Brooke Road.

8              THE COURT:  Okay.  So you can be back here in

9    half an hour then.

10             MS. NORMAN:  If necessary.

11             THE COURT:  You're not released from your

12   obligation to be here.  You must remain available to

13   be recalled.  And the U.S. Attorney's Office will call

14   you and tell you when to be here.  All right, sir?

15             THE WITNESS:  Yes.

16             THE COURT:  Do you understand?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  If not, you have to remain here.

19   Do you agree to do it that way?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  All right.

22             (The witness was excused from the witness

23    stand.)

24             THE COURT:  All right.  Next witness.

25             MS. NORMAN:  Thank you, Your Honor.  The

1    United States calls Keona Peoples.  Ms. Peoples.

2

3      KEONA PEOPLES, called by the United States, first

4    being duly sworn, testified as follows:

5

6      DIRECT EXAMINATION

7    BY MS. NORMAN:

8    Q    Good afternoon.

9    A    How are you doing?

10   Q    Please tell the ladies and gentlemen of the jury

11   your name.

12   A    Keona Deion Peoples.

13   Q    Can you, when you speak, speak up to the

14   microphone so that the court reporter can hear you and

15   also so the jurors can hear you?

16   A    Okay.

17           THE COURT:  Scoot up your chair a little

18   closer to the microphone, please.  And spell your

19   names, please, for the court reporter.

20   Q    Please spell your name.

21   A    Keona, K-e-o-n-a, Deion, D-e-i-o-n, Peoples,

22   P-e-o-p-l-e-s.

23   Q    Thank you.  That's much better.  I can even hear

24   you now.

25   A    Thank you.

PEOPLES - DIRECT                    73

1    Q    Now, Ms. Peoples, how old are you?

2    A    Twenty-seven.

3    Q    Back in May of 2009, were you dating Anwan Jones

4    who just walked out of here?

5    A    Yes.

6    Q    How long had y'all known each other?

7    A    Maybe like six.  Maybe three years before.

8    Q    All right.  So had you known who he was for a

9    while before you actually got to know him?

10   A    Kinda sorta.

11   Q    So from the time you got to know him, how long do

12   you think you were dating, so to speak?

13   A    Maybe 10 months.

14   Q    Was it 10 months prior to this incident in May of

15   2009?

16   A    My daughter was two years old when it happened.

17   So --

18   Q    Who's the father of your child?

19   A    Anwan.

20   Q    So Anwan Jones, who just walked out, is the father

21   of your child?

22   A    Yes.

23   Q    She was approximately two years old at the time

24   this occurred?

25   A    Yes.

PEOPLES - DIRECT                    74

1    Q    Were you actually living at Anwan's house on

2    Lockett Ridge Road?

3    A    No, I had my own place.

4    Q    That night, in the early morning hours we should

5    say, of May 15, 2009, you were with Anwan when you

6    returned to the house?

7    A    Yes.  I had got off work at maybe 10, went to the

8    house and met up with him, and we went and hung out at

9    the Locker Room, the Forest, for a few drinks.

10   Q    You said you got off work at 10, meaning 10 p.m.

11   or so?

12   A    I got off -- I probably got to the house around

13   about 10.  So I probably got off at 9 maybe.

14   Q    Do you remember where you were working at that

15   time?

16   A    At that time I was working at the Wal-Mart on

17   Mechanicsville.

18   Q    Were you working anywhere else at that time?

19   A    At that time, no.

20   Q    Okay.  So you got to his house or did you go to

21   your own house and then meet Anwan up there?

22   A    I went to his house.

23   Q    Then y'all went to the Forest?

24   A    Yes.  I still had my work clothes on.

25   Q    When you went back, was it your intent to stay at

1  Anwan's house that night?

2  A    Yes.

3  Q    When you walked in the door, do you know

4  approximately what time it was when you went to walk

5  in the front door of the house?

6  A    We left the bar around, I'd say, something to 2,

7  if almost 2.  We went to a gas station before we went

8  home.

9  Q    For what purpose, do you know?

10  A    Maybe Black and Mild cigarettes, cigars.  I'm not

11  quite sure.

12        THE COURT:  Black and Mild is a form of

13  cigar, is that what you're saying?

14        THE WITNESS:  Yes, sir.  That's why I said

15  cigarette, tobacco, cigar.

16  Q    It's kind of a thin --

17  A    Yes.  Something you smoke.

18  Q    Tell the ladies and gentlemen of the jury what

19  happened when you got to the house.

20  A    When I got to the house, I was putting the key in

21  the door and I heard some footsteps running behind

22  Anwan and that's how I got in the door.  I ran to the

23  back room.

24  Q    And you said as you went in the door, you just

25  ran?

PEOPLES - DIRECT                    76

1    A    Yeah.

2    Q    Who had the keys to open the door?

3    A    I did because I was driving the car.  So I had the

4    keys in my hand.

5    Q    I want to make sure I get this right.  I want to

6    show you what's been marked as Government's Exhibit

7    768A-25.

8              THE COURT:  Twenty what?

9              MS. NORMAN:   Twenty-five.

10   Q    Now, is that the doorway into your house?

11   A    Yes, that's the porch and that's the doorway.

12   Q    We're going to enlarge -- there appears to be

13   something right there in the middle.  Are those your

14   keys?

15   A    Yes, those are the car keys to Anwan's car, the

16   car I was driving that we had just came home from,

17   getting out of.

18   Q    So when you come in the door, you just dropped the

19   keys and ran?

20   A    I see there's a Black and Mild and see his keys,

21   so evidently once I got --

22             THE COURT:  Wait a minute.  You're talking --

23   A    I can see the keys, a cigar on the floor of the

24   doorway, so when I ran in the back, apparently I

25   dropped it as I was running.

1    Q    So what you're saying is right there where the

2    carpet -- right there is a half burnt or partially

3    smoked Black & Mild.  Is that the one you're talking

4    about?

5    A    I could have had it.

6    Q    And then those car keys are your keys?

7    A    The keys to Anwan's car.

8    Q    So when you came in, we see in this picture there

9    is like tile looking floor, the black and white tile

10   floor to your right.

11   A    That's the floor to the kitchen.

12   Q    And to get to where you ended up, you said you ran

13   to the back.  Is that the way you ran?  Down that

14   hallway?

15   A    Yes.  As you enter the kitchen, you make a left

16   and then you make a right.  There's a washer and dryer

17   to your right.  And the bedroom is to your left.  And

18   if you keep straight is the bathroom.

19   Q    When you ran back there, what was your intent?

20   Why were you running?

21   A    Because I knew that the gun was in the bedroom.

22   Q    Which gun was that that you know was in the

23   bedroom?

24   A    The gun that normally be around the house.

25   Q    What kind of a gun was it?  Do you know?

1    A    I just know it was a handgun.

2    Q    So it was something that fits in your hand.  It's

3    not like a big shotgun like with a long barrel or a

4    rifle with a long barrel?

5    A    No.

6    Q    It's just something that fits in your hand?

7    A    Yes.

8    Q    Had you ever fired that handgun before?

9    A    No, I have never fired it before because when I

10   did shoot the gun, I had a hard time shooting it

11   because I didn't know you had to actually cock it

12   back.

13   Q    Have you ever shot a shotgun before?

14   A    I never shot a gun a day in my life until that

15   night.

16   Q    Until that night?

17   A    Yes, ma'am.

18   Q    So before we get to that part, had you seen a

19   shotgun in that house earlier that day or earlier that

20   night or at any time that night other than when the

21   guys came in?

22   A    No, just that gun that's normally around the

23   house.

24   Q    And that's the handgun?

25   A    Yes.

1    Q    So you ran back to the bedroom down this hallway;

2    is that correct?

3    A    Yes, ma'am.

4    Q    And I'm going to show you what's been marked as

5    Government's Exhibit 768A-27.  That just shows the

6    curve and then the hallway to your right; is that

7    correct?

8    A    Yes.

9    Q    And that's the route you took?

10   A    Yes.

11   Q    And then I'm going to show you what's been marked

12   as Government's Exhibit 768A-45.  All right.  And

13   that's the rest of the hallway as you turn the corner

14   in the kitchen, correct?

15   A    Correct.

16   Q    And when you go to your left, that's the bedroom?

17   A    Yes.

18   Q    Now, what did you do when you ran into the

19   bedroom?  Where did you go in the bedroom?

20   A    On the side of the bed where I was hoping the gun

21   still was at.

22   Q    Which side of the bed would that be?

23   A    It was on the left side of the bed.

24   Q    So if you're facing the bed, it would be on the

25   left-hand side or the right-hand side?

1  A    When you come into the door, this is the bed.  I

2  went to the left and I came back to my right because

3  to your left is just a corner.  So I came back to my

4  right where I could stand so I can see whoever

5  approached the open doorway.  And I just stood close

6  to the back of the wall with the gun in my hand.

7  Q    So let's look at what's been marked as

8  Government's Exhibit 768A-45.  768A-50 then.  I'm

9  sorry.  What's been marked 768A-50.  There it is.  So

10 when we're looking through doorway here, you ran

11 toward that lamp that's in the back?

12 A    Yes, because around the bed is basically the same

13 as this wood, and you can sit things around the bed,

14 and that's where the gun was sitting.

15 Q    When you grabbed that, you said you came back to

16 the other side of the room; is that correct?

17 A    Yes.

18 Q    When you did that, what if anything did you see?

19 A    I stood there for quite awhile.

20 Q    When you say "quite awhile," it felt like forever?

21 A    It was like, if I can remember, it was at least

22 15, if that long.  I was afraid to go back out.

23 Q    What if anything could you hear?

24 A    I really can't remember what I -- I was just

25 shocked, and I was kind of like afraid, and I really

PEOPLES - DIRECT                    81

1    didn't know what to do.  So as far as what I could

2    hear, I can't remember.

3    Q    All right.  At some point did you see somebody

4    back toward the bedroom?

5    A    Yes.

6    Q    Tell the ladies and gentlemen of the jury what you

7    saw.

8    A    A guy with a gun.

9    Q    Where was he and what was he doing?

10   A    He came to the door, the bedroom door where I was

11   standing, and once he approached the door, I just

12   started shooting the gun until I couldn't shoot it no

13   more.

14   Q    When you first started, could you shoot it?

15   A    I couldn't shoot it.  So I pulled it back.

16   Q    When you say you pulled it back, what did you pull

17   back?

18   A    The top or the side, whatever.

19   Q    So when you look at the firearm, is it the slide

20   on top or is it the --

21   A    The slide on top.

22   Q    -- the lock on the back?

23   A    The slide on top.

24   Q    So when you did that, what happened?

25   A    The gun eventually went off.

1   Q    Prior to the gun going off, did you see or hear

2   anything else?

3   A    Just basically lights.

4   Q    When you say "basically lights," explain that to

5   the jury.

6   A    I could just hear noise and I could just see the

7   lights.  I didn't know if I was being shot at as well.

8   So I kept pulling the trigger until I couldn't no

9   more.  After I couldn't shoot no more, I just dropped

10  the gun and got in the closet.

11  Q    When this person that you see in the door, you

12  said you saw somebody coming in the doorway and you

13  were in the bedroom, what did you do or do you

14  remember?

15  A    My purpose of standing there when I got the gun

16  was to protect myself because I didn't know what

17  actually was going to happen because I know I heard

18  footsteps as we approached the door.  And I know that

19  it was more than just our footsteps.  So I was afraid

20  and I knew something was wrong.  So I just ran into

21  the bedroom.  And I was hoping and praying the gun

22  still was there.  I grabbed the gun and I stood in the

23  room and I basically --

24  Q    And that's when somebody came back?

25  A    Yes.

PEOPLES - DIRECT                    83

1    Q    Can you describe the person who came back?

2    A    A tall black guy.

3    Q    Did you get a good look at him or anything at that

4    time?

5    A    I just know he was brown skinned, tall.

6    Q    Was he carrying anything?

7    A    Yes.

8    Q    What was it that he was carrying?

9    A    A gun.

10   Q    A handgun or a long gun?

11   A    It was longer than the one I had in my hand.

12   Q    So something longer?

13   A    Yes.

14   Q    Let me show you what has been marked as

15   Government's Exhibit 62.  This is the right-hand side

16   of the bed; is that correct?

17   A    I know it's -- yes.

18   Q    That's the right-hand side.  I'm sorry.  I meant

19   to get closer.  Let me show you what's been marked as

20   Government's Exhibit 60.  And that's the closet; is

21   that correct?

22   A    Yes.

23   Q    Were you already moving toward that direction at

24   the time when all of this occurred or were you just

25   standing in the corner?

PEOPLES - DIRECT                84

1    A    I was standing closer to the bed because I was

2    afraid to come any closer.

3    Q    Now, did the guy stand there while you were

4    shooting at him or did he run or what happened?

5    A    I just know where the doorway is, the hallway

6    right there, I just could see him standing in the

7    hallway.  So, basically, he didn't get a chance to

8    come in the door.  He was right in front of the door.

9    Q    Right there in front of the doorway?

10   A    Yes.

11   Q    Or in the doorway not --

12   A    Enough where I could see his whole body before he

13   could walk up on me.

14   Q    I got you.

15        Okay.  At some point you got in the closet; is

16   that correct?

17   A    Yes, after I realized I couldn't shoot the gun no

18   more I just dropped it, and I got in the closet

19   because I was afraid to go out the door.

20   Q    All right.  And what did you do once you got in

21   the closet?  Did anybody come in there looking for

22   you?

23   A    I heard -- I got into a tub that you can like put

24   clothes and things into, and I could hear footsteps,

25   but I was on my cell phone calling family members and

1  the cops.

2  Q    Did you call 911?

3  A    Yes.

4  Q    When you call 911, could you tell them where you

5  were?

6  A    I was whispering and they was asking me to speak

7  up, and I was telling them someone was in the house,

8  and I couldn't speak as loud as they wanted me to, and

9  they kept asking me the address, and I gave them most

10 of the information that I possibly could.

11 Q    So did you end up having to actually call someone

12 else to help tell them where to come?

13 A    I really didn't.  I couldn't get no one on the

14 phone.  I tried to call -- most everyone I tried to

15 call didn't answer.

16 Q    Because it was 2 o'clock in the morning?

17 A    Yes.

18 Q    Did you call Anwan's mom?

19 A    I called her, yes.

20 Q    Was she trying to help give the address to the

21 police?

22 A    If I can remember, she could have because I didn't

23 know the address.

24 Q    What was your state of mind back then?

25 A    I was so in a state of shock.  The only thing I

PEOPLES - DIRECT                    86

1  could remember was Lucks Lane.  I couldn't remember

2  the address.  I couldn't remember nothing.

3  Q   The police did show up.  Where were you when they

4  showed up?

5  A   I stayed in the closet.

6  Q   Did the police come and get you out of the closet?

7  A   Yes.

8  Q   I want to show you what's been marked as

9  Government's Exhibit 768A-52.  Now, this is also a

10  picture of the master bedroom; is that correct?

11  A   Yes.

12  Q   And is this the light switch which is right next

13  to the door out; is that correct?

14  A   It's the opposite side of the bedroom.

15  Q   Okay.  Now, did there used to be something hanging

16  on the wall right as you were walking out of the room?

17  A   A strip pole.

18          THE COURT:  A what?

19  Q   Say that again.

20  A   A strip pole.

21  Q   And there was also something else hanging on

22  there, too, wasn't it?

23  A   A glass mirror.

24  Q   I want to show you what's been marked as

25  Government's Exhibit 55.  And if you look on the

1    ground, there's a trashcan and there's a mirror.

2    A    And the dog.

3    Q    And the dog's kennel?

4    A    He still was in there.

5    Q    All right.  So that mirror there, before you guys

6    went out that night was that mirror hanging on the

7    wall?

8    A    Yes.

9    Q    So that mirror came down off the wall during that

10   incident on May 15, 2009 at two something in the

11   morning; is that correct?

12   A    Yes, ma'am.

13   Q    Because that mirror was up on that wall just to

14   the left of where the TV; is that correct?

15   A    Yes.

16   Q    If we take a closer look at what's been marked as

17   768A-152 now, we see the top brackets that were

18   holding the mirror on the wall; is that correct?

19   A    Yes, ma'am.

20   Q    And you can also see almost the outline there of

21   the mirror if you look at the wall, correct?

22           THE COURT:  What exhibit are you talking

23   about?

24           MS. NORMAN:  768A-52.

25           THE COURT:  152 or 52?

PEOPLES - DIRECT                    88

1        MS. NORMAN:  52.

2        THE COURT:  Okay.

3   Q    Now, prior to leaving the house, were there any

4   red stains on the refrigerator, on the wall over by

5   the pool table, on the floor, or on the steps leading

6   into the house?

7   A    After the shooting or before we left the house?

8   Q    Before you left the house that night.

9   A    No, ma'am.

10  Q    Did you notice any of those things after the

11  shooting?

12  A    I didn't get a chance to really look at anything.

13  I was sitting on the bed speaking with the officer and

14  asking him was Anwan okay.  I know I sat on the bed

15  for quite awhile before they let us speak with each

16  other.  And after they spoke, I guess after they

17  was -- it was okay for us to talk with each other,

18  eventually the cop walked me outside, and me and Anwan

19  was talking.  So I didn't really look around and look

20  around nothing.  I just wanted to get up out the

21  house.

22  Q    Now, you ended up actually getting charged with

23  something as a result of all of this?

24  A    Yes.

25  Q    Can you tell the jury what you got charged with?

PEOPLES - DIRECT                              89

1   A    I can remember Section 1 and 2 drug, conspiracy,

2   manufacturing, possession of a firearm.

3   Q    And all of that related to the things that the

4   police took out of the house, the drugs, the money,

5   the gun that were taken out of the house; is that

6   correct?

7   A    Yes.

8   Q    Had you been involved with Anwan actively, you

9   know, being involved in drug trafficking at all?

10  A    No.

11  Q    Had you ever worked with Anwan in drug trafficking

12  at all?

13  A    No.

14  Q    Are you a convicted felon?

15  A    No.

16              THE COURT:  You need to speak up.

17              THE WITNESS:  No.

18  Q    So it wasn't illegal for you or unlawful for you

19  to possess a firearm, was it?

20  A    Not to my knowledge.

21  Q    Because you weren't a convicted felon at that

22  time.  Are you a convicted felon now?

23  A    No.

24  Q    But you did end up pleading guilty to a charge as

25  a result of all of this; is that correct?

PEOPLES - DIRECT                    90

1    A    Yes.

2    Q    Do you remember what charge that was?

3    A    As far as when the officers were asking me

4    about -- are you talking about charges --

5    Q    You ended up pleading guilty to something in

6    Chesterfield County Court.  Do you remember what that

7    was?

8    A    I didn't plead to anything in the court.  I just

9    said that the gun was mines when the officers asked

10   who the gun was.  I could have pled guilty to all my

11   charges.

12   Q    But most of your charges were dismissed; is that

13   correct?

14   A    Yes, ma'am.

15   Q    Was that because you were cooperating or was that

16   because you weren't involved with the drugs?

17   A    Because I wasn't involved and I was cooperating.

18   Q    And you were willing to come and cooperate; is

19   that correct?

20   A    Yes.

21   Q    Tell me if this sounds accurate, that in August of

22   2009, you were found guilty of disorderly conduct and

23   sentenced to 12 months, all 12 months suspended.

24   A    Yes.

25   Q    Does that sound accurate, as a result of

1  everything that happened that night?

2  A    Yes.

3         MS. NORMAN:  We have no further questions of

4  this witness, Your Honor.

5

6     CROSS-EXAMINATION

7  BY MR. COLLINS:

8  Q    Good afternoon, ma'am.

9       You told the jury when you first started

10 testifying you went back in the bedroom because

11 there's a gun that's always around, correct?

12 A    Not that it's always around.  It's just that I

13 knew the night when we left the house that it was in

14 the bedroom.

15 Q    It was your gun, wasn't it?

16 A    I said it was my gun, but it wasn't my gun.  I

17 just didn't want Anwan to get in trouble because I

18 knew he was a felon.

19 Q    So whose gun was it?

20 A    It's always around the house.  It could have been

21 Anwan's or whoever.

22 Q    You told the police at first it was Anwan's,

23 correct?

24 A    I could have.

25 Q    And then you told them it was yours and you had

1    gotten it about a month before for your protection.

2    A    Yes.

3    Q    Which was true?

4    A    I mean, the second time when I said I was just

5    trying to protect Anwan, but as far as who the gun

6    was, it could have been Anwan's, but it was around the

7    house, so I assumed it was Anwan's.

8    Q    So --

9    A    Other people stay in the house.

10   Q    In order to protect Anwan, you were willing to lie

11   to the police that were investigating this, correct?

12   A    After -- before I spoke with the police and they

13   told me it was okay to tell the truth.

14   Q    Did you ultimately tell the truth about the gun?

15   A    After I spoke with my attorney.

16   Q    When was that?

17   A    When I was in jail.

18           THE COURT:  When you were what?

19           THE WITNESS:  When I was in jail.

20   Q    So that was sometime after this incident?

21   A    Most likely.

22   Q    It wasn't that night, though, was it?

23   A    No.

24   Q    So you didn't have any problem lying to the police

25   either way, whichever lie helped out the most?

1   A    That's not true at all.  It just was that time,

2   and I didn't know if they was going to arrest Anwan,

3   and I felt like, you know, I just didn't want him to

4   get arrested because we were home.  We were going home

5   as normal people, and, you know, why should he have to

6   get locked up.  And, yes, I did lie so he wouldn't

7   have to get locked up because someone was basically

8   coming to harm us.  We were the victims.

9   Q    So to protect you or Anwan, you don't have any

10  qualms about lying?

11  A    It all depends, sir.

12  Q    Were you really normal people just coming home?

13  A    Yeah.

14  Q    You told the police that as you approached the

15  house, you looked around to make sure there was

16  nothing suspicious going on.  Why would you do that?

17  A    I told the police that I rolled around the house

18  actually.  Yes, I did.  Because it was rumors about

19  someone was coming to rob the house.

20  Q    Rumors?

21  A    Yeah.

22  Q    Where did you hear those rumors?

23  A    In the streets.  Around.  And the house just -- it

24  was always dark around the house, and we were a little

25  intoxicated.  And I was driving.  And I guess I'm a

1   paranoid person.  And when someone, you know, you hear

2   a rumor, you're going to take it and run with it.  And

3   that's the type person I am.

4   Q    When did you hear that rumor?

5   A    Back maybe a week or two before that night.

6   Q    Around the time that Taj Gregory got in a beef?

7   A    It could have been.

8   Q    Black and Milds are often used to make blunts, are

9   they not?

10  A    Sir, Black and Milds are to be smoked.  Black

11  Wrapped Dutchess are made to smoke marijuana out of.

12  Q    You never smoked marijuana out of a Black and

13  Mild?

14  A    No.

15  Q    Did you ever mention that there were drugs in the

16  house to the police?

17  A    Not to my knowledge, no.

18  Q    When you ran into the bedroom, had the shooting

19  started?

20  A    No, not with me and who I shot.

21  Q    Any shooting?

22  A    It could have been gunshots outside.  The only

23  thing I remember is he was trying to shut the door,

24  but as I was running, I just didn't look back.  So I'm

25  quite sure it was gunshots.  I heard gunshots and I

1   heard -- that's why I didn't go back out the door.  I

2   was afraid.

3   Q    How many gunshots did you hear?

4   A    I can't really remember.

5   Q    The person that came into the bedroom, did he

6   shoot first or did you shoot first?

7   A    I started shooting because I seen a gun.  So I

8   didn't know if I was shot or not.  I just remember

9   shooting a gun and I can't really say.

10  Q    So you started shooting first?

11  A    Most likely.

12  Q    Do you remember telling the police you don't know

13  if you actually shot or not?

14  A    I did say that because I was so scared.  I just

15  started shooting the gun.  I didn't know if I was

16  being shot at as well.  I just started shooting the

17  gun because I was afraid.  So I could have been shot

18  at, too.  I just was able to shoot the gun.  I really

19  don't know.

20  Q    You knew you had shot the gun?

21  A    Yes.

22  Q    Then why did you lie to the police about that?

23  A    Because I was afraid.

24  Q    Of what?

25  A    I guess getting in trouble because I was shooting

1    a gun.

2    Q    So, again, if you think it's going to work to your

3    advantage, you have no qualms about lying to the

4    police, fair?

5    A    No.

6    Q    It's not?

7    A    No.

8    Q    How would you phrase it?

9    A    I mean, it was my first time getting in trouble.

10   It was my first time in some type of situation like

11   that.  So, I mean, sir, a lot of things I said I could

12   have just said because I really didn't know what to

13   say as far as yes or no, and I probably just said

14   something.   I probably wasn't even thinking.

15   Q    Did you use the remote to disarm the alarm in the

16   house?

17   A    No.

18   Q    Did the alarm get disarmed?

19   A    No.  It could have.  I don't know.  I don't ever

20   mess with the alarm.  He normally does.   It's his

21   house.

22   Q    Well, is the remote for the alarm on the same set

23   of keys as the car keys and the house keys?

24   A    Don't even know that.

25   Q    Were you waiting in the bedroom 15 seconds or 15

1    minutes?

2    A    It could have been seconds.  It could have been

3    minutes.  It was quite awhile.

4    Q    It could have been 15 seconds or it could have

5    been 15 minutes; is that your testimony?

6    A    I cannot remember how many minutes.  If you want

7    me to remember four years back and how many minutes I

8    was standing in that door in that room, sir, I

9    probably couldn't time it for you.

10              MR. COLLINS:  Thank you.

11              THE WITNESS:  You're welcome.

12              MS. NORMAN:  Just very briefly, Your Honor.

13

14    REDIRECT EXAMINATION

15   BY MS. NORMAN:

16   Q    Ms. Peoples, have you ever been shot at or been

17   around anybody who was pointing a gun at you before

18   that night?

19   A    No.

20   Q    When you came home or went to Anwan's house that

21   night, were you -- you said you were already worried

22   that he was going to get robbed.

23   A    Yes, I was.

24   Q    Not saying that those rumors were true, but that

25   you were already worried about that, correct?

JONES - REDIRECT                    98

1   A    Yes.  Every time we go to his house late at night,

2   I normally ride around the neighborhood to see what I

3   can see just before we get out because Anwan never

4   carries a gun, and I didn't want to get shot or get

5   killed.

6   Q    And so you were scared that that might happen?

7   A    Yes, I was.  And my instincts was right.

8   Q    So you go in the door or you go to unlock the

9   door, and were you already a little nervous when you

10  were unlocking the door?

11       MR. COLLINS:  Judge, objection to leading.

12       THE COURT:  Why don't you just ask her how

13  she felt.

14  Q    How did you feel when you were opening the door?

15  A    I heard footsteps, so I was afraid.

16  Q    So when you heard the footsteps, did you hear the

17  people or whatever was making the footsteps say

18  anything?

19  A    No, I just assumed it was more than one person

20  because I know once we was already on top of the

21  steps, and Anwan was like, "Oh, shit."  So I heard

22  footsteps so I hurried up and got the key in the door.

23       THE COURT:  But the question was:  Did you

24  hear those people say anything?

25       THE WITNESS:  I didn't hear the people say

1   anything only besides Anwan saying, "Oh, shit."

2   Q   Once that happened, from that point forward, was

3   everything -- was there any moment where they said,

4   Look --

5            MR. COLLINS:  Objection, leading.

6   Q   Was it calm, this scenario, or was it some other

7   emotion going on at that time once those people --

8   A   I know he couldn't shut the door because we was --

9   I was in the door.  I was running.  So he couldn't

10  shut the door.  So I know he had to have been tussling

11  or something was going on wrong is the reason why I

12  ran.

13  Q   Did Anwan or you or anybody else invite those men

14  into the house?

15  A   No.

16  Q   So you ran just straight back to the back bedroom;

17  is that correct?

18  A   Yes.

19  Q   Once you got back there and you picked up the

20  firearm, did you have time to figure out how it

21  worked?

22  A   No.

23  Q   So what did you do?

24  A   I just held it in my hand and was hoping that it

25  worked if someone was to come in the doorway.

JONES - REDIRECT                               100

1   Q    Did you pull the trigger or anything to try to

2   make it work?

3   A    Not until I saw a person.

4   Q    Once you saw the person and you pulled the

5   trigger, did it work?  Did the gun work?

6   A    No, it didn't go off when I first pulled the

7   trigger.

8   Q    When the police arrived later, how were you

9   feeling then when they got there?

10  A    I was messed up.  I was shaking.  I was nervous.

11  I was afraid.  And I didn't know if Anwan was shot.  I

12  didn't know -- I was just kind of out of my mind.

13          THE COURT:  You were kind of what?

14          THE WITNESS:  Out of it.  Out of my mind.

15          MS. NORMAN:  We have nothing further.

16          THE COURT:  Can she be permanently excused?

17          MS. NORMAN:  Your Honor, we would ask the

18  same condition as we asked with Mr. Jones, that she

19  may be free to leave.

20          THE COURT:  All right.  Ms. Peoples, you're

21  still required to be here.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  You have two choices.  You can

24  agree to come back when the United States attorney

25  calls you and be available until you're told you're

1  released or you can stay here.  Which do you want to

2  do?

3            THE WITNESS:  I'll leave.

4            THE COURT:  You can leave and go somewhere

5  and do what you want to do.

6            THE WITNESS:  I understand.  If they need me,

7  I'll come back.  I understand.  So thank you.  You

8  have a good one.

9            THE COURT:  All right.

10            (The witness was excused from the witness

11    stand.)

12            MS. NORMAN:  Your Honor, our next witness is

13  in custody.  Would this be an appropriate time for a

14  brief break?

15            THE COURT:  The witness is going to take some

16  time, you say?

17            MS. NORMAN:  I think so.

18            MR. COLLINS:  Probably will.  She's really

19  covering for me who asked for the break initially.

20            THE COURT:  All right.  We'll take a recess.

21  Twenty minutes.

22            Just take your pads with you, please.

23            (The jury is out at 3:37 p.m.)

24            THE COURT:  All right.  We'll be in recess

25  for 20 minutes.

1              (Recess at 3:40 p.m. until 4:05 p.m.)

2              THE COURT:  All right.  Next witness.

3              MS. NORMAN:  Your Honor, the United States is

4    going to call two witnesses out of order just because

5    they have family commitments tomorrow and it took a

6    little bit longer than I thought to get to this point.

7    So our next witness is Detective Margott with the

8    Chesterfield Police Department.

9              THE COURT:  All right.

10

11        MICHAEL MARGOTT, called by the United States,

12   first being duly sworn, testified as follows:

13        DIRECT EXAMINATION

14   BY MS. NORMAN:

15   Q   Good afternoon.

16   A   Good afternoon.

17   Q   Please state your name for the jury.

18   A   Detective Michael Margott.

19   Q   Where and how are you employed, sir?

20   A   Chesterfield County Police Department.  I'm a

21   career detective in the Crimes Against Persons Unit.

22   Q   I want to direct your attention back to May 15 of

23   2009.  Were you so assigned back then?

24   A   Yes, ma'am, I was.

25   Q   On that day or in the early morning hours of that

1  day, did you respond to 1453 Lockett Ridge Road in

2  Chesterfield, Virginia?

3  A    I did.

4  Q    What was your role in responding to that home?

5  A    I was tasked with assisting and executing a search

6  warrant.  Basically, the search.

7  Q    As a part of that, there were several people there

8  helping with the search; is that correct?

9  A    Yes, ma'am.

10 Q    How do several people search one house?  How does

11 that typically work so there's not a lot of confusion?

12 A    You kind of pick a room and stick to it.  Like if

13 you and I were to search a room, I would start on one

14 side and meet you in the middle.  We kind of have a

15 system so you don't overlook something.

16 Q    All right.  If you find something, do you actually

17 just take it or do you call somebody else's attention

18 to it, document it, and they take it?

19 A    We have civilian forensics who are on scene and

20 they actually come in.  If we find something, they

21 document it with photographs, and ultimately would

22 recover it for us.

23 Q    So you might locate an item, but you don't take it

24 and move it?

25 A    Correct.

1    Q    Until they've done all that?

2    A    Correct.

3    Q    I want to go back to your role at 1453 Lockett

4    Ridge Road back on May 15, 2009.  Where did you start

5    looking in the house?

6    A    Initially in the kitchen.

7    Q    Did you find anything there that was significant

8    to you?

9    A    I searched in the cabinetry.  I found a bag of

10   pills.  I also found a bag, baggie, of like a white

11   chunk substance, which I was not sure what it was.  So

12   they were documented forensically.  And I believe

13   there was a digital scale within one of the two items.

14   Q    Okay.  From the kitchen, did you then move into

15   another room?

16   A    Yes, ma'am.

17   Q    What room did you move into?

18   A    To a bedroom off of the kitchen in the rear of the

19   house.

20   Q    On the main level?

21   A    Correct.

22   Q    When you went in there and started searching, what

23   if anything did you find that was significant to you?

24   A    Along the baseboard was a register, and you could

25   see two screws on the register.  One of them was

1  partially out and it looked like somebody had been

2  going in and out of that.  The paint was chipped off

3  of it.  So I began by taking one screw out that was

4  exposed and encountered a black velvet bag inside of

5  the register.

6  Q   I want to direct your attention to what has been

7  marked for identification purposes as Government's

8  Exhibit 768A-109.  Is that the vent you're referring

9  to?

10 A   Yes, ma'am.

11 Q   If we look then to 768A-110, does that depict what

12 you saw?

13 A   Yes.

14 Q   Then I'll turn to 768A-111.  Did you open the bag

15 while you were there?

16 A   Yes.

17 Q   Then is that what was inside that?

18 A   Yes, ma'am.

19 Q   If we look closely at it, it appears, at least the

20 top bills, to be one hundreds?

21 A   Correct.

22 Q   Did you then subsequently check to see whether it

23 was all 100-dollar bills or --

24 A   I did not.  It was all banded together with a

25 rubber band.

1    Q    But you did look and it was all banded together.

2    Then forensics would have seized that item at that

3    point?

4    A    Yes, ma'am.

5    Q    Okay.  Now, I also want to direct your attention,

6    was there a closet in that room?

7    A    Yes, ma'am.

8    Q    Now, can you explain to the ladies and gentlemen

9    of the jury, was there a lot of items in that closet?

10   A    A lot of clothing and shoes.

11   Q    I want to show you what's been marked as

12   Government's Exhibit 768A-128.  Is that a view as you

13   stand at the closet door into that closet?

14   A    Yes.

15   Q    To your left-hand side, were there more piles of

16   things in that closet?

17   A    Yes, ma'am.

18   Q    Does that closet go farther back to your left?

19   A    It was a walk-in closet.  It was kind of just a

20   straight shot in, not very wide.

21   Q    So when you went into the room, when you initially

22   went into the room, it looked like the room had had

23   everything thrown all over the place or was it

24   relatively neat when you first walked in?

25   A    Relatively neat.

MARGOTT - DIRECT                    107

1  Q    Then when y'all were searching, did you remove the

2  items out of the closet?

3  A    Everything.

4  Q    What did you do with the items?

5  A    Ultimately, they were placed on the bed and it was

6  literally a mountain when we were finished.  Probably

7  about 4 or 5 feet high.

8  Q    So I want to direct your attention now to this

9  picture we're looking at.  There were some shoes and

10 things at the bottom of the closet.  We see a purple

11 bin and some other shoes.  Was there anything in and

12 around that area that immediately caught your

13 attention?

14 A    The black firearm.

15 Q    I'm going to show you what's been marked as

16 768-127.  Can you see the firearm in this picture?

17 A    Barely from this photo, but it should be -- I

18 believe it's the Timberland boots in the back.

19 Q    Where the boot is upside down?

20 A    Yes, ma'am.

21 Q    So let's look at what's been marked as

22 Government's Exhibit 131.

23 A    That would be the firearm, yes, ma'am.

24 Q    Now, when you looked at this firearm, what if

25 anything did you notice about it of significance?

1    A    The slide was locked to the back.

2    Q    Can you tell the ladies and gentlemen of the jury,

3    first of all, for those of us who don't really know

4    much about firearms, what's the slide?

5    A    It's how you charge a firearm.  If you had the

6    magazine full of bullets, you insert it into the

7    bottom of the gun, and you rack it, and it will make

8    it hot, as we call it, loaded.

9    Q    To walk us through there, if we look to the top

10   where the Nike shoe is where I just put my finger,

11   that's where you put the -- you should have a mark.

12   A    Yes, ma'am.

13   Q    That's where you put the clip?

14   A    Correct.

15   Q    And the clip is what you put all the ammunition

16   in?

17   A    Correct.

18   Q    Then the item that you were talking about, the

19   slide, will you point, just put your finger on the

20   screen of where the slide is.

21   A    (Complying.)

22   Q    Okay.  So that's the slide?

23   A    Yes, ma'am.

24   Q    Now, what's the significance of it being all the

25   way back?

1    A    Usually, it indicates that it's empty or you can

2    lock it back as being safe.

3    Q    So do you fire a firearm as a part of your job?

4    A    Frequently.

5    Q    Are you accustomed to like a semi-automatic pistol

6    like this one?

7    A    I have the same -- I don't have the same .45, but

8    I have a Glock pistol, which is the same as in the

9    picture.

10    Q    How many rounds can you put inside that cartridge

11    case?

12    A    My particular weapon I believe it's 15, and we

13    always keep one in the chamber.  So 16 total.

14    Q    So if you pull the trigger and fired all of those

15    bullets, what if anything does the pistol

16    automatically do?

17    A    They generally lock back.

18    Q    So the slide generally would lock to the back?

19    A    Yes.

20    Q    When you recovered this particular, or you found

21    this particular pistol, did you clear it after it was

22    documented?

23    A    I don't recall doing it myself.  I was in there

24    with another detective.  He may have done that.

25    Q    All right.  But was there any indication that this

1    firearm was loaded at that time with the slide locked

2    all the way back?

3    A    Not that I recall.

4    Q    Now, did you find other items in the closet that

5    were of significance to you?

6    A    There were several spent shell casings, which were

7    .45-caliber, similar to that of the caliber of the

8    firearm.

9    Q    When you say "spent shell casings" or "spent shell

10   cases," what exactly are those?

11   A    They have been fired.  Basically, it's the casing

12   with no gunpowder or bullet attached to the top of it

13   anymore.

14   Q    So it's like the little piece of metal that would

15   have held the bullet and the gunpowder and all of

16   that?

17   A    Yes, ma'am.

18   Q    Was there just like one or two or were --

19   A    There were several, if I recall, within the

20   closet.

21   Q    As you said, you were not the only one there

22   searching that area; is that correct?

23   A    Correct.

24        MS. NORMAN:  We have no further questions of

25   this witness, Your Honor.

```
 1              THE COURT:  Any questions?

 2              MR. COLLINS:  Yes, sir.

 3

 4       CROSS-EXAMINATION

 5  BY MR. COLLINS:

 6  Q    Good afternoon, sir.

 7  A    Good afternoon, sir.

 8  Q    How are you?

 9  A    I'm fine.

10  Q    You found the place to be in relatively neat

11  order?

12  A    Relatively, yes.

13  Q    Didn't look like anybody had gone through the

14  drawers or strewn clothes about looking for something?

15  A    I don't recall seeing that, no.

16  Q    Why did you have to get a search warrant?

17  A    I was called in after the fact, so I'm not really

18  sure.

19  Q    You didn't get the search warrant?

20  A    No, sir.  I was there the following morning, I

21  should say.

22              MR. COLLINS:  Thank you.  That's all I have.

23              THE WITNESS:  Yes, sir.

24              THE COURT:  Can he be permanently excused?

25              MS. NORMAN:  Yes, he may, Your Honor.
```

1    THE COURT:  Mr. Collins?

2    MR. COLLINS:  Yes.

3    THE COURT:  You're excused.  Thank you for

4  being with us, Detective Margott.

5    THE WITNESS:  Thank you.

6    (The witness was excused from the witness

7   stand.)

8    THE COURT:  Next witness.

9    MS. NORMAN:  Thank you.  The United States

10  would call retired Corporal Reed.  And I do apologize

11  for having to call her out of order, Your Honor, but

12  she has an obligation tomorrow.  So we wanted to get

13  her out as quickly as possible.

14

15    MARION REED, called by the United States, first

16  being duly sworn, testified as follows:

17

18    DIRECT EXAMINATION

19  BY MS. NORMAN:

20  Q    Good afternoon.

21  A    Good afternoon.

22  Q    Can you please tell the jury your name?

23  A    Marion Reed.

24  Q    Can you spell your first name for the court

25  reporter?

1    A    M-a-r-i-o-n.

2    Q    And how do you spell your last name?

3    A    R-e-e-d.

4    Q    On or about May 15 of 2009, where and how were you

5    employed?

6    A    I was employed by the Petersburg Police Department

7    in Petersburg, Virginia.   I was a crime scene

8    investigator.

9    Q    As a crime scene investigator, generally speaking,

10   what is your role?

11   A    To collect evidence from a crime that was

12   committed, to package the evidence, and to make sure

13   the evidence that needed to get to the state lab was

14   transported there.

15            THE COURT:   Would you pull that microphone a

16   little closer and lift it up?

17            THE WITNESS:   Sure.

18   Q    Now I want to direct your attention specifically

19   to May 15 of 2009.   On that day, did you respond to

20   the Southside Regional Medical Center in Petersburg?

21   A    I did.

22   Q    Can you tell the ladies and gentlemen of the jury

23   what the purpose of you going to the hospital was?

24   A    I was called to the hospital because we had a

25   subject that was shot with a weapon, gunshot wounds.

1    When I got to the hospital, I was shown to one of the

2    trauma units where there was a gentleman there with

3    gunshot wounds to his left arm area.

4    Q    When you went in -- when you went into that trauma

5    room, were there other people already there?

6    A    There were.

7    Q    Police officers or civilians?

8    A    There were police officers there.  Of course, the

9    hospital staff.

10   Q    When you entered, what if any evidence did you

11   seize from the trauma room?

12   A    When I went into the trauma room, I was directed

13   to -- there were several paper bags in the room that

14   had clothing articles in them and I took those.  And I

15   also collected a blood sample from the floor.

16   Q    I'm going to direct your attention specifically to

17   an item that's been marked Government's Exhibit 47.

18   Can you take a look at that and see if you recognize

19   that exhibit?

20   A    Yes, I do.

21   Q    Tell the jury, please, what Government's Exhibit

22   47 is.

23   A    It's a written property receipt that Petersburg

24   Police Department uses that lists where items were

25   taken from, the date, the time, and the list of all

REED - DIRECT                          115

1    the items that were taken.

2    Q    Is that your list of items that you took?

3    A    It is.

4    Q    And can you tell the jury generally what the

5    nature of the items were that you took?

6    A    There were clothing items.  There were -- looks

7    like three shirts.  There was a pair of pants.  There

8    was a pair of tennis shoes.  There was a facial mask,

9    and, like I said, the blood sample from the floor.

10   And I think pictures that I took I put on a CD and

11   also put them on the property receipt.

12   Q    When you collected those items, did you turn them

13   over to anybody then or did you take them back to your

14   evidence room?

15   A    Everything was taken to my evidence room and

16   packaged.  Of course, I had to air dry the clothing

17   items because they were socked with blood.  And then

18   once they were dried, they were packaged, and they

19   were placed into my evidence room at Petersburg.

20   Q    At some point were shows items released to

21   Chesterfield Police Department?

22   A    They were.

23   Q    I do want to show you, and it should come up on

24   your screen, what's been marked for identification

25   purposes as Government's Exhibit 46A.  Are those the

1    shoes that you took from the medical center that

2    night?

3    A    As I recall them, yes.

4    Q    And you took pictures of these items?

5    A    I did.  Those are my pictures, yes, ma'am.

6    Q    Was there anything particular of the shoes that

7    you found of interest as the evidence collector?

8    A    Sure.  On the left shoe, there was a glass shard

9    about an inch, maybe a little bit longer.  Looked like

10   a mirror or a piece of a mirror or something that was

11   stuck into the top.

12   Q    Of the shoe?

13   A    Yes.

14   Q    Let me show you what's been marked as Government's

15   Exhibit 46B.  Is that the item you're referring to?

16   A    Yes, ma'am.

17   Q    And you can take your finger, I think, on that

18   screen, and I think you can put a circle round the

19   item that you're referring to?

20   A    (Complying.)

21   Q    Close enough.  All right.  You said that upon

22   inspection of that it appeared to be a piece of

23   mirrored glass?

24   A    Yes, ma'am.

25   Q    We'll look at what's been marked as Government's

REED - DIRECT                   117

1   Exhibit 46C.  Is that the same item there?

2   A    It's just closer.

3   Q    And then what's been marked as Government's

4   Exhibit 46D.  And that's just a different angle?

5   A    Yes, ma'am.

6         MS. NORMAN:  Your Honor, the United States --

7   I think we're going to collectively move to admit all

8   of the photographs at one time, but I do, since we're

9   going to move to release this witness when she's

10  finished, we'd ask to go ahead and move to admit the

11  items 46A, B, C, D at this time.

12        THE COURT:  And not 47?

13        MS. NORMAN:  I'm sorry.  And Exhibit 47 as

14  well.

15        THE COURT:  I don't have 47 in my book.

16        MS. NORMAN:  It was an item of evidence, Your

17  Honor, and it's still in the evidence bag.  And it's

18  right there.  Because it's an item of evidence, it

19  wasn't opened to make copies of.

20        THE COURT:  I see.

21        (Government's Exhibits 46A, B, C, D and 47

22  were admitted into evidence.)

23        MS. NORMAN:  Thank you, Your Honor.

24        We have no furthers questions of this

25  witness.

118

1          MR. COLLINS:  I have no questions, Judge.

2          THE COURT:  Can she be excused permanently?

3          MS. NORMAN:  Yes, Your Honor.

4          THE COURT:  Thank you for being with us,

5  Corporal Reed.  You may go about your business.

6  You're released.

7          THE WITNESS:  Thank you.

8          (The witness was excused from the witness

9    stand.)

10          THE COURT:  All right.  Next witness.

11          MS. NORMAN:  The United States would call Taj

12  Gregory.

13          THE COURT:  Mr. Neal, here's 47.

14          THE CLERK:  Thank you.

15

16     TAJ GREGORY, called by the United States, first

17  being duly sworn, testified as follows:

18

19     DIRECT EXAMINATION

20  BY MS. NORMAN:

21  Q   Good afternoon.

22  A   Good afternoon.

23  Q   Can you please tell the ladies and gentlemen of

24  the jury your name?

25  A   Taj Edwin Gregory.

GREGORY - DIRECT                    119

1    Q    And, Mr. Gregory, how old are you?

2    A    Thirty-four years old.

3    Q    Now, Mr. Gregory, I see that you are wearing a

4    jump suit and that you were brought in from the back.

5    A    Yes, ma'am.

6    Q    Can you tell the ladies and gentlemen of the grand

7    jury why that is?

8    A    I'm currently incarcerated for a drug conviction

9    that occurred on -- the conviction didn't occur on

10   May 15th, but the crime occurred on May 15th.

11   Q    In other words, you were charged with a drug

12   offense that was discovered when the police showed up

13   at your house on May 15?

14   A    Yes, ma'am.

15           THE COURT:  Of 2009?

16   Q    Of 2009?

17   A    Yes, ma'am.

18   Q    All right.  I want to show you what has been

19   marked as Government's Exhibit 50, 51 and Government's

20   Exhibit 52.

21           THE COURT:  Can you clean that green stuff

22   off there?

23           MS. NORMAN:  Thank you.

24   Q    Can you identify what those documents are?

25   A    Yes, ma'am.  My plea agreement, statement of

1    facts, and the judgment in my criminal case.

2    Q    Okay.  So what's been marked as Government's

3    Exhibit 50 is your plea agreement?

4    A    Yes, ma'am.

5    Q    51 is the statement of facts?

6    A    Yes, ma'am.

7    Q    And 52 is your conviction order?

8    A    Yes, ma'am.

9    Q    And that all relates to the drugs and the money

10   that were found in your residence on May 15 of 2009;

11   is that correct?

12   A    Yes, ma'am.

13   Q    Now, you entered into a plea agreement; is that

14   correct?

15   A    Yes, ma'am.

16   Q    And as a part of that plea agreement, did you

17   agree to cooperate with the United States?

18   A    Yes, ma'am.

19   Q    And what is your hope by cooperating with the

20   United States?

21   A    Well, I have hopes to get a sentence reduction.  I

22   hope to bring closure to the case and I hope to bring

23   justice.

24   Q    All right.  And what kind of sentence did you get

25   as a result of these federal charges?

GREGORY - DIRECT                      121

1    A    120 months.   Ten years.

2    Q    So you received a 10-year sentence?

3    A    Yes, ma'am.

4    Q    And you're hoping that maybe by cooperating with

5    law enforcement and the government you can get your

6    sentence reduced?

7    A    Truthfully cooperating, yes, ma'am.

8    Q    Now, tell the ladies and gentlemen of the jury,

9    you were in fact, and you have admitted in that

10   paperwork, you were in fact dealing drugs for some

11   time; is that correct?

12   A    Yes, ma'am.

13   Q    Tell the ladies and gentlemen of the jury what

14   kind of drugs were you dealing and with whom.

15   A    I was dealing powder cocaine, crack cocaine with a

16   friend of mine, my co-defendant, Anwan Jones.

17   Q    Where were you guys living leading up to May 15 of

18   2009?

19   A    1453 Lockett Ridge Road in Chesterfield County,

20   Virginia.

21   Q    How would you-all get the drugs you were selling?

22   A    We would take a truck down Danville, Virginia,

23   purchase the drugs, come back.

24   Q    Did you buy -- you said you were dealing with

25   cocaine and crack cocaine.   Can you tell the jury just

GREGORY - DIRECT                    122

1   generally what the difference is?

2   A   Well, cocaine is in a powder form.  We would buy

3   it in powder form and bring it back and cook it up.

4   Cook up like half and half.  If we get one kilo, which

5   is 36 ounces, we'd cook 18 ounces up into crack and

6   leave the other 18 ounces in the soft, in the powder.

7   Q   Is that because different people want to buy

8   different things?

9   A   Yes, ma'am.

10  Q   Did you guys sometimes cut the coke that you

11  bought?  You would basically put some cut in there and

12  stretch it out?

13  A   Yes, ma'am.

14  Q   How long had you been dealing drugs at that point?

15  A   I've been dealing drugs since, I would say, 1997.

16  Q   So from about 1997 all the way to 2009 when this

17  all occurred?

18  A   Yes, ma'am.

19  Q   During that time, did you deal with many different

20  people?

21  A   Yes, ma'am.

22  Q   What was your experience about what people did

23  with cut, you know, with adding something, additives

24  to the cocaine to stretch it out?  Was that normal?

25  A   Yes, it was normal.  It was, like, if you -- if

1  your cocaine was good, sometimes you didn't have to do

2  it or you could do it just to make extra money.

3  That's why you put the cut in there so you can bring

4  back extra money.

5  Q   So you buy a kilo, which you said I think was

6  36 ounces?

7  A   Yes, ma'am.

8  Q   And you add some cut to it and now you've got more

9  than 36 ounces to sell?

10  A   Yes.  Like a kilo is 36 ounces.  You could put

11  9 ounces of cut on it and then you have 45 ounces for

12  the price that you only paid for the 36 ounces.

13  Q   But what happens if you try to take -- how do you

14  take cocaine powder and make it into crack cocaine?

15  A   It's a process of what's called "cooking it up."

16  You break the powder down, add the cut.  The Inositol

17  is what we would use or either sometimes baking soda

18  along with the Inositol.  And you would put it in the

19  pot with the water and put the heat on it and cook it

20  up.

21  Q   When that happens, it gets hard?

22  A   Yes, ma'am.

23  Q   Kind of chalky or hard, hopefully harder than

24  chalky?

25  A   Yes, ma'am.

GREGORY - DIRECT                    124

1    Q    Did you have different clients that bought, like,

2    cocaine powder and different clients that bought crack

3    cocaine?

4    A    Yes, ma'am.

5    Q    How much do you think you would sell to one client

6    at one time, the most that you would sell at one time?

7    A    The most I would sell is probably like 18 ounces.

8    Q    So 18 ounces being a half a kilo?

9    A    Half a kilo, yes.

10   Q    Now, in May of 2009, how much would a kilo cost

11   you to buy?

12   A    28,000.

13   Q    If you brought back a kilo and somebody wanted

14   18 ounces, half of it, how much would you charge them

15   for the half a kilo?

16   A    I would first step on it, stretch it with the

17   Inositol.

18   Q    Just so that they understand, you're going to take

19   that kilo and add some cut to it, so now you have more

20   than 36 ounces?

21   A    I have 45 ounces.

22   Q    And then what are you going to do?

23   A    I would sell the 18 ounces for a thousand dollars

24   apiece.  So I would make 18,000.  I would make 1,000

25   off of each ounce.  So I would make 18,000.

GREGORY - DIRECT                          125

1    Q    That's basically how you make your money?

2    A    Yes, ma'am.

3    Q    Now, when you were living at Lockett Ridge, how

4    long did you live there with Anwan?

5    A    I moved in with Anwan September of 2008 and I was

6    there until May 15, 2009.

7    Q    During that time period, did you ever deal with

8    people at the house at Lockett Ridge?

9    A    Yes, I would have some people come to the house.

10   Q    Were these like customers or were they friends

11   that were also getting from you?  How would you decide

12   who could come to the house and who couldn't?

13   A    Well, prior to me moving in with him, I had my own

14   house.  So I would have more people coming to my

15   house, but out of respect for his house, it was only a

16   selective few of my friends/customers, who would come.

17   Q    Those few select friends and customers, where were

18   they from?  What area?

19   A    The city of Richmond.

20   Q    What part of the city of Richmond?

21   A    The area that I was raised in like off of German

22   School Road.

23   Q    So for folks that maybe aren't from the city of

24   Richmond, is that north of the river or south of the

25   river?

GREGORY - DIRECT                    126

1    A    South of the James.

2    Q    So south of the James in the city of Richmond?

3    A    Yes, ma'am.

4    Q    Was that far from where Anwan's family lived at

5    the time?

6    A    Where his grandmother lived?

7    Q    Uh-huh.

8    A    No, it's like a one-minute walk from where --

9    Q    So pretty close?

10   A    Yeah, real close.

11   Q    All right.  So a lot of the folks that you were

12   dealing with, they were also from that area?

13   A    Yes, ma'am.

14   Q    And the folks that you allowed to come over to the

15   house on Lockett Ridge Road, those were the folks that

16   were from that area, too?

17   A    Majority of them, yes.

18   Q    When they came to your house, what kind of

19   dealings did do you at the Lockett Ridge Road house?

20   A    More so it would be like bigger sales as far as

21   weight and moneywise.

22   Q    When you say "bigger sales," you're talking about

23   at least an ounce?

24   A    At least an ounce or better, yes.

25   Q    Now, you said that you had been dealing since I

GREGORY - DIRECT                  127

1  think you said '96?

2  A   '97.

3  Q   '97?

4  A   Yes.

5  Q   Were you very well-known on the streets?

6  A   Yes.  Yeah, I was very well-known.  I was very

7  flashy.

8  Q   Did you have a nickname?

9  A   Chuck.  Hollywood.

10  Q   So is that two different nicknames?  One nickname

11  is Chuck and the other is Hollywood?

12  A   Yes, two different nicknames.

13  Q   Do you know why you got the nickname Hollywood?

14  A   Because I flashy that I was.

15  Q   Explain to the jury what that means, flashy that

16  you were.

17  A   Flashy is the kind of cars, the nice, exotic cars,

18  Lexuses, Mercedes, rims, gold chains, earrings,

19  jewelry, glasses.  You know, from the outside looking

20  in, you would look at me and be like, Well, I truly

21  believe that guy might be selling drugs as far as how

22  young I was and the possessions that I had.

23  Q   So these friends that may come over, did you tell

24  them how to get there?  Did you show them how to get

25  there?  How did they know to come to Lockett Ridge?

GREGORY - DIRECT                                        128

1    A    Yeah, I would bring them out there.

2    Q    They would follow you?

3    A    Yeah, they would either follow me or they'd be in

4    the car with me.

5    Q    Your part of the house at Lockett Ridge was the

6    upstairs; is that correct?

7    A    Yes, ma'am.

8    Q    While you were living there at Lockett Ridge, did

9    you guys store your drugs or your money at that house?

10   A    Yes, ma'am.

11   Q    Did you store it anywhere else?

12   A    Well, sometimes I would -- being that I was making

13   the majority of my sales in the city, I would take the

14   money.  I might make a sale.  Instead of having the

15   money riding around with it on my possession, I would

16   take it to my mom house, but at the end of the night I

17   would take it home to Lockett Ridge.

18   Q    So you might put it at your mom's house

19   temporarily, but that's where you kept it?

20   A    Yes, ma'am.

21   Q    Now, I want you to take a look at the -- there's

22   two men sitting at the table here to my left or to

23   your right.  The man in the striped shirt, do you

24   recognize him?

25   A    Yes, ma'am.

1   Q    Can you tell the ladies and gentlemen of the jury

2   how you recognize him?

3   A    He was a client of mine.

4   Q    What kind of a client?  You said you had big ones

5   and not so big ones.

6   A    He was a not so big one.

7   Q    Tell the ladies and gentlemen of the jury how

8   you -- how he became a client of yours?

9   A    Well, one day at the gas station, Valero, on

10  Midlothian Turnpike, in the area that I was making my

11  moves in, where I was hustling at --

12  Q    Just so they understand, making your moves or

13  hustling means selling drugs?

14  A    Selling drugs, yes.

15  Q    All right.  Go ahead.

16  A    I was approached by the individual.  He asked me

17  did I have any drugs.

18  Q    Did he actually say, "Do you have any drugs?"

19  A    "Work."

20  Q    Explain to the jury what "work" means?

21  A    "Work" is drugs, cocaine.  And so he asked me did

22  I have any work.  And I asked him was he the police.

23  And he said no.

24       I asked him what was he looking for.  He told me,

25  An 8-ball of crack, which is a small amount.

GREGORY - DIRECT                    130

1   Q    Tell the ladies and gentlemen of the jury how much

2   does an 8-ball weigh.

3   A    3.5 ounces.

4   Q    Ounces?

5   A    Grams, sorry.  3.5 grams.

6   Q    It's called an 8-ball for a reason, right?

7   A    Yes.  It's an eighth of an ounce.

8   Q    So 3.5 grams.  And why did you ask him if he was

9   the police?

10  A    Because I did not know him, and it's a question

11  that drug dealers ask before -- a lot of drug dealers

12  ask before you serve somebody that you don't know.

13  Q    Do you think they're going to tell you the truth?

14  A    No.  A lot of times they probably don't, but it

15  was still a question that I asked.

16  Q    So he said, "No, I'm not working for the police."

17  And you asked him what he wanted.  What price did you

18  quote him?

19  A    125, $125.

20  Q    For 3.5 grams?

21  A    Yes.

22  Q    You said "work."  Is there a difference between,

23  like, cocaine powder or cocaine base and crack cocaine

24  or is it all work?

25  A    It's all considered work.

GREGORY - DIRECT                            131

1   Q    How did you know what he wanted, if he wanted

2   powder or crack?

3   A    Because I asked him.  He was -- he specifically

4   said "hard," which is another word for crack.

5   Q    So hard cocaine means crack cocaine on the street?

6   A    Yes.

7   Q    Okay.  So at that point at the Valero, did you

8   actually sell him crack cocaine at the Valero?

9   A    Yes, I had it with me.

10  Q    Approximately, when did that occur?

11  A    Can you rephrase the question?

12  Q    What, like, month?

13  A    In April of 2009.

14  Q    In April of 2009.  And so that first time at the

15  Valero did he have $125 to pay you?

16  A    Yes, he had $125.

17  Q    After that did you have any more dealings with

18  him?

19  A    Yes.

20  Q    Tell the ladies and gentlemen of the jury about

21  that.

22  A    He would call me and place his order, which was

23  always the same thing, an 8-ball of crack.  And we'll

24  arrange to meet either right there at the same spot or

25  there's a Pep Boys right beside the Valero.

GREGORY - DIRECT                              132

1    Q    On Midlothian Turnpike?

2    A    On Midlothian Turnpike.  We would meet right

3    there.

4    Q    Again, for folks who might not be familiar with

5    Richmond, Midlothian Turnpike, that area is on the

6    south side of the city of Richmond?

7    A    Yes, ma'am.

8    Q    And so how many times total do you think that you

9    met up with him to make a deal?

10   A    Like five, maybe six times.  It wasn't a very

11   long-going thing.

12   Q    Tell the ladies and gentlemen of the jury why that

13   was.  Why did you stop dealing with him?

14   A    Because the first time he came with the correct

15   amount of money, but maybe like the third or fourth

16   time he would come short.

17   Q    What does that mean?

18   A    Meaning I wanted $125, but he would come with 110

19   or maybe 105, and --

20   Q    What would you do when he did that?

21   A    I would still give it to him on the strength of

22   him telling me that he would give me the rest the next

23   time he saw me.

24   Q    Did that happen?

25   A    No.

1  Q   So, basically, he was short a little bit of money.

2  He said, When I get rid of this or next time I come

3  and buy something, I'll bring you the extra money?

4  A   Yes, ma'am.

5  Q   And the next time he did not?

6  A   Yes, ma'am.

7  Q   All right.  Was there anything else that concerned

8  you about that?  I mean, about dealing with him?

9  A   That part right there was bad for business

10  because, you know, if you say you're going to have

11  something, you're going to have it.  So that part

12  right there was, you know, had me like kind of fishy

13  about keeping on dealing with him.

14  Q   So how did you go about stopping dealing with him?

15  A   I would switch up my phones on the regular and

16  when I would get a new phone for the customers who I

17  would hold onto, I would put their new numbers in my

18  new phone, and I would send them all one big text

19  message, This is my new number.  So for those I did

20  not want to continue dealing with, I would not give

21  them my new number.  So that's how I would cut ties

22  with whoever I didn't want to deal with anymore.

23  Q   So is that how you cut ties with dealing with him?

24  A   Yes, ma'am.

25  Q   Did you ever know his name?

GREGORY - DIRECT                134

1    A    C.

2    Q    Just the letter C?

3    A    C.  When I asked him his name, that's what he told

4    me he went by.  That's what he told me, C.

5    Q    Now, going back to the house on Lockett Ridge, did

6    you ever own a firearm?

7    A    No, ma'am.

8    Q    Did you carry one?

9    A    No, ma'am.

10   Q    Do you know what a shotgun is?

11   A    Yes, ma'am.

12   Q    Have you ever shot a shotgun ever?

13   A    Yeah, a long time ago.

14   Q    But nothing recently?

15   A    Nothing recently.

16   Q    When you were living at Lockett Ridge, did you

17   ever have a shotgun inside of Lockett Ridge?

18   A    No, ma'am.

19   Q    Did you ever see a shotgun inside of Lockett

20   Ridge?

21   A    No, ma'am.

22   Q    Did you ever see, hear or learn of anybody, you,

23   Anwan or anybody else who was invited to be at the

24   house, did you see them with a shotgun up inside the

25   house?

GREGORY - DIRECT                              135

1    A    No, ma'am.

2    Q    Prior to this incident, were you aware of a

3    shotgun -- prior to this, were you aware of a shotgun

4    being fired in the house?

5    A    No, ma'am.

6    Q    Now, finally, there was money taken by law

7    enforcement out of the house and it was from all

8    different places inside the house.

9    A    Yes.

10   Q    Including upstairs.

11   A    Yes.

12   Q    The money that was upstairs, was that yours?

13   A    Well, I mean, all the money was ours, but that's

14   what -- I put it upstairs, yes.  It was $40,000.

15   Q    So you had 40,000 that you had basically done your

16   share of the business?

17   A    Yes.

18   Q    That's what you had collected?

19   A    Yes, ma'am.

20   Q    And Anwan would do his share?

21   A    Yes, ma'am.

22   Q    And then what would you do?  Put the money

23   together?

24   A    When it was time for us to do our numbers, we

25   would put the money together and make sure everything

1   came out with what it was, what it was supposed to

2   have been.

3   Q   Meaning however much you needed to go re-up?

4   A   Yes, ma'am.

5   Q   Finally, I want to ask you, there was some mention

6   at some point today about there was somebody who was

7   beefing with you maybe a week or two -- the words were

8   "beefing with you" a week or two before this occurred.

9   A   Yes.

10  Q   Can you tell the ladies and gentlemen of the jury

11  who that was and what the beef was about?

12  A   It was this individual named Demetrius Roots.  He

13  goes by the name of Dog.  Him and Anwan was feuding

14  over a female.  They used to -- Demetrius and Anwan

15  used to be real tight.

16  Q   When you say "real tight," you mean they were

17  close friends?

18  A   They was real close friends.  So when me and Anwan

19  had got real tight, very, very tight, you know, they

20  are tight in their friendship kinda.

21  Q   In other words, Anwan -- if I understand what

22  you're saying, Anwan and Demetrius were pretty good

23  friends?

24  A   Yes.

25  Q   But then when you and Anwan started getting closer

GREGORY - DIRECT                 137

1    and working together and living together --

2    A    And making a lot of money together.

3    Q    -- and making a lot of money --

4    A    Yes.

5    Q    -- Mr. Roots wasn't happy about that?

6    A    No, he wasn't.

7    Q    All right.  Then you said something about a girl.

8    What happened with that?

9    A    Yeah.  Anwan and Demetrius was sleeping with the

10   same female, and the female would run back and tell

11   Anwan what Demetrius said, and if Anwan was to say

12   something about Demetrius, she would say something

13   to -- she would run back.

14   Q    Information would get back?

15   A    Yes, ma'am.

16   Q    So what happened with you and Mr. Roots?

17   A    One day I was out at Sports Zone, this is a shoe

18   store on Midlothian Turnpike, and --

19   Q    Can I ask, where on Midlothian Turnpike is it?

20   A    It was the Cloverleaf Mall then, but now it's the

21   Kroger Marketplace, the new Kroger Marketplace.  It's

22   directly across the street from that.

23   Q    Just west of Chippenham Parkway?

24   A    Yes.

25   Q    You have to go under Chippenham Parkway heading

GREGORY - DIRECT                    138

1  out of the city and it's right there on your right?

2  A    Yes, ma'am.

3  Q    All right.  So you were there and what happened?

4  A    I was there and Demetrius came into the store and

5  confronted me and an altercation occurred.

6  Q    What did Mr. Roots confront you about?

7  A    He confronted me about why -- one day I seen his

8  little cousin and his little cousin had -- we rode

9  past each other in opposite directions.  And his

10 little cousin had what you call gritted on me.  He

11 gave me a mean stare.

12 Q    The little cousin is a boy or girl?

13 A    A boy.

14 Q    What age range are we talking about?

15 A    I'm going to say he probably was like 24, maybe

16 25.  He was younger than me.

17 Q    Go ahead.

18 A    So that occurred prior to me and Demetrius'

19 altercation.  And one day I seen Demetrius's

20 girlfriend, not the one that they were sleeping with,

21 but his girlfriend, and she spoke to me, and I spoke

22 back, and she took that back to him.  So when he

23 confronted me in the store, he was like, "Why are you

24 trying to holler at my girl?  And I don't appreciate

25 you gritting on my cousin."

GREGORY - DIRECT                          139

1      And I'm like, "What is you talking about?"  He was

2  like, "You know what I'm talking about."

3      So I -- excuse my French.  I said, F your girl.  F

4  your cousin.  And an altercation occurred.  I was --

5  he cut me with a knife.

6  Q   Where did he cut you?

7  A   On the left side of my face.  I guess it was a

8  knife.  A razor or something.

9  Q   Something sharp enough to cut your skin?

10  A   Yes, ma'am.  And, you know, we got to fighting.

11  We both left out the store.  He went one way.  I went

12  to my mom house.  Then I went to Chippenham Hospital.

13  And that was the end of the altercation.

14  Q   So that altercation between you and Mr. Roots

15  wasn't about a specific drug debt or a drug deal?

16  A   No, ma'am.

17  Q   Or anything of that nature?

18  A   No, ma'am.

19  Q   But Mr. Roots had dealt with Anwan in the past?

20  A   Yes.

21  Q   And you had dealt with Mr. Roots in the past?

22  A   Yes.

23  Q   But this particular altercation wasn't related to

24  any drugs?

25  A   To any drug debt or nothing.  No, it had nothing

1  to do with drugs.

2  Q   And both you and Mr. Jones have known Mr. Roots

3  for some time?

4  A   Yes.

5         MS. NORMAN:  One moment, Your Honor.

6  Q   Now, on the night of the robbery --

7         MR. COLLINS:  Objection.

8         MS. NORMAN:  I withdraw.

9  Q   On the night of the incident on May 15 of 2009,

10  where were you?

11  A   I was at my son's mother house out Courthouse

12  Green.  That's behind Chesterfield Courthouse.  You

13  know, the courthouse out Chesterfield off of

14  Ironbridge Road.

15  Q   Were you going to head back home that night?

16  A   No.  Actually, that night we was at the bar, me

17  Anwan and Keona, at a bar called The Forest on Forest

18  Hill Avenue, and we went our separate ways.  I asked

19  him where was he going.  He said like, "Me and Keona

20  are going home."

21        And he was like, "What you doing?"  I was like,

22  "I'm going over Erica house."  That is my son's

23  mother.  And that's how the night ended.

24  Q   At some point after that somebody with the

25  Chesterfield County Police called you; is that

GREGORY - DIRECT                    141

1    correct?

2    A    Called me?

3    Q    Or somebody called you?

4    A    Yeah.   That morning when I woke up I had like

5    seven missed calls.   A couple of them was from Anwan's

6    cell phone and a couple of them was from his

7    grandmother's house.   So I called his cell phone back.

8    It was -- I guess it was like 7 or 8 o'clock in the

9    morning.   And I'm like, you know, "What's up?"

10        He was, like, "Somebody tried to rob me."

11             MR. COLLINS:   Objection, Judge.

12             THE COURT:   Why do we need to know what he

13   said?

14             MS. NORMAN:   We don't need to know what he

15   said.

16   Q    But did you speak to him?

17   A    Yes, ma'am.

18   Q    When you spoke to him, at that point did you

19   receive any information from him that the police

20   wanted to talk to you?

21   A    No, ma'am.

22   Q    At some subsequent point did you have contact with

23   the police?

24   A    Yes, ma'am.

25   Q    Now, finally with regard to that, when you got in

GREGORY - DIRECT                    142

1    the beef, for instance, the altercation with

2    Mr. Roots, did you call the police?

3    A    No, ma'am.

4    Q    Did you particularly want, did you, want the

5    police coming to the house on Lockett Ridge Road?

6    A    No, ma'am.

7    Q    Did you have a beef with anybody or a disagreement

8    with anybody about drugs or drug money other than this

9    non-drug related altercation with Mr. Roots?

10   A    No, ma'am.

11         MS. NORMAN:  We have nothing further, Your

12   Honor.

13

14         CROSS-EXAMINATION

15   BY MR. COLLINS:

16   Q    Well, you explained to Officer Spotswood that you

17   had been selling some, to use your term, "shitty work"

18   around that time, right?

19   A    If you refer to it as that.

20   Q    You referred to it as that.

21   A    Okay.

22   Q    And doesn't that sometimes cause problems in your

23   business?

24   A    Yes.

25   Q    It wouldn't be unusual for a customer to get upset

1    when they paid you good money for shitty work, would

2    it?

3    A    No, it wouldn't be unusual.

4    Q    How many felonies have you been convicted of?

5    A    This is my third.

6    Q    Well, let's see.  You had a possession of cocaine

7    in 1996, right?

8    A    As a juvenile, yes.  It would be four including

9    that one as well, yes.

10   Q    Okay.  So you got a criminal record that goes back

11   to 1996, correct?

12   A    Yes.

13   Q    Tell the ladies and gentlemen of the jury what a

14   Rule 35 is.

15   A    A Rule 35 is a motion to get your sentence, a

16   federal sentence, reduced through cooperation for the

17   government.

18   Q    And you're hoping that you get that, correct?

19   A    In hopes, yes.

20   Q    And you have been hoping that for sometime, have

21   you not?

22   A    Yes.

23   Q    In fact, you were so hoping that you initially

24   told the police that the defendant was getting drugs

25   from both you and Anwan, correct?

GREGORY - CROSS                    144

1    A    I told the police?

2    Q    Uh-huh.

3    A    If that was said, then I guess that's what was

4    said.

5    Q    And you said sometimes he would come to your

6    residence, right?

7              MS. NORMAN:  Objection, Your Honor.  If we

8    can specify exactly who he's referring to that he

9    spoke to so we're at least able to follow-up.

10             THE COURT:  You mean to know what police

11   officer the conversation is said to be with?

12             MS. NORMAN:  Yes, Your Honor.

13             THE COURT:  I think that's fair.  And roughly

14   when.  The dates would be good.

15             MS. NORMAN:  One moment, Your Honor.

16             THE COURT:  You want to talk to --

17             MS. NORMAN:  May I speak with counsel,

18   please?

19             THE COURT:  Sure.

20   BY MR. COLLINS:

21   Q    In March of this year, talking to Agent Spotswood,

22   Spotswood asked you if you knew Mr. Pernell, and you

23   said, Yes, he used to buy work from us.  Meaning you

24   and Anwan.  That's not correct, is it?

25   A    In March?  Was this during a visit or a telephone

1   conversation?

2   Q   I can't tell you that.  You were there.  I wasn't.

3   A   I talked to him on more than one occasion.

4   Q   I understand that.

5          THE COURT:  Let's try it this way:  Did you

6   ever tell him that?

7          THE WITNESS:  I informed Mr. Spotswood that C

8   would get the work from me.

9          THE COURT:  The question was:  Did you ever

10  tell Agent Spotswood that the defendant would get

11  drugs from you and Mr. Jones, i.e., from us?

12         THE WITNESS:  Yes.  Yes.  Yes.

13  Q   And you told him that he had been to your

14  residence?

15  A   Yes.  Yes.

16  Q   Later you told the police, Wait a minute.  I made

17  a mistake.  I was talking about someone else.

18  A   Yes.

19  Q   And you said, Show me some pictures.  I'll tell

20  you what you want to know.

21  A   Yes, that's correct.

22  Q   Yeah, because if you don't tell the truth, you

23  can't get your Rule 35, right?

24  A   Correct.

25         THE COURT:  What were you mistaken about?

GREGORY - CROSS                146

1   Whether he had been to your house or whether he bought

2   drugs or both?

3          THE WITNESS:  The individual who I thought

4   was Mr. Pernell because I had never actually met a

5   Robert Pernell --

6          THE COURT:  Excuse me.  My question was:  You

7   said you were wrong about it, but we don't know what

8   "it" was.  So were you wrong about Mr. Pernell having

9   come to your house?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Were you also wrong about Mr.

12   Pernell having bought drugs from you and Mr. Jones?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  So you were wrong about both

15   those things?

16          THE WITNESS:  Yes, sir.

17   BY MR. COLLINS:

18   Q    Would Anwan sometimes be at the house when you

19   would conduct business there?

20   A    Sometimes he would, but like maybe on one or two

21   occasions he was there, but I would, like, try to

22   sneak around him because I didn't even want him to

23   know that, being that he allowed me to move in with

24   him, that I was allowing people to come to his house.

25   Q    Now, did you normally sell on the street in the

GREGORY - CROSS                           147

1    same spot or area?

2    A    Yes.

3    Q    The Valero or the place next door?

4    A    I was doing business off of my cell phone.  So I

5    would meet people in that area, yes.

6    Q    So someone that bought drugs from you would know

7    where you're going to be selling, correct?

8    A    Yes.

9    Q    So preventing Mr. Pernell from having your cell

10   phone number wouldn't prevent him from coming up to

11   you on the street as you say he did the first time,

12   correct?

13   A    Can you repeat the question?

14   Q    Keeping him from having your new phone number

15   wouldn't prevent him from walking up to you at the

16   Valero as he did the first time, would it?

17   A    If he happened to saw me there, no, it wouldn't

18   prevent him.

19   Q    How many sales would you make on any given day?

20   A    I can't put a number on it.  It depends on how the

21   day went.

22   Q    Give me a good day.

23   A    Fifteen, maybe 20.

24   Q    Medium day, average day, 10?

25   A    Yeah, I guess you could say that.

GREGORY - CROSS                    148

1    Q    How many days a week were you out there?

2    A    Seven days a week.

3    Q    So during medium traffic, 70 customers a week?

4    A    No, not 70 customers.  The same customer might

5    come back three or four times a day.  I wasn't dealing

6    with 70 different individuals.

7    Q    Seventy different sales?

8    A    Seventy different sales.

9    Q    But you remember specifically what somebody you

10   didn't know said to you the first time he walked up to

11   you?

12   A    Yeah.

13   Q    Word for word?

14   A    Yeah.

15   Q    What day was it?

16   A    It was in early April.  Exactly what day?  That

17   was 3 1/2 years ago.

18   Q    How do you know it was early April?

19   A    Because that's around the time frame that it was.

20   I caught the case in May.  So I remember.

21   Q    Could it have been late March?

22   A    Early.  It was in April.

23   Q    You never showed him where you lived, correct?

24   A    Correct.

25   Q    You never told him where you lived, did you?

GREGORY - CROSS                    149

1   A    No.

2   Q    Demetrius.   When you say he did business with you,

3   he sold to you, did he not?

4   A    Yes.

5   Q    And at some point you cut him out and started

6   getting from Danville, correct?

7   A    Yes.

8   Q    And in your sort of flashy Hollywood way, you

9   always wanted him to know you were doing well without

10  him; isn't that correct?

11  A    No.

12  Q    No?   There wasn't any competition there at all?

13  A    No.

14           MR. COLLINS:   May I have a second, Judge?

15           THE COURT:   Sure.

16  BY MR. COLLINS:

17  Q    Do you remember occasionally exchanging emails

18  with Agent Spotswood?

19  A    Yes.

20  Q    I'm going to hand you one and ask you to look at

21  that and ask you if that's an email from you to Agent

22  Spotswood?

23  A    Yes.

24  Q    Read it for me, please.

25  A    The whole entire email or just the highlighted

1   area?

2   Q    The whole email.

3   A    "I know shit happens, but I was really looking

4   forward to seeing you today to go through the album

5   and discuss matters at hand.  With his date now being

6   April 30, and you coming down here two weeks before

7   his trial, then there goes my time down for being able

8   to offer what I can to help you all and my situation

9   as well.  Meaning, if he taps out between now and the

10  second week of April, I won't be able to prove to you

11  that I can identify him, and I won't be able to offer

12  whatever it is that I may have on him.  Do you feel

13  where I am coming from?  You're saying me being in

14  residence is enough, but I want to do more to secure

15  my fate.  I don't want anything to stand in the way of

16  me coming home.  Waiting on the information that I

17  provided on blank to go through and then he get

18  indicted through the grand jury is another long

19  process.  I have been waiting on this demonstration

20  with the attempted robbery for four years and now that

21  it is here, I want to be able to do all that I can to

22  bring justice to the system for his actions and to get

23  home to my elderly parents and children.  Spotswood,

24  please help me in this matter.  Get at me when you

25  can."

GREGORY - CROSS                    151

1  Q    At this point you haven't even identified anybody,

2  have you?

3  A    No.

4  Q    You're saying, Bring me some pictures so I can

5  pick somebody out for you?

6  A    Yes.

7  Q    And I'm going to do whatever I can to help you

8  out?

9  A    Yes.

10  Q    Because it's my fate that I'm interested in here?

11  A    Yes, and to bring justice to the system.

12  Q    Well, you have written to Ms. Norman as well,

13  haven't you?

14  A    Yes.

15  Q    And you're expressing some frustration that you

16  haven't gotten your Rule 35 yet?

17  A    Yes.

18  Q    And some frustration that Anwan got a small state

19  sentence while you got hammered in the feds?

20  A    Yes.

21  Q    You're not happy about that?

22  A    No.

23  Q    And you're essentially telling her, I will do

24  whatever I have to do for you to help me get my

25  sentence reduced, correct?

GREGORY - CROSS                    152

1    A    I was asking her, like, when was this going to

2    transpire so I can have some type of idea when my

3    opportunity would come for me to help myself, yes.

4    Q    You say, And I'm still willing to get debriefed

5    and provide - and you put quotes around "truthful" -

6    information.  Why did you put quotes around that?

7    A    Because I know that if I was to lie, then the

8    opportunity for me to get a Rule 35 would be out the

9    window.  So truthfully, that's why I put quotation

10   marks and --

11   Q    Well, the first time you talked to them when you

12   told them about the guy that came to your house and

13   bought from you and Anwan, that wasn't truthful, was

14   it?

15   A    It was a mistaken identity, but I discussed with

16   them -- and I let him know that I was wrong as soon as

17   I found out that I was wrong.

18   Q    Who determines whether or not you're telling the

19   truth?  Ms. Norman?

20   A    I believe the jury or the Judge.

21   Q    No.  In terms of your Rule 35.

22   A    Who's in control of it?

23   Q    Who determines whether or not you've told the

24   truth?

25   A    The courts.

1    Q    What makes you think that?

2    A    That's where I'm at.  I'm in court.  My testimony.

3    Q    What was he wearing that first day he came up to

4    you?

5    A    I can't recall.

6    Q    But you recall exactly word for word what he said?

7    A    The way the conversation went, that's what I said,

8    yes.  He asked me --

9    Q    How many conversations in your career have you had

10   just like that?

11          MS. NORMAN:  Objection.  If we could just

12   have some clarification on what conversation he's

13   referring to.

14          THE COURT:  The form of the question is the

15   objection?

16          MS. NORMAN:  Yes.

17          THE COURT:  Sustained.

18   BY MR. COLLINS:

19   Q    You testified earlier that Mr. Pernell said to you

20   on that first occasion when you asked him if he was

21   the police, and he said he wanted an 8-ball hard, how

22   many conversations like that have you had in your

23   career?

24   A    I can't recall.

25   Q    Give me an estimate.

GREGORY - CROSS                           154

1   A    I mean, I've been in the streets hustling since

2   1997, '96, '97.  I left the streets in 2009.  So

3   that's like over a 12-year period.  So to put a number

4   on that, I mean, to round it out how many each year

5   somebody approached me, I can't give you no exact

6   number.

7   Q    It's in the thousands, isn't it?

8   A    No.

9   Q    Certainly it's in the hundreds.

10  A    I wouldn't even give it that much.  I can't put an

11  exact number, but I know for sure it would not be

12  that.  Maybe not even 50.  A lot of people I dealt

13  with is people that I dealt with.  So, you know, to

14  say thousands, hundreds, no.

15  Q    Fifty?

16  A    I can't recall.

17            MR. COLLINS:  That's all.

18

19        REDIRECT EXAMINATION

20  BY MS. NORMAN:

21  Q    Mr. Gregory?

22  A    Yes, ma'am.

23  Q    Recently in approximately March, early March of

24  this year --

25  A    Yes, ma'am.

GREGORY - REDIRECT                    155

1  Q    -- did you receive information from someone close

2  to you or someone you knew trying to describe to you

3  who Robert Pernell was?

4  A    No, ma'am.

5  Q    Did somebody come to court and see Mr. Pernell?

6  A    Yes, ma'am.

7  Q    Did they try to generally describe him to you?

8  A    Yes, ma'am.

9  Q    Based on that general description, did you think

10 you knew who it was?

11 A    Based on that description, I knew that --

12 Q    Based on that description --

13         MR. COLLINS:  Let her --

14         THE COURT:  Whoa, whoa, whoa.  What's the

15 objection?

16         MR. COLLINS:  She hasn't let him answer the

17 first question.

18         MS. NORMAN:  I'm just trying to rephrase it

19 to keep it focused, Your Honor.

20         THE COURT:  Yeah, but let him testify.  So

21 don't rephrase it so you're testifying.

22         MS. NORMAN:  Yes, sir.

23 Q    At that point when you received the general

24 description, had anybody shown you a photograph --

25 A    No, ma'am.

1   Q   -- of Robert Pernell?

2   A   No, ma'am.

3   Q   At that point after someone gave you a general

4   description, did you reach out to contact or did Agent

5   Spotswood contact you?

6   A   I reached out to Agent Spotswood and informed him

7   that the person who I thought was Pernell was not

8   Pernell.

9   Q   Okay.  So you provided information to Agent

10  Spotswood about someone who you did in fact -- that

11  you and Anwan did in fact deal with?

12  A   Yes, ma'am.

13  Q   And that information that you gave Agent Spotswood

14  about that other person was in fact true information

15  or not?

16  A   True information.

17  Q   But that person, was that person Robert Pernell?

18  A   No, ma'am.

19  Q   So the information was correct.  It was just the

20  identity that was incorrect?

21  A   Yes, ma'am.

22  Q   Were you subsequently shown pictures of the person

23  that you were referring to in that first debrief?

24  A   Yes, ma'am.

25  Q   Were you able to positively identify that person?

GREGORY - REDIRECT                    157

1    A    Yes, by his name and his nickname.  By his

2    government name and his nickname, yes, ma'am.

3    Q    Was that person that you subsequently identified,

4    was that Robert Pernell?

5    A    No, ma'am.

6    Q    Were you also shown additional photographs?

7    A    Yes, ma'am.

8    Q    Was it just one, two?  How many additional

9    photographs were you shown?

10   A    I was shown three photographs altogether.

11   Q    All right.  On those photographs, were there any

12   sort of identifiers or anything like that on them?

13   A    No, ma'am.  It was just a picture.  That's it.  No

14   names, words or nothing.  Just a picture.

15   Q    At that point were you able to look at the

16   pictures and talk to Agent Spotswood about who the

17   individuals were?

18   A    Yes, ma'am.

19   Q    The first person who you had identified was not

20   Robert Pernell, was it?

21   A    No, ma'am.

22   Q    And that's the person that you provided the

23   information that Mr. Collins just asked you about?

24   A    Yes, ma'am.

25   Q    Now --

GREGORY - REDIRECT                    158

1      THE COURT:  I believe that the jury is paying

2   attention and probably has gotten all of what you're

3   talking about now for probably about the third time.

4      MS. NORMAN:  I'm sorry.

5   Q   The second photo, did you recognize the person in

6   the second photo?

7   A   Yes, ma'am.

8   Q   Was the person in the second photo somebody you

9   had dealt with before?

10  A   Yes, ma'am.

11  Q   And did you talk to Agent Spotswood about that

12  person?

13  A   Yes, ma'am.

14  Q   Did you know that person by name?

15  A   Yes, ma'am.

16  Q   Was that second photo Robert Pernell?

17  A   No, ma'am.

18  Q   Now, were you shown a third photo?

19  A   Yes, ma'am.

20  Q   Did you recognize the person in the third photo?

21  A   Yes, ma'am.

22  Q   Was that somebody you had dealt with?

23  A   Yes, ma'am.

24  Q   Did you tell Agent Spotswood about the person in

25  the third photo?

1   A    Yes, ma'am.

2   Q    And, subsequently, did you -- well, at that time

3   did you know who that person was?

4   A    Yes, ma'am.

5   Q    You had dealt with that person?

6   A    Yes, ma'am.

7   Q    And did you know -- what did you call that person?

8   How did you know that person?

9   A    I knew him as C.  I didn't know him -- that's all

10  I knew him as is C.

11  Q    That's the only name you knew him as?

12  A    Yes, ma'am.

13  Q    Did anybody tell you before you identified that

14  picture that that was a picture of Robert Pernell?

15  A    No, ma'am.

16  Q    At the time that you have told us today that you

17  were dealing with Mr. Pernell, were there other

18  individuals you were selling 8-balls to?

19  A    A few, yeah.  A couple.  But I was dealing more in

20  bigger weight.  So, you know, for a smaller sale like

21  that to come through I knew who I was dealing with.

22  Q    So it wasn't really your regular business, was it?

23  A    Dealing in weight that small, no.

24  Q    At that time in April, May 2009, before you were

25  arrested, how many 8-ball customers do you think you

GREGORY - REDIRECT                    160

1  were dealing with at that time?

2  A    Maybe three or four.

3  Q    And the other people that you were dealing weight

4  with, how many people do you think you were dealing

5  weight with?

6  A    Maybe about five, six.

7  Q    And the people you were dealing weight with, how

8  long had you been dealing weight to them?

9  A    I started selling weight in the 2005.  So I could

10 say about four years.

11        THE COURT:  Are you saying "weight" meaning

12 greater quantity of drugs?

13        THE WITNESS:  Yes, sir.

14 Q    And the word "weight" when you use that term, what

15 is the actual weight that you're talking about?

16 A    Like 28 grams or better or more.

17 Q    And 28 grams is an ounce?

18 A    Is an ounce, yes, ma'am.

19 Q    So either an ounce or more.  You said before five

20 people, six people maybe?

21 A    Yes, ma'am.

22 Q    Were all of them regulars or were there some new

23 folks in there, too?

24 A    They was all regulars.

25 Q    When were you actually convicted of this federal

1   crime?

2   A    My conviction was -- I believe I got picked up in

3   October 22, 2009.  I pled guilty April 14, 2010.  So I

4   believe it was like in February or March of 2010 when

5   I pled guilty to the crime.

6   Q    That you pled guilty.  And then sentenced in

7   April?

8   A    Sentenced April 14, 2010.

9   Q    During the course from the time you were arrested

10  on the federal charges, did you talk with agents who

11  arrested you about -- did you fully cooperate at that

12  time?

13  A    I was trying to cooperate.  I had my attorney

14  David Lassiter.  He was to get in touch with the

15  commonwealth out in Chesterfield.

16  Q    You're talking about in Chesterfield?

17  A    I was still in the state.

18  Q    Once you came over to the federal system --

19  A    Okay.  Yes.

20  Q    Once you came over to the federal system, did you

21  actually cooperate?

22  A    Yes, ma'am.

23  Q    And so your understanding of a Rule 35, is it

24  based solely on this?

25  A    On this?  No, because the information that I

1   provided when I got into federal custody was a lot of

2   drug information on people who was getting drugs from

3   me and individuals who I was buying drugs from.

4   Q    Okay.

5   A    So it was not based just on this.

6   Q    So your concern with this case isn't because -- is

7   solely, or say whether it is or not, is it because you

8   think that this case or will or will not result in a

9   Rule 35 or do you think that your other work would

10  result in a Rule 35?

11  A    I would hope that all of it would result into a

12  Rule 35.

13  Q    But this case is holding up the works; is that --

14  A    Yes, ma'am.

15  Q    Because you won't get one until everything is

16  done?

17  A    Until the case is closed, yes, ma'am.

18  Q    Until all of it is closed?

19  A    Yes, ma'am.

20  Q    What Mr. Collins read you, is that what you were

21  referring to?

22        THE COURT:  Will you let him testify about

23  why?

24        MS. NORMAN:  All right.  I'm sorry.

25  Q    Mr. Collins read you that or handed you something

GREGORY - REDIRECT                    163

1   and asked you to read it.  What were you referring to

2   there?

3   A    I was referring to all the information that I

4   provided the government to take into consideration

5   towards my Rule 35.

6   Q    At the end of the day who makes the decision on

7   whether or not you actually receive a Rule 35?

8   A    Ms. Norman.

9   Q    Me?

10  A    Yes, ma'am.

11  Q    So I file a motion for you; is that correct?

12  A    Yes, ma'am.

13  Q    If I file the motion on your behalf asking for

14  your sentence to be reduced pursuant to Rule 35, who

15  makes the decision on whether that happens?

16  A    The judge.

17  Q    Do you understand that to be the case?

18  A    Yes, ma'am.

19  Q    Now, finally, let's go back.  I believe Mr.

20  Collins asked you about working out of the Valero.

21  A    Uh-huh.

22  Q    Did you work out of the Valero?

23  A    No, ma'am.

24  Q    Explain to the jury how you worked.

25  A    I worked off of my cell phone.  My clients would

1    call me and I would meet them in a specific location.

2    It just wasn't at the Valero or the Pep Boys.  It

3    could be the Wal-Mart parking lot on Forest Hill

4    Avenue.  It could be Food Lion on Hull Street Road.

5    It could be the Skateland beside the Food Lion.  It

6    was different locations, but all in that Forest Hill

7    to Hull Street radius.

8         It wasn't like I would just meet everybody or I

9    would just stand outside the Valero gas station and

10   wait for my clients to come meet me there, no, ma'am.

11            MS. NORMAN:  We have nothing further.

12            MR. COLLINS:  Can I follow-up, Judge,

13   briefly?

14            THE COURT:  Yes.

15            MR. COLLINS:  Thank you.

16

17     RECROSS-EXAMINATION

18   BY MR. COLLINS:

19   Q    This friend that Ms. Norman referred to is

20   actually your girlfriend, right?

21            MS. NORMAN:  If he could just -- objection to

22   the form of the question.  If he could just narrow it

23   down to which friend.

24   BY MR. COLLINS:

25   Q    The friend who described someone to you --

GREGORY - RECROSS                    165

1  A   Yes.

2  Q   -- which resulted in you getting confused.  That

3  was your girlfriend, correct?

4  A   Yes.

5  Q   She would follow the court proceedings,

6  particularly out in Chesterfield, and discuss them

7  with you, correct?

8  A   No.  Out in Chesterfield?

9  Q   You didn't talk about it?

10  A   Out in Chesterfield?

11  Q   Uh-huh.

12  A   No.

13  Q   What court proceedings did she go to?

14  A   Federal court proceedings.

15  Q   And she would discuss those with you?

16  A   She would, yeah.  Yes.

17  Q   Helping you to get your Rule 35?

18  A   Keeping me updated on what was going on because I

19  couldn't be there myself.

20          MR. COLLINS:  Thank you.

21          THE COURT:  You do have the right of final

22  examination if you want it.

23

24

25      REDIRECT EXAMINATION

1    BY MS. NORMAN:

2    Q   Mr. Gregory, what did your girlfriend tell you

3    specifically about the federal court proceedings?

4    A   She would tell me when the next court date was.

5    That was basically all that had transpired from the

6    information that she gave me.

7    Q   Did she bring you a picture or draw you a picture

8    of Mr. Pernell?

9    A   No, ma'am.

10   Q   In fact, the information she gave you about what

11   Mr. Pernell looked like, was it accurate?

12   A   The person who she described wasn't the person who

13   I thought he was, who I discussed with Mr. Spotswood

14   when I got back in touch with him and told him because

15   the person who I thought it was, it was a short,

16   light-skinned guy.

17   Q   In fact, the information that you said was the

18   truth about the other guy, the one that you were

19   confused, that information would certainly be very

20   good information if it had been true about Mr.

21   Pernell, wouldn't it?

22   A   Yes, it would have been.

23           THE COURT:  That's beyond where Mr. Collins

24   went with his questions.

25           MR. COLLINS:  I just was going to ask if we

1   could swear Ms. Norman in.

2           THE COURT:  Would you like to cross-examine?

3           MS. NORMAN:  I will withdraw it, Your Honor.

4   Thank you.

5           THE COURT:  Can he be excused permanently or

6   does he need to be back here?

7           MS. NORMAN:  Yes, Your Honor, he can be

8   excused.

9           THE COURT:  All right.  Thank you very much.

10          (The witness was excused from the witness

11   stand.)

12          THE COURT:  Ladies and gentlemen, it's 5:30,

13   and you've been here a long time.  If we start a new

14   witness, we will be here after six.  So I think what

15   we'll do is adjourn for the day.

16          What we're going to do is this:  Make sure

17   you put your names on your pads, give them to Mr. Neal

18   when you go out, and he'll safeguard them and have

19   them on the table when you come back in the morning.

20          Please remember my admonitions not to discuss

21   this case with anybody, including your families.  And

22   if they want to talk about it, you just blame me, and

23   tell them I said you wouldn't talk about it.  And then

24   remember also not to be trying to do any research on

25   it.  If you want to Google, Google something like

1    what's going on in the NBA or the NFL draft or news or

2    whatever you're interested in, but stay out of this

3    case.

4            All right.  Thank you very much for paying

5    careful attention.  We will see you tomorrow morning

6    at 9:30.

7            THE JURY:  9:30?

8            THE COURT:  9:30.

9            Mr. Crowder, do you want to stay tonight and

10   get you a room?

11           JUROR CROWDER:  No, I'll come back tomorrow.

12           THE COURT:  If you want to stay tomorrow,

13   bring your stuff with you.

14           JUROR CROWDER:  I sure will.

15           THE COURT:  That's all right.

16           JUROR CROWDER:  Thank you, sir.

17           THE COURT:  Okay.

18           (The jury is excused for the evening at 5:30

19   p.m. to return tomorrow at 9:30 a.m.)

20           THE COURT:  I was going to instruct the jury,

21   give them the limiting instruction, and after hearing

22   the testimony I need to know a little bit better about

23   exactly what limiting instruction you think is

24   appropriate here based on what Mr. Gregory said and

25   where we stand.

1    MR. COLLINS:  Well --

2    THE COURT:  Because, as I understand it, he

3  backed off the statement that Mr. Pernell bought drugs

4  from Mr. Gregory and Mr. Jones.

5    MR. COLLINS:  Correct.

6    THE COURT:  And he had said that to the

7  detective or to ATF Agent Spotswood, but he backed off

8  of it and said he hadn't said that.  Am I correct in

9  understanding what he said?

10    MR. COLLINS:  I think he said he had said

11  that Mr. Pernell bought drugs from both him and Jones

12  and had been to their house, but then he later said,

13  My bad.  I was thinking about somebody else.

14    THE COURT:  Both of those things were wrong.

15    MR. COLLINS:  That's a different guy.  So the

16  only thing -- and I'd have had a problem with those

17  things.  The only thing he brings to the table is that

18  he would meet him on the street three or four times

19  and sell him drugs.  He doesn't bring him to the

20  house.  He doesn't tell him where he lives.  So it

21  can't possibly go to motive or intent or knowledge or

22  anything other than the nexus with interstate commerce

23  and that it does.

24    THE COURT:  I'm having trouble making the

25  connection to motive or intent.  He didn't even show

1    he knew where the guy lived.

2         MS. NORMAN:  And that was never our intent to

3    say that this was this seal the deal, smoking gun, so

4    to speak, piece of evidence that he had taken him to

5    the house.  That was not the intent.

6         THE COURT:  Do you agree that the only value

7    that it has is to be probative of the interstate

8    commerce connection?

9         MS. NORMAN:  I do not agree that that's the

10   only thing it's probative of.

11        THE COURT:  Well, what else is it probative

12   of and how does it get there?

13        MS. NORMAN:  Well, No. 1 is knowledge.

14        THE COURT:  Of what?

15        MS. NORMAN:  Well, knowledge of the drug

16   trafficking trade and knowledge that somebody -- I

17   mean, this was not a randomly selected house.

18        THE COURT:  He knows -- it is certainly

19   probative, the evidence we know about is certainly

20   probative that Mr. Pernell knew that Mr. Gregory was

21   involved in the drug trafficking trade.  That is

22   probative though, it seems to me, only of the

23   interstate commerce nexus, not of -- I guess, other

24   than he could know that as a seller of drugs there was

25   some money around.

1          MS. NORMAN:  Well, that's part of it, but the

2     other part of it is that Mr. Pernell made the

3     statement to the detectives that he went to that house

4     to back up his friend because Anwan had some messed up

5     product and messed up money.  It shows knowledge that

6     messed up product and messed up money referred to

7     drugs, not to chickens or grass seed.

8          THE COURT:  Yeah, but that's a statement that

9     he made to somebody else about Jones.  It doesn't have

10    anything to do with Gregory.

11         MR. COLLINS:  There's no evidence that he

12    knows Jones and Gregory even know each other.

13         THE COURT:  At this juncture I don't see that

14    evidence.  Maybe there's somebody else.  I can

15    understand the motive and the knowledge component of

16    it if there was some evidence that he knew that

17    Gregory and Jones worked together or lived together,

18    but I haven't heard that.  That's what I was waiting

19    for and I didn't hear it.

20         I'm going to give them the instruction that's

21    probative of the interstate commerce and that's all.

22         MR. COLLINS:  Thank you, Judge.

23         THE COURT:  And then the other thing I'm

24    going to do is give an instruction, and I'll add to

25    your package my standard instruction about awaiting

172

1    sentence reduction and testimony from a government

2    cooperator, and you'll get that tomorrow.  You've got

3    the rest of them.

4              MR. COLLINS:  Thank you, Judge.

5              THE COURT:  There are two standard

6    instructions that in essence say, This is what the

7    program is.  It's okay to do this, but you've got to

8    view that testimony with a jaundiced eye or with a

9    critical bent, whatever it says it says, and she'll

10   have that for you in the morning.

11             Now, how are you going to proceed tomorrow?

12   You got in five witnesses today.

13             MS. NORMAN:  The majority -- well, I should

14   say we have a number of witnesses tomorrow, but most

15   of them will be about the length of Detective

16   Margott's testimony or less.

17             THE COURT:  We don't have any more house

18   tours?

19             MS. NORMAN:  We have one more house tour,

20   Your Honor, and that's the forensic investigator who

21   had to collect all of the evidence, and that will be

22   our longest witness tomorrow.

23             THE COURT:  Does he have a diagram?

24             MS. NORMAN:  Yes.

25             THE COURT:  That says "I found all this stuff

1    here"?

2          MS. NORMAN:  Yes.

3          THE COURT:  Okay.  I think there are ways to

4    expedite that without going through the house tour.  I

5    think I could probably draw you a diagram of that

6    house and so could the jury.

7          I would like if at all possible to have this

8    case to the jury no later than Thursday morning.

9          MS. NORMAN:  Yes, sir.  I believe that our

10   evidence will be over.

11         THE COURT:  That means being ready with the

12   instructions and everything.  So I'm not going to

13   force you.  I'm not trying to force you into a

14   situation where you have to argue the case at night

15   and then keep them here.  I'm not trying to do that,

16   but I do want to move it along.

17         MS. NORMAN:  Your Honor, we do have one other

18   housekeeping activity, if you will.  My government

19   representative, Agent Spotswood, has a family

20   commitment tomorrow.  His wife has surgery in the

21   morning, and he's going to have to accompany her for

22   that.  So he won't be here in the afternoon.  He'll be

23   here in the morning but just not in the afternoon.  So

24   we'll try to wrap it up before then.

25         THE COURT:  Well, you can go on without Agent

174

1    Spotswood.

2            MS. NORMAN:  I believe so, but I wanted to

3    make sure that his absence didn't go unnoted.

4            THE COURT:  All right.  Well, we're finished

5    for the evening then.  We'll be in adjournment.

6            MS. NORMAN:  Thank you, Your Honor.

7            (The proceedings were adjourned at 5:33 p.m.)

8            I, Diane J. Daffron, certify that the

9    foregoing is a correct transcript from the record of

10   proceedings in the above-entitled matter.

11

12            /s/
     _____        _____

13    DIANE J. DAFFRON, RPR, CCR        DATE

14

15

16

17

18

19

20

21

22

23

24

25