1           IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2               RICHMOND DIVISION

3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                        :
4   UNITED STATES OF AMERICA   :
                        :
5   v.                  : Criminal No. 3:09CR452
                        :
6   ROBERT LEE PERNELL       : May 1, 2013
                        :
7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

8                    **DAY TWO**

9

10        TRANSCRIPT OF JURY TRIAL TESTIMONY
        BEFORE THE HONORABLE ROBERT E. PAYNE
11        UNITED STATES DISTRICT JUDGE

12

13

14

15   APPEARANCES:

16   OLIVIA L. NORMAN, Assistant United States Attorney
      Office of the U.S. Attorney
17   600 E. Main Street, Suite 1800
      Richmond, Virginia   23219
18
           Counsel for the United States
19
   CHRISTOPHER J. COLLINS, Esquire
20   304 E. Main Street
      Richmond, Virginia   23219
21
           Counsel for the Defendant
22

23

24           DIANE J. DAFFRON, RPR
          OFFICIAL COURT REPORTER
25        UNITED STATES DISTRICT COURT

1                        I N D E X

2
                        DIRECT   CROSS   REDIRECT   RECROSS
3
    JAMES CHAPMAN          179     190      --         --
4
    DUSTIN WOOLSON         191     199      200        --
5
    RALPH BURTON           201     211      --         --
6
    ANDREW HARRIS          214     218      --         --
7
    EDWIN JONES            219     229      --         --
8
    DAVID CLAYTON          237     --       --         --
9
    KELLY BARRETT          249     265      --         --
10
    SANDRA SIMMONS         271     321      --         --
11
    BRAD CONNER            323     338      340        --
12

13
                        E X H I B I T S
14
                                                    Page
15                   GOVERNMENT'S EXHIBITS

16  Nos. 46A-D and 47                                179

17  No.  1                                           236

18  Nos. 37-44                                       246

19  Nos. 773-1 through 773-8                         260

20  No. 28                                           263

21  Nos. 31 and 32                                   265

22  No. 224-8                                        270

23  Nos. 768-12, 768-14, 768-17 & 768-18             275

24  All exhibits starting with 768A                  278

25  No. 25                                           289

1

2                                                                    Page

3                  GOVERNMENT'S EXHIBITS (Continued)

4    No. 23                                              297

5    Nos. 8 and 9                                        300

6    No. 10                                              300

7    Nos. 13, 14 and 15                                  306

8    Nos. 17 & 20                                        307

9    No. 21                                              309

10   No. 12                                              311

11   No. 45                                              312

12   No. 26                                              314

13   No. 19                                              318

14   No. 24                                              320

15   Nos. 2, 3, 4, 5, 6, 7 & 30                          331

16   No. 48                                              334

17   No. 49                                              357

18

19

20

21

22

23

24

25

1           (The proceedings in this matter commenced at

2     9:45 a.m.   The jury is present.)

3

4           THE CLERK:   Criminal No. 3:09CR00452-01, the

5     United States of America vs. Robert Lee Pernell.

6           Mr. Olivia Hawkins represents the United

7     States.   Mr. Christopher J. Collins represents the

8     defendant.

9           Are counsel ready to proceed?

10          MS. NORMAN:   The United States is ready, Your

11    Honor.

12          MR. COLLINS:   Mr. Pernell is ready, Judge.

13          THE COURT:   Good morning, ladies and

14    gentlemen.   We're glad to have you back today.   The

15    lawyers have worked hard to try to streamline the

16    proceedings and they're going to continue to do that,

17    and they've done a good job so far.   So we'll see

18    where we're heading by the end of the day.

19          All right.   Your next witness, Ms. Hawkins.

20          MS. NORMAN:   Thank you, Your Honor.

21          The United States' next witness is Officer

22    Chapman.   And if it pleases the Court, as we wait for

23    Officer Chapman to enter, the United States would move

24    to admit the exhibits that were identified yesterday

25    by the witnesses.

1        THE COURT:  50, 51 and 52?

2        MS. NORMAN:  Yes, sir.  And also the

3   photographs marked 46A, 46B, 46C, 46D and the

4   inventory marked --

5        THE COURT:  46A through D?

6        MS. NORMAN:  Yes.  And the inventory marked

7   Exhibit 47.

8        THE COURT:  Any objections?

9        MR. COLLINS:  No, sir.

10        THE COURT:  They are all admitted.

11        (Government's Exhibits 46A-D and Exhibit 47

12    are admitted into evidence.)

13

14

15

16     JAMES CHAPMAN, called by the United States, first

17   being duly sworn, testified as follows:

18

19     DIRECT EXAMINATION

20   BY MS. NORMAN:

21   Q    Good afternoon.

22   A    Good afternoon.

23   Q    Please tell the ladies and gentlemen of the jury

24   your name and where and how you're employed.

25   A    My name is Officer James Chapman.  I'm with the

1  Chesterfield County Police Department.

2  Q    How long have you been with the Chesterfield

3  County Police Department?

4  A    Five years now.

5  Q    I want to direct your attention to May 15, 2009.

6  Were you working in the early morning hours of May 15,

7  2009?

8  A    Yes, ma'am.

9  Q    What position did you hold at that time?

10  A    I was a patrol officer.

11  Q    How long had you been a patrol officer?

12  A    About five months.

13  Q    Prior to being a patrol officer, did you have any

14  other sort of police or military training?

15  A    I was in the Army for 9 1/2 years before becoming

16  a police officer.

17        THE COURT:  Were you an MP?

18        THE WITNESS:  No, sir.

19  Q    But in the course of your employment with the

20  Army, were you trained in entering buildings and

21  trained in warfare, if you will?

22  A    Yes, ma'am, trained in close quarters combat

23  before going to Iraq for a year.

24        THE COURT:  Can you pull that microphone a

25  little bit towards you?  Thanks.

1   Q    So on May 15, 2009, did you have reason to go to

2   1453 Lockett Ridge Road in Chesterfield, Virginia?

3   A    Yes, ma'am.

4   Q    Can you tell the ladies and gentlemen of the jury

5   what did you find when you arrived there?

6   A    We responded for a shots fired call.  When we

7   arrived on the scene at Lockett Ridge, we found Anwan

8   Jones, who was in the front yard of his house.  He

9   said he was jumped after coming back from a bar by two

10  gunmen and that his girlfriend was still somewhere in

11  the house.  And he did not know where the gunman was

12  at at that time.

13  Q    All right.  You said you were encountered by Anwan

14  Jones.  Where approximately were you encountered by

15  him?

16  A    I believe it was in his front yard.

17  Q    But it was outside?

18  A    Yes, ma'am, it was outside the house.

19  Q    What was his behavior at the time?

20  A    Nervous, excited, scared.

21  Q    Was he calmly relaying this information to you?

22  A    No, ma'am.  He was, I guess for lack of a better

23  term, hysterical.

24  Q    So based on what he said -- and you said "we

25  arrived."  Was there another officer with you?

CHAPMAN - DIRECT                    182

1  A    Yes, ma'am.  Officer Woolson and myself arrived

2  within seconds of each other.

3  Q    Approximately, what time was that?

4  A    I don't recall.

5  Q    Was it --

6  A    It was in the early morning.

7          THE COURT:  How long after you got the call

8  did you get there, do you think?

9          THE WITNESS:  Five, 10 minutes, somewhere in

10 there, sir.

11 Q    All right.  So you received the call and went

12 directly there?

13 A    Yes, ma'am.

14 Q    All right.  So tell the ladies and gentlemen,

15 after you encountered Mr. Jones, what else did you

16 observe as you had first arrived at the scene?

17 A    As we went to enter the house to clear the

18 building, there was a large amount of blood on the

19 front steps and front porch leading into the house.

20 Q    Did Anwan Jones appear to have been injured?

21 A    No, ma'am, he did not.

22 Q    What did you think when you saw the blood on

23 the -- did it appear to be fresh or did it appear to

24 be something dry?

25 A    Oh, it was fresh.

CHAPMAN - DIRECT                        183

1   Q    What was the weather like at that time?

2   A    Dry.

3   Q    At that time?

4   A    Yes, ma'am.

5   Q    Tell the ladies and gentlemen of the jury how you

6   and Officer Woolson enter the house.

7   A    At the front door we announced ourselves as

8   Chesterfield County Police, come out and be

9   identified.  We screamed this three or four times

10  before making entry into the house.

11       As we made entry into the house, we saw more blood

12  on the front carpet of the family room, which was

13  directly in front of us, and to our right there was

14  the kitchen, and you could also see blood smears on

15  the refrigerator in the kitchen.

16  Q    How did you go about clearing the house?

17  A    Room to room.

18  Q    Starting with the living room?

19  A    We started with the -- because the way you looked

20  in the house, the living room was fairly open.  So we

21  could clear that room without going all the way down,

22  and there didn't appear to be any doors or anything

23  like that.  As I said, the kitchen was to our right

24  almost immediately as we entered the house.  And to

25  the right of the kitchen was a hallway which at the

CHAPMAN - DIRECT                    184

1   end you could see a bathroom.

2   Q    All right.  So what if anything did you notice

3   about the kitchen?  Anything in the kitchen that you

4   noticed?

5   A    Just the blood smear on the refrigerator and there

6   was nothing else.  I don't recall anything else.

7   Q    Did you guys go down that hallway toward the

8   bedroom?

9   A    Yes, ma'am.

10  Q    What if anything did you notice about the hallway?

11  A    When we were going down, there was a laundry room

12  on the right-hand side of the hallway, and, as I said,

13  the bathroom was at the end with the door open, and

14  there was a closed door to the left.  The laundry room

15  door was knocked off the hinges and because we could

16  see to clear the bathroom without having to make

17  entry, we made entry into the closed room that was on

18  our left-hand side, and we found a bedroom there.

19  Q    So let's go back for a brief moment.  You said the

20  closet door was knocked off the hinges?

21  A    Yes, ma'am.  Laundry room door.

22  Q    Sorry.  Laundry room door?

23  A    Yes, ma'am.

24  Q    Are they the type of doors that are on hinges on

25  one side and you open the door or is it the bifold

CHAPMAN - DIRECT                    185

1  kind?

2  A   It's the bifold kind.

3  Q   Were both of them knocked over or just one?

4  A   I remember seeing one. I'm not sure about the

5  other one.

6  Q   When you entered the room that had the closed

7  door, what if anything did you discovery in there?

8  A   When we opened the door, we saw there was a

9  knocked over trash can.  There were wall mirrors on

10  the wall, and several of those appeared to be broken,

11  and as we were entering, we could see that there were

12  large holes in the wall of the bedroom, and we could

13  also hear crying coming from the closet of that

14  bedroom.

15  Q   When you say "crying," explain to the jury what

16  kind of crying.  Was it whimpering?

17  A   It was whimpering and you could hear --

18          THE COURT:  One at a time.

19          MS. NORMAN:  I'm sorry.

20          THE WITNESS:  Sorry.

21  A   It was crying.  I don't remember the exact type,

22  but I do remember someone saying, "Help me.  Help me."

23  And that's when we opened the door and we found Ms.

24  Peoples under a pile of clothes in the closet.

25  Q   When you say you found her under a pile of

1   clothes, was she coming out of the clothes or was she

2   still in the clothes when you found her?

3   A    She was -- as we opened the door and we were

4   identifying ourselves as police officers, she began to

5   come out of the clothes.  I believe that's what

6   happened.

7   Q    Then what did you do once she came out of the

8   clothes?

9   A    We asked her if -- first, we asked her if she was

10  okay, and then we asked if the gunman was still in the

11  house, and she told us she was not sure.

12  Q    So then what if anything did you do once she said

13  she wasn't sure if they were still in the house?

14  A    We told her to wait in the closet.  We would come

15  back.  And we finished clearing the rest of the house.

16  Q    Did you find anybody else in the house?

17  A    No, ma'am, no one else was in the house.

18  Q    All right.  When you went back, was she still in

19  the closet.

20  A    Yes, ma'am.

21  Q    All right.  Tell the ladies and gentlemen of the

22  jury what you did when you went back to the closet.

23  Did you retrieve her out of there?

24  A    Yes, ma'am.

25  Q    Did you notice anything inside the closet at that

1  point?

2  A    No, ma'am.

3  Q    Once you retrieved her out of the closet, what did

4  you do with her?

5  A    We brought her out of the house.  At that point I

6  lost sight of her because Sergeant Norris arrived on

7  the scene, and I was telling him what we had at the

8  house at that time, what the situation was.

9  Q    Did you notice anything outside of the house close

10 to the front of the house other than the blood you

11 have already talked about?

12 A    Yes, ma'am.  I saw two shell casings for a .45.

13 Q    Now, you're very specific.  Shell casings for a

14 .45?

15 A    Yes, ma'am.

16 Q    Tell the ladies and gentlemen of the jury how you

17 know they were .45 shell casings.

18 A    I have three .45's myself at the house, and that's

19 my preferred gun that I shoot off duty.  And a .45 is

20 a pretty distinctive round.  So I was able to tell

21 right away that it was a .45.

22 Q    And the casing is what part -- explain to the jury

23 what a casing is, a shell casing is.

24 A    It's the part of the bullet that holds the powder

25 and the primer.  It's what's ejected out of the gun

1   after you fire a bullet or a round, excuse me, and the

2   bullet comes out of the muzzle and the barrel.  What

3   you have left over is the casing.

4   Q   And then the casing, if you have like a pistol as

5   opposed to a revolver, if you have a pistol, the

6   casing gets ejected out?

7   A   Yes, ma'am.  If you have an automatic pistol, the

8   round is ejected from the gun.

9   Q   Once you got Ms. Peoples out, you noted those

10  things, did you do anything else?

11  A   We waited for K-9 to come.  Sergeant Norris locked

12  down the house, and we were waiting for K-9 to come,

13  and once Richmond K-9 arrived on scene, I was tasked

14  to go with them on a track.

15  Q   While you were going on this track, did you see

16  anything that was of note to you?

17  A   Yes, ma'am.  Behind the house there's a creek and

18  there were several bushes there.  And when we were

19  walking we found I believe it was a black stocking

20  cap, a puddle of blood, and there was an indentation

21  where it looked like someone had fallen down in the

22  bushes and sat for at least enough time to make an

23  indentation.

24  Q   All right.  When you followed along, where did it

25  seem like the dog just stopped?

 1   A    We went up -- I believe it's Pointers Chase, I

 2   believe is the name of the road.

 3   Q    It doesn't matter what the name of the road was,

 4   per se, but is it the road that runs sort of behind

 5   the house?

 6   A    It's runs parallel to the house, yes, ma'am, and

 7   you could see drops of blood on the road.  And then it

 8   just stopped, and we continued to go past that road

 9   down -- I don't know the exact distance, but we went

10   for a little bit, and at which point the dog lost the

11   track, and we called the track because the dog lost it

12   and it started to rain.

13   Q    When you say "started to rain," was it just

14   sprinkling sort of raining or --

15   A    It started to come down fairly steady.

16   Q    Once you finished with that, did you go back and

17   speak with either Anwan Jones or Ms. Peoples at all?

18   A    I did speak with Anwan Jones.  I actually spoke to

19   him prior to doing the track with Richmond just to try

20   and get a better description of the subjects.

21   Q    Was he able to give you a description of the

22   subjects?

23   A    He said two black males wearing all black, one

24   carrying a shotgun and one another carrying another

25   type of gun that he wasn't sure what it was.

1  Q    Well, what about Ms. Peoples?

2  A    I didn't talk to Ms. Peoples after getting her out

3  of the house.

4  Q    Now, by the time you got Ms. Peoples out of the

5  house, how was she acting then?

6  A    I don't remember.

7        MS. NORMAN:  We have no further questions of

8  this witness, Your Honor.

9

10      CROSS-EXAMINATION

11  BY MR. COLLINS:

12  Q    Good morning, Officer Chapman.

13  A    Good morning, sir.

14  Q    Did you find any indication outside of the house

15  that a shotgun had been fired?

16  A    No, sir.

17  Q    So Anwan Jones described one of the assailants

18  having a shotgun and the other one some other kind of

19  gun?

20  A    Yes, sir.

21  Q    Was he specific as to length?

22  A    No, sir, not the other type.  Just a shotgun and

23  another type of gun.

24  Q    He didn't describe the other one as a long gun or

25  another shotgun?

1   A    I don't remember.

2   Q    Well, would that be something you would remember?

3   A    It would be if he said it was a pistol or a long

4   gun or two shotguns, I would have remembered that, but

5   he just said "a shotgun and another type of gun."

6           MR. COLLINS:  Thank you, sir.

7           THE WITNESS:  Yes, sir.

8           MS. NORMAN:  We have no further questions of

9   this witness, Your Honor, and I believe he can be

10  excused.

11          MR. COLLINS:  Yes.

12          THE COURT:  Thank you very much for being

13  with us, Officer Chapman.  You're excused and free to

14  go about your duties.

15          THE WITNESS:  Thank you, sir.

16          (The witness was excused from the witness

17   stand.)

18          MS. NORMAN:  The United States' next witness

19  is Officer Woolson.

20

21     DUSTIN WOOLSON, called by the United States,

22  first being duly sworn, testified as follows:

23

24     DIRECT EXAMINATION

25  BY MS. NORMAN:

WOOLSON - DIRECT

1   Q    Good morning.

2   A    Good morning.

3   Q    Please tell the ladies and gentlemen of the jury

4   your name, where and how you're employed.

5   A    My name is Dustin Harold Woolson.  I'm a senior

6   officer with the Chesterfield County Police

7   Department, Chesterfield County, Virginia.

8          THE COURT:  Could you spell your name,

9   please?

10         THE WITNESS:  Dustin Woolson, D-u-s-t-i-n,

11   W-o-o-l-s-o-n.

12   Q    Officer Woolson, were you so employed on May 15th

13   of 2009?

14   A    Correct.

15   Q    On May 15, 2009, were you working in the early

16   morning hours?

17   A    Correct.

18   Q    Were you called to respond to the house located at

19   1453 Lockett Ridge Road in Chesterfield County?

20   A    I was.

21   Q    Tell the ladies and gentlemen of the jury, please,

22   what if anything you saw when you first got there.

23   A    As I pulled up to the residence, I exited my

24   police vehicle, and I was met in the road by an

25   individual later identified as Mr. Anwan Jones.

WOOLSON - DIRECT                          193

1   Q    When you say "in the road," the parking area in

2   the front yard is right on the road in front of that

3   house; is that correct?

4   A    Correct.

5   Q    There's no sort of buffer or curbing or anything.

6   It just all goes straight into the road?

7   A    Correct.

8   Q    And Anwan Jones, what if anything did he tell you

9   at that moment?

10  A    Mr. Jones advised that two individuals had just

11  broken into his house, that one of them had a firearm,

12  and that his girlfriend, who was later identified as

13  Ms. Keona Peoples, was still inside of the residence

14  in a closet.

15  Q    When you looked at the house, did you note

16  anything in particular at the house at that point?

17  A    First observation of the house, the front door was

18  open.  As we approached that front door, myself and

19  another officer, I did observe some blood on the

20  carpeting leading to the front door.

21  Q    And there's sort of a pathway there, there's some

22  wood steps at the front of the house, and then a foyer

23  inside and some carpeting inside of that as well; is

24  that correct?

25  A    That's correct.

WOOLSON - DIRECT                    194

1  Q    Did you see what you believed was blood on all of

2  those areas or just part of those areas?

3  A    I recall seeing blood on the carpet and some on

4  the steps.

5          THE COURT:  The outside steps?

6          THE WITNESS:  Yes, sir, the outside steps

7  leading into the residence.

8  Q    At some point did you enter the house?

9  A    We did so.

10  Q    What if anything did you say when you entered?

11  A    We entered the house.  We identified ourselves as

12  the police.

13  Q    At some point did somebody respond to your

14  announcing?

15  A    We did.  We heard somebody calling us from a room

16  down the hallway to the right of the entrance of the

17  house.

18  Q    Who was that person?

19  A    We later identified that person as Ms. Keona

20  Peoples.

21  Q    Now, tell the ladies and gentlemen of the jury,

22  and describe for us since we weren't there, what was

23  the condition of Ms. Peoples when you encountered her.

24  A    When we did find Ms. Peoples, we found her inside

25  a closet that was located in a bedroom.  We found her

1    under a pile of clothing that was tucked back in the

2    closet a little bit under some other clothing that was

3    hanging up.

4        When we did find Ms. Peoples, she was crying.  We

5    attempted to ask her some questions, who she was, any

6    more information we could use as we went through the

7    house.  It was difficult to get any answers out of

8    her.  She wasn't able to give coherent words.  She

9    wasn't able to make an audible sentence.

10   Q    Sometimes a person might be unable to answer your

11   questions because they just don't want to.  Sometimes

12   people might be unable to answer your question because

13   they have a physical impairment.  What if anything,

14   based on your observations, was the cause of her

15   having difficulty answering your questions?

16        MR. COLLINS:  Objection, Judge.  I don't

17   think he's qualified to make that opinion.

18        MS. NORMAN:  I asked about his observations,

19   what if anything about her behavior.

20        THE COURT:  Well, I think you can ask the

21   question in another way and get the same information

22   and the objection would not be valid, but that one is.

23   Sustained.

24   BY MS. NORMAN:

25   Q    If you could explain your observations of Ms.

 1  Peoples when you were trying to ask these questions.

 2  A   As I said, she was crying.  It was difficult to

 3  get any information out of her.  She was --

 4  Q   Why was it difficult for you to get the

 5  information out of her?

 6  A   It seemed as if she was not able to put a sentence

 7  together at the moment.  She came at us very

 8  willingly.  It appeared that she just wanted to exit

 9  the house and get out of the house.

10           THE COURT:  She wanted to or wanted you to?

11           THE WITNESS:  That she wanted to herself.

12  Q   What was her physical condition?  Could you tell

13  what her physical condition was?  What if anything --

14  was she standing calmly and straight and looking at

15  you?  How was she physically acting?

16  A   She was shaking.  As I said, we found her, she was

17  crouched down under a pile of clothing, and we had to

18  remove her from that clothing.  Once she was up, she

19  did appear as if she wanted to exit the house.  She

20  was shaking.

21  Q   Did you help take Ms. Peoples out of the house?

22  A   At some point I did, yes.

23  Q   At some point after you took her out of the house,

24  did you speak to her about what happened?

25  A   I did.

WOOLSON - DIRECT                    197

1  Q    Tell the ladies and gentlemen of the jury how long

2  it was between the time you took her out of the house

3  and you actually got a chance to talk to her,

4  approximately.

5  A    Approximately, 10 to 15 minutes.

6  Q    How, if at all, did her condition change from the

7  time she was in the house to when you tried to talk to

8  her outside the house?

9  A    The point I tried to talk to her the second time

10  once we were out of the residence she appeared to have

11  calmed down slightly.  She was able to make coherent

12  sentences.  She was able to speak to me freely about

13  what happened.  The shaking subsided some and at some

14  point she was able to stop crying long enough to tell

15  me what had happened.

16  Q    What did she tell you had happened?

17  A    She advised me that her and her boyfriend, who she

18  identified as Mr. Anwan Johns, they had returned home

19  to that residence from where they were playing pool at

20  an establishment called The Locker Room.  She advised

21  that that was on Forest Avenue in Richmond.

22      She advised that she was the first to approach the

23  door of the house, and as she was unlocking the door,

24  she heard Mr. Jones say, "Oh my God."

25      At that time she advised that she was forced into

 1    the residence by what she believed to be two subjects.

 2         At that time she advised that all she could

 3    remember was two males yelling and that one of them

 4    had a long black gun.

 5    Q    What else did she tell you happened inside the

 6    house?

 7    A    She advised that she remembers a very bright light

 8    and possibly a loud bang.

 9              THE COURT:  A loud what?

10              THE WITNESS:  Bang, sir.

11    Q    What did she do, if anything?  What did she say

12    she did in response to that?

13    A    In response to that, she ran into the bedroom and

14    hid in the closet.

15    Q    Did she make any statements to you about whether

16    or not she had a firearm?

17    A    She did so.

18    Q    What did she say about that?

19    A    She advised that once she ran into the bedroom,

20    after she observed the individuals with the gun, she

21    remembered grabbing a handgun that she knew Mr. Jones

22    kept in the bedroom.  She advised that she attempted

23    to pull the trigger several times.  There was no

24    result of that.

25         She recalls pulling back the slide on top of the

1  handgun and then attempting to fire again.  At the

2  time that I spoke with her, she was not sure if the

3  firearm discharged or not.

4  Q   As she was explaining these things to you, how was

5  she physically acting?

6  A   Calmer than the initial observation inside the

7  residence.  She was no longer shaking.  The crying had

8  subsided while she was telling me these things.  She

9  was able to make full sentences and she was coherent.

10          MS. NORMAN:  We have no further questions of

11  this witness.

12

13      CROSS-EXAMINATION

14  BY MR. COLLINS:

15  Q   Good morning, officer.

16  A   Good morning.

17  Q   Once she had calmed down, did she tell you that

18  was her gun?

19  A   She did not.

20  Q   Once she calmed down, is that when she told you

21  she didn't know if she had fired any shots or not?

22  A   That's correct.

23  Q   This was about 10 minutes, 15 minutes after you

24  first encountered her?

25  A   Approximately, yes.

1              MR. COLLINS:  Thank you.  That's all I have.

2              THE COURT:  Can he be excused?

3              MS. NORMAN:  I just have -- if I can just ask

4    a follow-up.

5              THE COURT:  All right.

6

7         REDIRECT EXAMINATION

8    BY MS. NORMAN:

9    Q    When she told you that she attempted to fire the

10   firearm and then she pulled the slide back, did she

11   say she didn't shoot or she just doesn't know?

12   A    She advised that she was unsure if the weapon

13   discharged or not.

14             MS. NORMAN:  Thank you.  We have no further

15   questions and he can be excused.

16             MR. COLLINS:  Yes, sir.  He can go.

17             THE COURT:  Thank you for being with us,

18   Officer Woolson.  You're excused to go about your

19   business.

20             THE WITNESS:  Thank you, Your Honor.

21             (The witness was excused from the witness

22    stand.)

23             MS. NORMAN:  The United States would call

24   Detective Jody Burton.

25

1

2       RALPH G. BURTON, called by the United States,

3  first being duly sworn, testified as follows:

4

5       DIRECT EXAMINATION

6  BY MS. NORMAN:

7  Q    Good morning.

8  A    Good morning.

9  Q    Can you please tell the ladies and gentlemen of

10 the jury your name and where and how you are employed?

11 A    Career Officer Ralph G. Burton, Jr.  I'm employed

12 with the Chesterfield County Police Department

13 currently assigned to its aviation unit.

14 Q    Back on May 15, 2009, were you employed at that

15 time with the Chesterfield County Police?

16 A    I was.

17 Q    What was your position then?

18 A    I was a detective with the department.

19 Q    Were you in a particular --

20 A    Crimes against persons.

21 Q    On May 15, 2009, were you called to a residence

22 located at 1453 Lockett Ridge Road in Chesterfield

23 County, Virginia?

24 A    Yes, ma'am, I was.

25 Q    What was the purpose of you being called there?

1    A    To assist with a search warrant that had been

2    obtained for the residence as a result of a shooting

3    incident, attempted robbery, that had occurred there.

4    Q    What was your role in the search?   What were

5    you --

6    A    I was assigned to search a master bedroom

7    downstairs, which also included a closet area, and to

8    go through and search those areas, and then notify

9    forensics once they came in of any evidence that we

10   observed so that they could photograph and collect

11   that evidence.

12   Q    When you say "we," was there another detective

13   with you?

14   A    There were other detectives in the room and

15   throughout the house.

16   Q    Now, in the master bedroom, did you find anything

17   of significance in the master bedroom?

18   A    I did a search of the downstairs bedroom closet

19   that was in the master bedroom.   Located some large

20   quantities of U.S. currency that had been hidden in

21   some of the clothing that was hanging in that closet.

22       In that same closet, I also located a black Glock

23   handgun.   It was a model 38, .45 GAP caliber.   It was

24   found in the closet floor among numerous pairs of

25   shoes.

BURTON - DIRECT                    203

1      The slide was locked to the rear on the gun and it

2   had a magazine inserted into it, which was empty.

3   Q    I want to show you what's been marked as

4   Government's Exhibit 131.  Does that look familiar?

5   A    That appears to be the weapon we found in the

6   closet, yes.

7   Q    Now, I want to show you -- sorry.

8             THE COURT:  131 is a picture?

9             MS. NORMAN:  Yes, sir.

10            THE COURT:  So 131 is a picture of the

11  weapon?

12            MS. NORMAN:  Yes.  I'm sorry.

13            THE COURT:  For the record.

14  BY MS. NORMAN:

15  Q    So the record is clear, I'm sorry, this is

16  Government's Exhibit 131.  And it's a photograph of a

17  bunch of shoes and what appears to be a firearm.  Is

18  that basically how you found the item?

19  A    Yes, ma'am, it is.

20  Q    I want to show you what's been marked as

21  Government's Exhibit 134.  Looking at that, is that

22  the same weapon?

23  A    Yes, it is.

24  Q    And we see the top piece where the writing or the

25  stamp is that says Austria, 45 GAP, I believe.  What

1   piece of the firearm is that?

2   A    That's the slide.

3   Q    Now, I'm going to show you what's been marked as

4   Government's Exhibit 768A135.  What is that.  Is that

5   part of the same firearm?

6   A    That is the opposite side of the slide of the

7   firearm.  What is depicted there, that notched out

8   space, if you will, on that slide is the ejection

9   port, and that is the extraction hook to the back of

10  that.

11  Q    Okay.  If you touch that screen, it will actually

12  make a mark on the screen.  So if you can sort of draw

13  an arrow or point to the ejection port.

14  A    Here's your ejection port here.

15  Q    Okay.  So if you were holding the firearm, that

16  ejection port would be on what side if you were

17  holding it and pointing it towards something?

18  A    On the right side of the firearm.

19  Q    So it would be on the right side?

20  A    Yes, ma'am.

21  Q    What comes out of there?

22  A    That's where your bullet casings would come out.

23  Your discharged casings, once a bullet has been fired,

24  the weapon will extract that round, that empty casing,

25  if you will, from that area, from the ejection port.

BURTON - DIRECT                    205

1    Q    You noted that this was a semi-automatic weapon?

2    A    It is a semi-automatic weapon, yes, ma'am.

3    Q    So for us that might not understand what the

4    difference is, what does a semi-automatic weapon --

5    how does that work?

6    A    A semi-automatic weapon will fire a number of

7    rounds as fast as you can pull the trigger manually

8    and for whatever magazine capacity.  If you have 15

9    rounds in the weapon, if you could pull the trigger 15

10   times as fast as you could, you could fire those 15

11   rounds provided that the weapon did not malfunction in

12   some way.

13   Q    When you pull the trigger, that fires the round?

14   A    It does.

15   Q    Each time you fire, what happens with the casing?

16   A    The casing is ejected from the ejection port here

17   where I noted on the screen.  The casing comes out of

18   this area here.

19   Q    So that would be every trigger pull?  Every time

20   you pull the trigger, the casing should be flying out?

21   A    Yes, ma'am.

22   Q    What else did you note, if anything, in the closet

23   that appeared to be significant to you?

24   A    There were several silver 45 GAP spent cartridge

25   casings, ones that had been fired, lying in the

1   closet, as well as two copper-colored bullets that

2   were found, one of which was found in a black shoe in

3   the floor.

4       There were some other items found in that closet

5   on the closet door.  There was like an organizer, a

6   shoe organizer, hung on that door.  It had a bag of

7   some type of crystal granules in that bag, and there

8   were numerous items of clothing very densely packed in

9   that closet hanging on closet rods.

10      Those items of clothes on the right side had what

11  appeared to be a number of bullet holes through those

12  clothes.

13  Q   Through the clothes on the right side?

14  A   Through the clothing, yes, ma'am.

15  Q   Now, did you also -- outside of the closet in the

16  master bedroom itself, did you note anything else on

17  the floor of the master bedroom that caught your

18  attention?

19  A   I did.  At the foot of the bed just below the

20  baseboard, if you will, of the bed or the footboard of

21  the bed there was a piece of carpet raised up, a

22  fluffed up spot, if you will, and there was a plastic

23  shotgun wad lodged down in the carpet, and there were

24  several shotgun pellets or projectiles in the floor.

25  You could see the wood in the floor underneath the

 1  carpet where they had gone into the floor.

 2  Q    You described the item as a shotgun wad?

 3  A    Yes, ma'am.

 4  Q    Can you tell us, what exactly is a shotgun wad?

 5  A    A shotgun wad is encased within your -- well, the

 6  shotgun bullet itself, in layman's terms, when it's

 7  loaded, it has a primer charge in the base of it.

 8  Q    A primer charge, so we all know, that's the gun

 9  powder, so to speak?

10  A    That's the gun powder, so to speak.  That would be

11  at the bottom, which would be in the brass colored or

12  silver colored area of the shotgun ammunition.  Then

13  in the plastic area, within that is where your shot,

14  your projectiles or bullets, if you will, are

15  contained within that area of the shotgun ammunition.

16       Inside of there is a plastic wadding that controls

17  or holds the shotgun pellets in there and it also

18  controls the flight of those shotgun pellets as they

19  exit the muzzle of the weapon.  Once it exits the

20  muzzle of the weapon, the shotgun pellets disperse,

21  and the shotgun wad itself falls free at some point on

22  the ground in the flight of the bullet.

23  Q    Depending on the ammunition you buy for your

24  shotgun, it might have lots and lots of pellets or it

25  might just have a couple of really big pellets?

1    A    It depends on the variation of your ammunition.

2    If you buy birdshot, there are lots of pellets in

3    birdshot.  If you buy buckshot, there may be 9, there

4    may be 12, or there may be 15 depending on the size of

5    the shot that you buy.

6    Q    The wad is just basically a piece of plastic

7    that's inside that round?

8    A    Just a piece of plastic.

9    Q    Okay.  I want to show you what has been marked as

10   Government's Exhibit 768A-112.  This appears to be the

11   foot of the bed.  Is this the area you were talking

12   about?

13   A    Yes, ma'am.  It would be this area here appears to

14   be where the carpet is raised.

15   Q    It appears, and this is a photograph of that area,

16   it appears that there is a carpet, and then like this

17   brownish, tannish-colored rug on top?

18   A    Yes.

19   Q    Did you raise and look in that area?

20   A    I observed this area here and noted that for

21   forensics.  As I recall, I think when they came in

22   there to photograph and collect anything that was

23   there, then the carpet in that area was manipulated

24   and exposed where we could see what was underneath.

25   Q    So I'm going to show you what's been marked as

BURTON - DIRECT                    209

1    Government's Exhibit 768A-113.  Is that the area under

2    the rug?

3    A    Yes, it is.

4    Q    All right.  And the item, can you use the pointer

5    or use your finger and show us where that was?

6    A    The plastic shotgun wad is here.  This clear

7    plastic material there.

8    Q    Okay.  Now I'm going to show you what's been

9    marked as Government's Exhibit 115.  Is that a closeup

10    of the same item?

11    A    That is, yes.

12    Q    And can you show us if there's any of those pellet

13    things you were talking about?

14    A    Well, there are a number of them.  Some in the

15    previous picture, but you see one here, here.

16    Q    I'm going to take your markings off just for a

17    second.

18    A    Okay.

19    Q    Because those areas where you just pointed to, I

20    think you just covered them up, right?

21    A    I did, actually.

22    Q    So those two little round beebee looking things?

23    A    Yes, ma'am.  I'll try not to cover them.  Here and

24    here.

25    Q    Okay.  And then this grayish piece of plastic

1   looking stuff, what is that?

2   A    That appears to be the shotgun wad.

3   Q    Once you guys had gone through and found all of

4   these items of interest, did you assist forensics in

5   trying to find any additional evidence of a shooting

6   in the house itself?

7   A    We did.  We searched the remainder or the

8   downstairs area of the house because we saw what

9   appeared to be bullet holes that traveled in the

10  directions of other portions of the house.  And there

11  was some sheetrock removed from a wall of the bedroom

12  where we were searching for the bullets there.  And we

13  were searching the wall area in the kitchen and game

14  room area of the house where we removed some sheetrock

15  as well searching for bullet fragments.  And there was

16  one copper bullet that was found in the wall at the

17  opposite end of the house from where the bedroom was,

18  some distance away, I would estimate maybe 30 feet

19  possibly, a couple of rooms away.

20          THE COURT:  What kind of bullet was it?

21          THE WITNESS:  It was a copper bullet or

22  projectile that appeared to have come from a handgun.

23          THE COURT:  Do you know what kind?  What

24  caliber?

25          THE WITNESS:  It appeared to have been of a

1  .40 or .45 caliber, but there were no markings on it,

2  so I couldn't tell the Court.

3          THE COURT:  That's just based on your

4  experience.

5          THE WITNESS:  Based on my he experience, it

6  appeared to be a .40 or .45 caliber bullet due to its

7  dimensions and size.

8  Q    How did the bullet that was recovered out of the

9  sheetrock in the game room area, how did that -- did

10 that look at all similar to the two bullets you

11 described for us earlier that were found in the

12 closet?

13 A    They were similar, yes.  The ones that were in the

14 closet weren't as damaged because they had appeared to

15 have been stopped in flight due to the dense clothing

16 within the closet.  The bullet that we found in the

17 wall was damaged somewhat because it was lodged in the

18 wood and it traveled through several areas of the

19 house where we found it.

20         MS. NORMAN:  We have no further questions of

21 this witness, Your Honor.

22     CROSS-EXAMINATION

23 BY MR. COLLINS:

24 Q    Good morning, Detective.

25 A    Good morning, sir.

BURTON - CROSS                    212

1   Q    You're not saying that the gun was fired in the

2   lower level of the house.  You're saying the bullets

3   came from the bedroom, but they ended up in different

4   parts of the house?

5   A    There was a gun found in the closet in the lower

6   portion of the house in that closet.  And there were

7   bullet casings in the closet.

8   Q    When you say "the lower level," is that where the

9   master bedroom is?

10  A    The master bedroom was on the lower level, yes,

11  sir.

12  Q    So you didn't go from the master bedroom to the

13  lower level.  It was on the lower level?

14  A    The lower level master bedroom, yes, sir.

15  Q    How many cartridge casings did you find in the

16  closet of the master bedroom?

17  A    There were a number of them.  In excess of five as

18  I can recall.  I don't have in my notes an exact

19  number.

20  Q    Weren't you guys supposed to count those?

21  A    Well, we note where they're at and have forensics

22  come in and correct them, sir.

23  Q    So somebody else collected them?

24  A    Somebody else collected them.

25  Q    Did you notice anywhere else in the bedroom area

BURTON - CROSS                    213

1  that indicated a shotgun had been fired other than

2  that spot in the floor?

3  A    I did not.

4  Q    What's the magazine capacity of that Glock?

5  A    I'm unfamiliar with the magazine capacity of that

6  particular weapon.

7          MR. COLLINS:  Okay.  Thank you, sir.  That's

8  all I have.

9          THE COURT:  Any questions?

10          MS. NORMAN:  No redirect.

11          THE COURT:  Can he be excused?

12          MS. NORMAN:  Yes, Your Honor.

13          MR. COLLINS:  Yes.

14          THE COURT:  All right, sir.  Thank you for

15  being with us and giving us your testimony.  You're

16  excused, sir.

17          THE WITNESS:  Thank you, sir.

18          (The witness was excused from the witness

19   stand.)

20          THE COURT:  Next witness.

21          MS. NORMAN:  The United States would call

22  Officer Harris, Chesterfield Police Department.

23

24

25

214

1

2       ANDREW HARRIS, called by the United States, first

3    being duly sworn, testified as follows:

4

5       DIRECT EXAMINATION

6    BY MS. NORMAN:

7    Q    Good morning.

8    A    Good morning, ma'am.

9    Q    Can you please tell the ladies and gentlemen of

10   the jury your name and where and how you are employed?

11   A    I'm Career Officer Andrew Harris.   I work for

12   Chesterfield County Police Department.

13   Q    How long have you been with Chesterfield County?

14   A    Almost 12 years now, ma'am.

15   Q    I want to direct your attention to May 15 of 2009.

16   Were you working with Chesterfield Police Department

17   then?

18   A    Yes, ma'am.

19   Q    Were you actually working that day?

20   A    Yes, ma'am.

21   Q    Did you have occasion to report to the Southside

22   Regional Medical Center in Petersburg?

23   A    Yes, ma'am.

24   Q    Can you tell the ladies and gentlemen of the jury

25   why you went to Southside Regional Medical Center?

1    A    Yes.  One of my additional assignments is what

2    they call a road tech.  I handle some forensics

3    evidence.  I was tasked to go there to do a GSR kit.

4    Q    Can you tell the ladies and gentlemen of the jury

5    what a GSR kit is?

6    A    It's a gunshot residue kit.  It's used to take a

7    swab of a person's hands or a particular area to see

8    if there's any type of shotgun shavings, gun powder or

9    something like that from a weapon that's been fired.

10   Q    As a tech, are you the one who actually takes the

11   kit and does the swabbing?

12   A    Yes, I do the swabbing, but no additional testing

13   comes from me.  It's sent to the state lab, if needed.

14   Q    The individual who is sitting at counsel table

15   with the striped shirt, did you have occasion to take

16   a GSR kit from him?

17   A    I can't rightfully say, ma'am, because it was

18   2009, several years back.  And in my capacity, it

19   would have been a very, very brief encounter.

20   Q    When you went to the Southside Regional Medical

21   Center, did you take the GSR kit from somebody?

22   A    Yes, ma'am.

23   Q    How were you able to identify who you took it

24   from?

25   A    When I went to the room, I was told that the

HARRIS - DIRECT                          216

1    subject that I was there to see, which had just came

2    in, had been shot.  When I approached the subject, I

3    remember asking him what was his name.  He told me his

4    name was Frank.  Frank Williams.

5    Q   The subject you took the GSR kit or the swabs from

6    as a part of the GSR kit identified himself as Frank

7    Williams?

8    A   Yes, ma'am.

9    Q   Did that individual have a gunshot wound that you

10   saw?

11   A   Yes, ma'am.

12   Q   Where was that gunshot wound, if you remember?

13   A   I can just vaguely remember, ma'am.  I believe it

14   was to his arm and there might have been another area,

15   as I understand.

16   Q   And you're pointing to your left arm?

17   A   Yes, ma'am.  I don't rightfully remember whether

18   it was right or left.  Like I said, it was a very

19   brief encounter.  In my capacity of what I do as a

20   road tech, that many years ago, I do remember going

21   there.  I do remember doing the GSR kit.  I remember

22   the subject had a gunshot wound.  I remember it was to

23   his arm.  It went through his arm, to my

24   understanding, and it hit another portion of his body.

25   Q   Once you took the GSR kit from the individual who

1    identified himself as Frank Williams, what did you do

2    with the kit?

3    A    The kit is placed -- it comes in the already

4    pre-setup type of container here.  It's an envelope.

5    All you do is you take it, and you do each one

6    separately and put it inside of a glass vial.  It's

7    then sealed with the red tape, which if it's broken,

8    it can't be resealed.  It's placed inside of our

9    evidence bag, in which I initialed on the back, and

10   it's placed inside of our property section, and I have

11   no further contact with it.

12   Q    That item there has a government's exhibit sticker

13   on it, and it has been marked for identification

14   purposes, I believe, as Government's Exhibit 1; is

15   that correct?

16   A    Yes, ma'am.

17   Q    By looking at the evidence bag that contains the

18   GSR submission envelope, is that the GSR kit you took

19   from the man who identified himself as Frank Williams

20   on May 15, 2009?

21   A    Yes, ma'am.  This is my handwriting.  And also I

22   placed it in the bag so that I could see the

23   handwriting.  That's my handwriting, ma'am.

24           MS. NORMAN:  Okay.

25           THE COURT:  Is that the kit you took from

HARRIS - DIRECT                    218

1   Frank Williams?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  All right.

4           MS. NORMAN:  We have no further questions of

5   this witness, Your Honor.

6           THE COURT:  Any questions?

7

8       CROSS-EXAMINATION

9   BY MR. COLLINS:

10  Q    Good morning, officer.

11  A    Good morning, sir.

12  Q    Does it refresh your recollection at all if I

13  suggest the bullet went through his lower arm and into

14  his upper arm?

15  A    Sir, I can't really say.  Again, like I say, it's

16  been so long ago.  My encounter with the subject would

17  have been very brief.  I went there specifically for

18  the GSR kit.  I remember asking him what his name was,

19  and when he told me his name, I make sure I write all

20  that information down, and, again, continue on with

21  the process of collecting the kit.

22  Q    Quite frankly, I appreciate your candor.  Thank

23  you.

24  A    Yes, sir.

25          MS. NORMAN:  We have no further questions and

HARRIS - CROSS                        219

1    he may be excused.

2            THE COURT:  Thank you very much for being

3    with us.  And are you going to leave that here?

4            MS. NORMAN:  Yes.  We're asking that the

5    exhibit be left here, Your Honor.

6            THE COURT:  All right.

7            MS. NORMAN:  We just need to present another

8    witness.

9            (The witness was excused from the witness

10     stand.)

11

12        EDWIN S. JONES, called by the United States,

13    first being duly sworn, testified as follows:

14

15        DIRECT EXAMINATION

16    BY MS. NORMAN:

17    Q    Good morning.

18    A    Good morning, ma'am.

19    Q    Can you please tell the ladies and gentlemen of

20    the jury your name and where and how you were employed

21    on May 15, 2009?

22    A    Captain Edwin S. Jones, ID 5408, Petersburg

23    police.

24    Q    Back on May 15th of 2009, your rank was

25    lieutenant?

E. JONES - DIRECT                    220

1   A   Yes, ma'am.

2   Q   What sort of duties did you have as lieutenant

3   with the Petersburg Police Department at that time?

4   A   At that time I was in charge of major crimes in

5   the investigation unit.

6   Q   Now how are you employed?

7   A   I am still employed by the City of Petersburg, but

8   I've just come back from the task force, federal task

9   force.  So I'm in between.

10  Q   Assignments?

11  A   Yes, ma'am.

12  Q   On May 15 of 2009, did you have reason to go to

13  Southside Regional Medical Center in the morning

14  hours?

15  A   Yes, ma'am.

16  Q   Can you tell the ladies and gentlemen of the jury

17  why did you go to Southside Regional Medical Center?

18  A   Yes, ma'am.  On the date and time in question,

19  5-19-2009, being in charge of the investigation unit

20  in the City of Petersburg, I was summonsed by phone to

21  respond in reference to a shooting in our city.

22      I was the on-call detective.  So I came out and I

23  responded at 0720.

24  Q   Just for those of us who don't use military time,

25  that's 7:20 in the morning?

E. JONES - DIRECT                    221

1   A    7:20 a.m.

2   Q    Okay.

3   A    I responded to Southside Regional in reference to

4   a gunshot wound.  When I got there -- I normally will

5   wait a couple of minutes to observe what's going on

6   before I go in there.  And at that time I observed a

7   male, a black male, in the trauma room, and they were

8   working on him.  I always talk to the doctor first to

9   find out if I can talk to the person that's shot.

10       When I spoke to him he identified himself to me as

11  Mr. Frank Williams.

12  Q    When you spoke to who?

13  A    The defendant.

14  Q    So was the defendant, the man in the striped shirt

15  who sits here today, was that the man who was in the

16  hospital with the gunshot wound?

17  A    Yes, ma'am.

18  Q    The defendant told you he was who?

19  A    He gave me the name of Mr. Frank Williams.

20  Q    Did he tell you anything else about how he had

21  received a gunshot wound to his arm?

22  A    Yes, ma'am.  At the time, during the course of the

23  investigation, I treated it as a gunshot in the city.

24  Q    Why did you do that?  Why did you treat it as a

25  gunshot in the city?

E. JONES - DIRECT                                222

1   A   Because he claimed that he was shot in the

2   hospitality district of the city, which is mainly

3   where the hotels are in the east end of the city.

4   Q   When you say "he," are you referring to the

5   defendant?

6   A   Yes, ma'am.

7   Q   Okay.

8   A   Being that I was trying to ascertain what had

9   happened for him being shot, I observed a gunshot

10  wound to the left side of his arm.  It went through

11  his forearm, went through his bicep and lodged in his

12  shoulder.  It was a single gunshot wound.

13       I then found out that -- he told me he was with a

14  girl, and he didn't know why someone would do this to

15  him.  I pressed the issue in reference to a

16  description to find out if I could get a description

17  from him.  And his words to me, and he was in a great

18  deal of pain, but he was alert, he told me that, "I

19  can't help you put somebody in jail.  I just can't do

20  that with all due respect."

21       And so at that point I asked him, I'm going to

22  find out -- I'm going to check around and find out if

23  we had any gunshot wounds or gunshot incidents

24  anywhere in the tri cities.  And at that point I found

25  out that Chesterfield had an incident.

E. JONES - DIRECT                    223

1    I said okay. I didn't advise him of that. But I

2    had that in the back of my mind. I went ahead and

3    left out of the room because he wouldn't tell me

4    anything else.

5    Q    When he told you what his name was --

6    A    Frank Williams.

7    Q    -- and said it was Frank Williams, did you ask for

8    any further identifiers?

9    A    Yes, ma'am, I asked him for his DOB.

10   Q    For those of us that don't use acronyms, what is

11   DOB?

12   A    I asked him for his date of birth, ma'am. and I

13   asked him for his Social. He gave me a couple of

14   dates of birth that did not match. They were

15   different. He couldn't remember his Social Security

16   number. I said, Have you been to any doctor, any type

17   of dentist? Have you been anywhere to receive medical

18   treatment? He said no. And he was evasive on my

19   questions on that.

20       I then left the hospital, and I advised the

21   hospital personnel, Advise me if anybody comes in and

22   inquires about this man, because he wasn't going to

23   leave the hospital because he had to have surgery for

24   his shoulder.

25       Around 1:30, which is 1330 hours --

E. JONES - DIRECT                    224

1    Q    That same day, May 15?

2    A    That same day.  I received information from the

3    hospital.  Upon me acting on that information, and

4    that information was a female had come in and inquired

5    about a person that had been shot.  They normally will

6    gather the information to run them through a system

7    that will tell you if you are at any hospital or if

8    you have been shipped to MCV for advance treatment.

9    That information was gathered, relayed to me.

10        I then took that information.  I ran it through

11   NCIC and VCIN, which is the system that we run people

12   that are wanted through, nationally and locally,

13   through the state.

14        That then came up under that name wanted seven

15   times, robbery related, out of the city of Richmond.

16   RPD also had put an alert on there, "armed and

17   dangerous."

18            MR. COLLINS:  Objection, Judge.  I don't

19   think he can testify to the previous record.

20            MS. NORMAN:  It's not a previous record.  It

21   was what information he received.  And it's not

22   offered for the truth of the matter but just for what

23   steps he took next.

24            THE COURT:  Why is that relevant?

25            MS. NORMAN:  Because so far the testimony has

1  been that the defendant identified himself as Frank

2  Williams.  And so what this detective did to find out

3  what his true identity was is relevant to being able

4  to identify that this was the defendant who was in the

5  hospital with the gunshot wound at that time.

6          THE COURT:  Well, I haven't heard any

7  connection yet.

8          MS. NORMAN:  That's where the questions are

9  leading.

10          THE COURT:  Whose NCIC record did you run?

11  Frank Williams?

12          THE WITNESS:  No, sir.  I received

13  information of Robert Pernell with a date of birth of

14  7-28-70.

15          THE COURT:  Where did you get that?

16          THE WITNESS:  I got that from the hospital,

17  sir.

18  Q   But you got the information based on --

19          THE COURT:  Excuse me.  So the objection is

20  he can't testify to what the record was?

21          MR. COLLINS:  Yes.

22          THE COURT:  Why can't he just say he ran a

23  record and that he found that?  And what it was

24  doesn't make any difference at this stage, not for

25  identity, does it?

E. JONES - DIRECT                    226

1        MS. NORMAN:  No.

2        THE COURT:  Ladies and gentlemen, disregard

3    the testimony about what the record was.  Just don't

4    pay any attention to that.  But the fact that Captain

5    Jones ran the record is pertinent and what he found is

6    pertinent to identifying and linking the person Frank

7    Williams with the name Robert Pernell that he was

8    looking for if you make that connection in the next

9    question.

10       MS. NORMAN:  That's what --

11       THE COURT:  All right.  Let me hear it.

12   Otherwise, I'm going to strike the whole thing.

13       MS. NORMAN:  Yes, sir.

14   Q    Based on the information you had received from the

15   hospital, did you get a photograph of the person named

16   Robert Pernell?

17   A    Yes, ma'am, out of DMV fox tips.

18   Q    When you received that photograph, did you look at

19   it?

20   A    Yes, ma'am.

21   Q    Did you recognize the person in the photograph?

22   A    Yes, ma'am.

23   Q    Who did you recognize the person in the photograph

24   to be?

25   A    As the same person I had interviewed in reference

1    to being a victim of a shooting earlier that morning.

2         THE COURT:  You mean the person who told you

3    he was Frank Williams?

4         THE WITNESS:  Yes, sir.

5    Q   Is that the defendant who sits here today?

6    A   Yes, ma'am.

7    Q   So the defendant, who is here, provided the name

8    Frank Williams.  You did some research, came up with a

9    picture of Robert Pernell, and that's who you were

10   able to positively identify the defendant as?

11   A   Yes, ma'am.

12   Q   Once you identified or made a positive identity of

13   the defendant at the hospital, did you go back and

14   attempt to talk to him again?

15   A   Yes, ma'am.  First I contacted Chesterfield

16   because they had a case.  And then around 1:45 that

17   day I arrived back at the hospital.  And after

18   contacting Chesterfield, a Detective Clayton

19   responded.  I advised him of my findings.

20        We went to pull a surveillance tape from the

21   hospital to find out who the female was and if she was

22   still there.  She had left the area by the time we had

23   got there.

24        And I then went up to his room to confront him

25   with this information.  By that time, Detective

E. JONES - DIRECT                    228

1  Clayton, Detective Brad Conners of Chesterfield, and a

2  Detective Coats of Richmond had come down.  Richmond

3  had brought the warrants to me, the outstanding

4  warrants, and I was going to serve them.

5  Q    Just so we understand, the hospital is located in

6  Petersburg; is that correct?

7  A    Yes, ma'am.

8  Q    And you're a Petersburg law enforcement officer?

9  A    Yes, ma'am.

10  Q    So that's your jurisdiction; is that correct?

11  A    Yes, ma'am.

12  Q    Did you further investigate at that point whether

13  there had actually been any reports of shots fired in

14  the city of Petersburg in the early morning hours of

15  May 15, 2009?

16  A    Yes, ma'am, I did, and there had been no reported

17  shots fired.  No units had responded.  No one had

18  called in anything.

19          MS. NORMAN:  Thank you.

20          We have no further questions of this witness,

21  Your Honor.

22          THE COURT:  Mr. Collins.

23          MR. COLLINS:  Thank you, Judge.

24

25      CROSS-EXAMINATION

1    BY MR. COLLINS:

2    Q    Captain Jones, how long have you been a police

3    officer?

4    A    Twenty-seven years and three months.

5    Q    In that 27 years, has any other suspect or person

6    of interest ever lied to you about their name?

7    A    Oh, yes, sir.

8    Q    It happens fairly frequently, doesn't it?

9    A    More times than I want to admit to, yes.

10            MR. COLLINS:  Thank you.  That's all I have.

11            THE COURT:  Can he be excused?

12            MS. NORMAN:  Absolutely, Your Honor.

13            MR. COLLINS:  Judge, I would like to

14    approach.

15            THE COURT:  Can he be excused?

16            MR. COLLINS:  Yes, sir.  I'm sorry.

17            THE COURT:  All right.  Captain Jones, you

18    can be excused.  Thank you for being with us and

19    giving us your testimony.

20            THE WITNESS:  Yes, sir.

21            (The witness was excused from the witness

22     stand.)

23            THE COURT:  What did you say?

24            MR. COLLINS:  I would like to have a side

25    bar, if I may.

E. JONES - CROSS                    230

1          THE COURT:  All right.

2          Ladies and gentlemen, we don't do this a lot,

3    but sometimes this saves times.  So we're going to

4    turn on the white noise again, and I'll listen to the

5    lawyers up here.

6          All right.

7          (The following sidebar conference begins:)

8          MR. COLLINS:  Judge, this is an officer with

9    20 years experience.  He knows darn well that you

10   can't mention other crimes that are not involved in

11   this one.  In this particular case, the crime that he

12   mentioned, I think intentionally, is the magic word in

13   the case.  I don't know how the jury gets out of their

14   mind that now there was some other charge out there

15   for robbery.  I'm going to ask for a mistrial.

16         MS. NORMAN:  First of all, as far as the

17   questioning goes, we were not trying to elicit that.

18         THE COURT:  That isn't what he said.

19         MS. NORMAN:  I just want to make sure that

20   that's clear.

21         MR. COLLINS:  I didn't blame her.  She

22   wouldn't do that.

23         MS. NORMAN:  As far as the information that

24   was relayed was that he was a wanted person, but

25   wanted simply means that there is an allegation.

E. JONES - CROSS                    231

1    There's an allegation in this case as well.  There's

2    an indictment in this case.  And there's a very

3    specific instruction.  And I think that it would be

4    appropriate to instruct the jury with regard to his

5    testimony specifically that a charge is nothing more

6    than an allegation.  And we're not presenting his

7    conviction.  And we're not presenting any evidence on

8    that other than the stipulation.  And there's not even

9    any ties to that, any specific ties to that.

10            So I think it is corrected to the extent that

11   saying that somebody has an allegation against him is

12   prejudicial, I think that it can be corrected by the

13   instruction that, remember, it's an allegation.  He's

14   presumed innocent and he is innocent until proven

15   otherwise.

16            MR. COLLINS:  Yeah, but they're going to

17   think there's yet another allegation that he did a

18   robbery, and he was convicted of something less than

19   that because it wasn't a robbery.  I don't know how

20   you get that out of their head.

21            THE COURT:  He didn't testify to convictions.

22            MS. NORMAN:  No, allegation.

23            THE COURT:  He just said what the report

24   showed as a charge, I believe, is what he was saying.

25   But in any event, the word "robbery" was mentioned,

E. JONES - CROSS                    232

1   and I don't know if he said more than one, but I think

2   he said one.

3           MR. COLLINS:  I think he did.

4           THE COURT:  And the question is, is that a

5   prejudice that cannot be eliminated with a limiting

6   instruction.  And your view is that it is, and your

7   view is that it cannot; is that right?

8           MR. COLLINS:  Yes.

9           MS. NORMAN:  Yes.

10          THE COURT:  Is that where we are?

11          MR. COLLINS:  Yes.

12          THE COURT:  All right.  Well, I'm not

13  convinced that the witness gave the testimony

14  deliberately with that intent.  I think a man with

15  that experience probably should have known better, but

16  by the same token, everybody makes mistakes, and he

17  did.

18          I think I can correct it with a limiting

19  instruction, and it is the obligation of the Court to

20  declare a mistrial but not to do so unless there's a

21  manifest necessity for terminating the proceedings or

22  the interest of justice would otherwise be defeated.

23          I think I have to consider whether giving of

24  a curative instruction or a less drastic alternative

25  is appropriate, and I think it is in this case.

E. JONES - CROSS                      233

1    Do you want me to give another instruction at

2  this time or do you want to wait until the end?

3          MR. COLLINS:  I think wait until the end,

4  Judge.

5          THE COURT:  Okay.

6          MR. COLLINS:  And I would note exception,

7  respectfully.

8          MS. NORMAN:  I was going to say that making

9  the instruction now I think would just highlight

10  something that probably doesn't need highlighting, but

11  it does need curing at the time of the rest of the

12  instructions.

13          THE COURT:  I'm going to give an instruction

14  that says that the witness testified to what the

15  content of the NCIC report was, and that whatever he

16  was talking about was merely what was in the report,

17  and it is not probative of anything at all, and that

18  the evidence was stricken and to absolutely disregard

19  it.

20          MR. COLLINS:  And that there was never any

21  conviction of that charge.

22          THE COURT:  And that there was no conviction.

23  It's just an allegation.

24          All right.  Without waiving your objection to

25  your mistrial, is that an adequate instruction given

E. JONES - CROSS                234

1   that you don't think one ought to be given, and you

2   can't solve it that way anyway?

3           MR. COLLINS:  Given all those things, that's

4   adequate, yes.

5           (The sidebar conference is ended.)

6           THE COURT:  All right.  Where do you stand?

7           MS. NORMAN:  The United States would call

8   Detective Clayton.

9           THE COURT:  Is that going to be an extensive

10  witness?

11          MS. NORMAN:  He'll be a little bit longer

12  than Lieutenant Jones was.  Just a little bit.

13          THE COURT:  Well, I think we'll take the

14  morning recess at this time.

15          Ladies and gentlemen, we'll take a 20-minute

16  recess at that time.

17          Detective Clayton, if you'll just wait.  We

18  are going to take a recess and then call you.

19          THE WITNESS:  Yes, sir.

20          (The jury is out at 10:50 a.m.)

21          THE COURT:  For planning purposes, how many

22  more witnesses do you anticipate calling and how long

23  do you think your other witnesses will be total?

24          MS. NORMAN:  This witness, Detective Clayton,

25  should take just a little bit longer than Lieutenant

E. JONES - CROSS                    235

1    Jones did.

2              THE COURT:  And that was 20 minutes or so.

3              MS. NORMAN:  The witness after that should

4    take about 10 minutes.  Then we have the forensic

5    investigator who has to --

6              THE COURT:  That takes a couple hours or an

7    hour or what?

8              MS. NORMAN:  That's probably going to take an

9    hour for the government to put on that evidence.

10             THE COURT:  All right.

11             MS. NORMAN:  And then our last witness should

12   take about maybe 30 minutes.

13             THE COURT:  Okay.  I have I obligated some

14   time ago to host a table at the annual law day

15   luncheon, and I'm going to leave here at 12:15 and be

16   back here no later than 1:30.  I won't stay for the

17   whole luncheon, but that will be the plan so I won't

18   have to change that.  You ought to be able to get all

19   your evidence in.

20             MS. NORMAN:  Yes.  Hopefully, yes.  If you're

21   leaving at 12:15, we'll be able to get everything

22   except --

23             THE COURT:  You won't be able to get it in

24   before I leave.

25             MS. NORMAN:  Right.  But we'll be able to get

236

1  the other ones out of the way and we'll come back and

2  do forensics and the last one.

3          THE COURT:  At this time do you still plan no

4  witnesses, Mr. Collins?

5          MR. COLLINS:  At this time, yes.

6          THE COURT:  Thank you very much.  We'll be in

7  recess.

8          (Recess taken.)

9          THE COURT:  Next witness.

10          MS. NORMAN:  The United States calls

11  Detective Clayton.

12          Your Honor, as we're waiting for Detective

13  Clayton, the United States would move to admit

14  Government's Exhibit 1, which was the primer residue

15  kit introduced by Detective Harris.

16          THE COURT:  Any objection?

17          MR. COLLINS:  No, sir.

18          THE COURT:  It's admitted.

19          (Government's Exhibit No. 1 is admitted into

20  evidence.)

21          THE COURT:  Are 131 and 134 already in and

22  135?

23          MS. NORMAN:  No, sir, not yet.

24          THE CLERK:  I don't have them in, Your Honor.

25

237

1        DAVID CLAYTON, called by the United States, first

2   being duly sworn, testified as follows:

3

4        DIRECT EXAMINATION

5   BY MS. NORMAN:

6   Q    Good morning.

7   A    Good morning.

8   Q    Can you please tell the ladies and gentlemen of

9   the jury your name and where and how you're employed?

10  A    I'm Detective David Clayton.  I'm employed by the

11  Chesterfield County Police Department.

12  Q    How long have you been with Chesterfield County?

13  A    Nine years.

14  Q    What was your assignment May 15, 2009?  How were

15  you assigned?

16  A    I was assigned as a detective to the general

17  persons section in the Criminal Investigations

18  Division.

19  Q    On May 15th of 2009, did you have occasion to

20  respond to the Southside Regional Medical Center

21  located in Petersburg, Virginia?

22  A    Yes, ma'am, I did.

23  Q    What was the purpose of you responding there?

24  A    I was called by the on-duty sergeant to respond to

25  the hospital because they had an individual that was

CLAYTON - DIRECT                    238

1  being treated for a gunshot wound.

2  Q   When you got there, did you meet up with anybody?

3  A   It was Detective Ash and Officer Neville were

4  already on the scene when I got there.

5  Q   Were there any Petersburg personnel present?

6  A   There were a couple of Petersburg officers.  I

7  don't recall their names.  And Lieutenant Jones also

8  arrived at the hospital.

9  Q   Upon your arrival to the hospital, did you at any

10  point go see the person who was complaining of the

11  gunshot wound?

12  A   Yes, ma'am.  Myself and Lieutenant Jones went in

13  to try and figure out where he'd been shot.

14  Q   Where the individual had been shot?

15  A   Yeah, geographically, not on his body.

16  Q   That was going to be my next question.

17      Do you recognize the person that you went and saw

18  in the courtroom today?

19  A   He's seated to the left of defense counsel.

20          MS. NORMAN:  Just for the record, that would

21  be the defendant, Robert Pernell.

22  Q   Were you able to identify the person with the name

23  Robert Pernell at some point that morning?

24  A   I wasn't at first.  It was -- we had an original

25  conversation where Mr. Pernell chose not to tell us

CLAYTON - DIRECT                    239

1  anything about who he was.  Then later on we received

2  some information about a person named Robert Pernell

3  being treated at the hospital.

4  Q    Then at some point you left the hospital?

5  A    Yes, ma'am.

6  Q    And then returned back again to the hospital; is

7  that correct?

8  A    Correct.

9  Q    When you returned back to the hospital, who did

10  you go back to the hospital with?

11  A    It was myself, Detective Conner and Lieutenant

12  Jones, again, from Petersburg.

13  Q    Were you one of the individuals who observed the

14  camera footage to figure out who had allegedly come to

15  visit Mr. Pernell?

16  A    Correct.  The information I'd received was that a

17  female who'd came in asking for Robert Pernell had

18  told the staff that he should be at the hospital being

19  treated for a gunshot wound.  I went into the security

20  office and we reviewed the footage, and we could see

21  the female coming in to the information desk and tried

22  to follow her back outside with the cameras, but the

23  camera wasn't pointed in the right direction.  So I

24  don't know where she went after she left the hospital.

25  Q    At some point -- you said you had tried at first

CLAYTON - DIRECT                    240

1    to interview Mr. Pernell and tried to figure out where

2    geographically he was located when he was shot.

3    A    Correct.

4    Q    Did you go back and try to interview him a second

5    time about that?

6    A    Once we had received the information about his

7    correct name, and I reviewed some pictures that were

8    taken of him that morning and a picture in our

9    database of Robert Pernell with the information I had

10   been given and could see they were the same person,

11   then when myself and Detective Conner and Lieutenant

12   Jones went back, we again tried to interview him about

13   what had happened.

14   Q    At that time did Mr. Pernell make any statements

15   with regard to the shooting that you-all were

16   investigating in Chesterfield?

17   A    He didn't make any direct statements other than we

18   told him we knew that he had been involved in the

19   shooting, and his only statement to us was he didn't

20   try to kill two people that day.

21   Q    And that's the only statement he made at that

22   point?

23   A    Correct.  He didn't make any other statements

24   while we discussed with him at that time about the

25   shooting and his involvement.

CLAYTON - DIRECT                           241

1    Q    After that and some other just general

2    investigation, you-all left the hospital, I gather?

3    A    Correct.

4    Q    On or about May 20 of 2009, so about five days

5    later, did you return to the hospital this time also

6    with Detective Conner and with a search warrant?

7    A    That's correct.  It was for a buccal swab.

8    Q    Can you tell the ladies and gentlemen of the jury

9    what exactly is a buccal swab?

10   A    A buccal swab is basically two Q-tips.  We use

11   them to collect DNA evidence, and it's to be compared

12   to items that we send to the state lab for DNA

13   analysis.

14   Q    How, for instance, would you use the two Q-tips to

15   take a buccal swab?

16   A    They are placed in the person's mouth and rubbed

17   around on their cheeks, and then they're placed into a

18   cardboard box and sealed up.

19   Q    And those buccal swabs you rub on the inside of

20   the cheeks, not the outside, correct?

21   A    Correct, inside the mouth.

22   Q    And then when you submit those to the lab, they

23   use that as a comparison?

24   A    Correct.

25   Q    Who did you take the buccal swab from that day,

1   May 20th of 2009?

2   A    From the defendant, Mr. Pernell.

3   Q    All right.  Did you put those buccal swabs into

4   the property room into evidence in the Chesterfield

5   Police Department?

6   A    Yes, ma'am.

7   Q    That item was listed as Item 33 in the evidence

8   room; is that correct?

9   A    That's correct.

10  Q    All right.  Also on or around that same time

11  period, you also went and collected some evidence from

12  Petersburg Police Department; is that correct?

13  A    That's correct.

14  Q    What day was that?

15  A    It was the 26th of May, 2009.

16  Q    On that day, can you tell the ladies and gentlemen

17  of the jury what you went and collected from

18  Petersburg and what you did with it?

19  A    There were several items of clothing that had been

20  collected from Mr. Pernell on the day of -- the

21  original day that he went to the hospital for

22  treatment.  And Petersburg had originally collected

23  them because Southside Regional is in Petersburg.  And

24  at the time they were collected we weren't sure

25  exactly for certain where Mr. Pernell had been shot,

CLAYTON - DIRECT                    243

1   where his juries had occurred.  So we made the

2   decision to have Petersburg collect the items.

3   Q    Then when you went and collected the items, what

4   if anything did you do with them?

5   A    I collected them from Petersburg, and I took them

6   directly to our police property where they were placed

7   into -- taken as is and placed into new packaging with

8   the original packaging, and then I sealed them, and

9   signed them, and filled out our paperwork, and they

10  were placed into our property.

11  Q    I'm going to show you what's been marked as

12  Government's Exhibits 37, 38, 39, 40, 41, 42, 43, and

13  44.  Are those the items in front of you there?

14  A    Yes, ma'am.

15  Q    All right.  Let's start with Exhibit 37.  What's

16  been marked as Government's Exhibit 37?

17  A    Government's Exhibit 37 is listed as a pair of

18  black tennis shoes.  Left side has shards of mirror

19  glass embedded in the foam around the top.

20  Q    That's Item 37 right there in front of you?

21  A    Yes, ma'am.

22  Q    Describe the packaging for us.  Is that how you

23  packaged it?

24  A    Yes, ma'am.

25  Q    How are you able to tell whether or not that's

CLAYTON - DIRECT                           244

1   been opened?

2   A    The tape is our standard evidence tape, and it has

3   my initials across the tape.

4   Q    In order to get the bag open, you either have to

5   cut the tape or cut the bag itself?

6   A    That's correct.

7   Q    Has it been cut since your initials were placed on

8   there?

9   A    No, ma'am.

10  Q    Can we go ahead and open Government's Exhibit 37,

11  please, carefully.

12       When you opened that bag, for the record, there's

13  another bag inside of it, correct?

14  A    Correct.  This was the bag that it was packaged in

15  in Petersburg and I opened it to verify the contents

16  when I received it.

17  Q    When you received it, it was still sealed?

18  A    That's correct.

19  Q    If we could go ahead and open that and see what's

20  inside.

21            MS. NORMAN:  Your Honor, may I just approach

22  the witness stand very briefly?

23  Q    Now, Exhibit 37 appears to be a pair of black

24  athletic shoes of some sort.  The shoe, the left shoe,

25  does it have any contents in it?

1   A    It has what appears to be glass, reflective glass,

2   mirrored glass, and it's stuck -- it's hard to show,

3   but it's stuck right inside the foam on the top of the

4   shoe.

5           MS. NORMAN:  Your Honor, the United States

6   would move to admit Government's Exhibit 37.

7           MR. COLLINS:  No objection.

8           THE COURT:  Is there any objection to the

9   chain of custody on 38 through 44?

10          MR. COLLINS:  No, none of those.  And I'll

11  stipulate that they have all been handled properly.

12          THE COURT:  All right.  Is there any

13  objection to them?

14          MS. NORMAN:  No objections to their

15  admission?

16          MR. COLLINS:  No.

17          MS. NORMAN:  Your Honor, then we would move

18  to admit Government's Exhibit 38, which is a pair of

19  pants; Government's Exhibit 39, which is a shirt;

20  Government's Exhibit 40, which is a shirt;

21  Government's Exhibit 41, which is a black mask;

22  Exhibit 42, which is boxers; Government's Exhibit 43,

23  which is a T-shirt; and Government's Exhibit 44, which

24  is another T-shirt.

25          THE COURT:  They are admitted without

CLAYTON - DIRECT                         246

1    objection.

2              (Government's Exhibits 37 through 44 are

3    admitted into evidence.)

4              MS. NORMAN:  Now, instead of going through

5    them and opening each one -- and, Your Honor, we can

6    have the detective open each one and present the

7    evidence as is or we can just open them and allow the

8    jury to look at them now that they have been admitted

9    when they go back for their deliberations.

10             THE COURT:  It's up to you-all and what you

11   want to do.

12             Mr. Collins, do you care?

13             MR. COLLINS:  No.

14   BY MS. NORMAN:

15   Q   So you checked each one of these items; is that

16   correct?

17   A   Yes, ma'am.

18   Q   Before you repackaged them?

19   A   That's correct.

20   Q   Do you recall what color the pants are?

21   A   No, I don't recall off the top of my head.

22   Q   Do you recall that any of the items were bright

23   colored or anything like that?  Do you remember any of

24   that?

25   A   No, ma'am.

1  Q   Can you open each of the bags, please, and just

2  take the items out so we can see them one at a time

3  starting with Government's Exhibit 38?

4          MR. COLLINS:  I will stipulate to all the

5  clothing.

6          MS. NORMAN:  If he stipulates they are all

7  dark clothes except for the undershirt, which is not,

8  then he doesn't need to do that.

9          THE COURT:  It's stipulated that all of them

10 are dark clothes.

11         MS. NORMAN:  Except for the undershirt.

12         THE COURT:  There are two T-shirts, 43 and

13 44.  Which one isn't?

14         MS. NORMAN:  I know one of them is white.

15 One moment, Your Honor, and I can tell you.

16         Your Honor, may we see Government's Exhibit

17 47, please?

18         THE COURT:  47?

19         MS. NORMAN:  Yes.

20         THE COURT:  That's the inventory.  Mr. Neal,

21 do you have that?

22         Do you have Government's Exhibit 47 over

23 there, Mr. Langford?  That's the inventory.  It's in a

24 plastic sleeve.

25         MR. LANGFORD:  Yes.

CLAYTON - DIRECT                    248

1          MS. NORMAN:  May I see that, please?

2          THE COURT:  Would it be quicker to have him

3    look at 43 and 44 and see which one is light and which

4    one is not?

5          MS. NORMAN:  Yes, sir.

6          THE COURT:  Do that, please.  Would you look

7    at 43 first and see?

8          THE WITNESS:  Yes, Your Honor.

9          Item 43 is a white sleeveless T-shirt.

10          THE COURT:  Item 44 is what?

11          THE WITNESS:  Item 44 is a black

12   short-sleeved T-shirt, size XXXL.

13          THE COURT:  All right.  Now, we've gotten it

14   straightened out.

15          MS. NORMAN:  Thank you.

16          We have no further question.

17          THE COURT:  Any questions?

18          MR. COLLINS:  I have no questions of this

19   witness.

20          Thank you, detective.

21          THE COURT:  Can he be excused and leave the

22   evidence here?

23          MS. NORMAN:  Yes, please.

24          THE COURT:  All right.

25          MS. NORMAN:  The government's next witness is

1   going to be forensic investigator Barrett.

2           THE COURT:  All right.

3           Thank you, Detective Clayton.  You're excused

4   to go about your business.

5           THE WITNESS:  Thank you, sir.

6           (The witness was excused from the witness

7    stand.)

8

9       KELLY BARRETT, called by the United States, first

10  being duly sworn, testified as follows:

11

12      DIRECT EXAMINATION

13  BY MS. NORMAN:

14  Q    Good morning.

15  A    Hello.

16  Q    Can you please tell the ladies and gentlemen of

17  the jury your name and where and how you are employed?

18  A    I'm Kelly Barrett.  I'm a forensic investigator

19  for Chesterfield County Police Department.

20  Q    How long have you been a forensic investigator for

21  Chesterfield Police Department?

22  A    It will be eight years next week.

23          THE COURT:  Can you pull that microphone

24  closer to you?

25          THE WITNESS:  Is that better?

BARRETT - DIRECT                          250

1          THE COURT:  Yes.

2          A little closer.

3    Q    As a forensic investigator, what are your

4    responsibilities?

5    A    I process crime scenes by documenting them,

6    photographing them.  I write reports.  I do forensic

7    training for our police personnel and sometimes some

8    outside agencies like St. Mary's.  I'll do photography

9    classes for them.

10   Q    On May 15 of 2009, were you working that night?

11   A    I was on call that week.  Our unit has one

12   investigator on call all night every week.  So I had

13   that week that particular month.

14   Q    On May 15 of 2009, were you called out to assist

15   in a matter?

16   A    Yes, ma'am.

17   Q    Can you tell the ladies and gentlemen of the jury

18   what were you called out to assist in?

19   A    Our dispatcher called my cellphone and just

20   advised me that I would be en route to a shooting on

21   Lockett Ridge.  So I got myself together and left my

22   house.

23   Q    Do you recall approximately what time you received

24   the call?

25   A    It was probably between 2 and 3 o'clock.

1  Q    In the morning?

2  A    Yes.

3  Q    Now, when you were driving to the scene of 1453

4  Lockett Ridge Road, what was the weather like?

5  A    I live a fair distance away, and it started

6  pouring down when I left my house.  So it took me a

7  little bit longer than it would have if it wasn't

8  raining so hard.

9  Q    As a forensic investigator, did the rain concern

10  you at all?

11  A    Yes.  I knew it was a shooting, so naturally, most

12  likely, it wouldn't have all been indoors, and I was

13  right by that account.  When I arrived it was still

14  raining intermittently.

15  Q    By the time you had gotten there?

16  A    Yes.

17  Q    Once you arrived there, were there other police

18  personnel already on the scene?

19  A    Yes, ma'am.

20  Q    Were other people doing things?

21  A    Yes.  We train some of our road units, our

22  officers, in forensics so they can do the basics for

23  us until we can arrive.  And in this case, we had an

24  officer there who was assigned to start collecting any

25  exterior evidence that would have been damaged from

1    the rain.

2    Q    Would that include -- what did that include in

3    this case?

4    A    I know for him, when I arrive, he immediately

5    comes to me and briefs me on the forensic situation.

6    And for him, he had to get there and collect blood

7    because the rain showers were washing the exterior

8    blood away.

9    Q    I'm going to show you what has been marked as

10   Government's Exhibit 224-8.

11   A    Okay.

12            THE COURT:  Is it a picture?

13            MS. NORMAN:  It's a picture.

14   Q    This is a photograph.  Do you recognize that

15   photograph?

16   A    Yes.

17   Q    Can you tell the ladies and gentlemen of the jury

18   what is that a photograph of?

19   A    That's the front stoop of the residence, 1453

20   Lockett Ridge.  So the front stoop of the house.  And

21   I see blood splatter on the stairs and some latex

22   gloves.

23   Q    Now, when you were traveling from a distance, it

24   was raining as you were getting there; is that

25   correct?

1    A    It was raining from when I left my house

2    throughout my travel to Lockett Ridge.

3    Q    Had the rain really started at Lockett Ridge at

4    that point?

5    A    This photograph I don't see rain in.  So I

6    wouldn't have taken out my camera and tried to shoot a

7    picture in a downpour.  But when I had arrived, the

8    officer had already collected the blood evidence that

9    he needed to because of the rain.

10   Q    Now, I want to direct your attention to what has

11   been marked as Government's Exhibit 773-1.  Did you

12   take this photograph?

13   A    Yes.

14   Q    What does this photograph depict?

15   A    When I arrive on the scene, I like to get a photo

16   of the address.  That's the mailbox at the end of

17   the -- where the yard meets the road of 1453.  So it's

18   just kind of a marker to show that that's the house

19   that I would be processing.

20   Q    We see a car parked behind the mailbox in this

21   picture.  Were those police vehicles or were those

22   vehicles that were there when you arrived?

23   A    That vehicle, I don't believe that's a police

24   vehicle.

25   Q    The black one that we see?

BARRETT - DIRECT                         254

1  A    Correct.

2  Q    All right.  Is that the parking area for the

3  house?

4  A    I think it is.  I believe so.  And then the crime

5  scene tape wraps behind that vehicle.  So that's part

6  of the scene, so yes.

7  Q    I'm going to show you what's been marked as

8  Government's Exhibit 773-2.  What is that?

9  A    That's the exterior of the house, the front of the

10 house.  I'm standing right outside the police tape

11 shooting my picture towards the front.

12 Q    Now, that picture, it appears that it's kind of

13 light.  Were you adding light to it or is it naturally

14 that light?

15 A    I have an exterior flash.  So I think in that

16 picture the flash was up.

17 Q    That's actually adding some light to the scene?

18 A    Yes.

19 Q    Okay.  Now, I want to take direct your attention

20 to Government's Exhibit 773-3.  What is this?

21 A    That's the exterior.  That one actually looks like

22 it has the flash added to it.  The prior picture, I

23 think, might have just been -- I'm sorry.  I just

24 turned the monitor off.  Excuse me.

25 Q    Now, when we look in this picture, we see the

BARRETT - DIRECT                    255

1  walkway?

2  A    Uh-huh.

3  Q    At the bottom of the picture it appears a

4  different color than the middle segment and then it

5  gets dark again.  What is that?

6  A    That would just be the light, the effect of the

7  light.  It only travels so far.  Now, you have the

8  house, the exterior of the house, is a light color.

9  When you shoot a picture at night the light color of

10 the house kind of reflects some of the lighting.  So

11 if the house were brick, it would have been very dark

12 and absorbed most of my light.

13 Q    Now, when you look at this picture, the forensic

14 work that you did at the house, was it inside the

15 house, outside the house or other --

16 A    Outside.  When I arrived, we were told that we

17 were not searching the interior of the home or we had

18 not gained access to the interior.  I couldn't go in

19 and do anything at the time.

20 Q    So you could look around the outside, but you-all

21 were denied consent to go inside?

22 A    Correct.

23 Q    So looking at this picture, can you tell the

24 ladies and gentlemen of the jury generally if you

25 found anything of forensic value to you?

1 A    Yes.  As I had said a little earlier, when I

2 arrived the officer who started the forensic work came

3 over and briefed me.  And you can see the steps.  I

4 guess we'll call them steps.  They are kind of

5 stepping stones that lead up to the front door.

6     He advised that the area of my concentration would

7 be right there.  That's where he started.  That there

8 was blood on the stoop steps that he had collected.

9     I was advised that there was other evidence

10 outside.  They had been kind of looking around.  That

11 there was a shell case up in the front.  I walked up

12 there.  I looked around and I observed a shell case

13 sitting off to the side in the grass.  There wasn't

14 much grass, but you can kind of see the area in this

15 picture off to the left of the porch if you're facing

16 it.

17 Q    So if you will, and you have to be gentle when you

18 do this, but if you will just touch the screen in the

19 approximate area where you found the shell case.  And

20 you just touch it and it will leave a mark.

21 A    Like right around here.

22 Q    So that's the approximate area there?

23 A    Yes.

24 Q    When we look at the house, we can get a general

25 idea?

1    A    Yes, just off the step stones.

2    Q    Now, I'm going to direct your attention to what's

3    been marked as Government's Exhibit 773-5.  Before we

4    get to that, what is the significance of the number

5    773?

6    A    That's my unit number.  When I collect evidence, I

7    write "773" on it.  It helps me with my report.  It

8    helps me keep everything organized.  And I do markers

9    in my photographs so I can go back and say, This is a

10   picture of my item 773-1, or the second piece of

11   evidence I'd pick up would be 773-2, and it would go

12   on and on.

13   Q    So it goes sequentially based on when you pick it

14   up?

15   A    Yes.

16   Q    The first piece of evidence you pick up is 1, the

17   second is 2, etc.?

18   A    That's the way that I do it, yes.

19   Q    The same with the photographs.  They are in the

20   order, basically, in the order that you took them?

21   A    Yes, they should be.

22   Q    All right.  So your No. 773 is on each of the

23   photographs you took?

24   A    Yes.

25   Q    So going to what's been marked as Government's

BARRETT - DIRECT                    258

1    Exhibit 773-5, this is a closer area, can you tell us

2    as we look at this picture of the Exhibit 773-5, point

3    us, if you will, to what forensic interest there is in

4    this picture.

5    A    When I'm photographing the scene, I want you to be

6    able to see the evidence in its natural setting

7    because if I shot a picture of it only closeup, you'd

8    only see this tiny little area.

9        So I'm standing on the step stones probably about

10   10 feet back from my piece of evidence.

11       Should I touch the screen to show you?

12   Q    You can make a circle around it if you want to.

13   A    Right there.  I have -- it looks like trash.  It's

14   just a piece of paper.  And on that paper it's

15   actually a marker that I use, and I've written on it

16   "773-1" because that's where my evidence is.

17       So I want to show you in this photograph where the

18   evidence is in relation to the space that we're

19   standing in.  So you can see the stoop and the step

20   stones.

21   Q    Now, I'm going to show you what's been marked as

22   773-6.  Tell us what that is.

23   A    That is a little bit closer to the same marker

24   marking the evidence of where I found my 773-1.

25   Q    Okay.

BARRETT - DIRECT                     259

1        THE COURT:  That white piece is your marker?

2        THE WITNESS:  Yes, sir, right there.

3        MS. NORMAN:  And if we can zoom in on the

4   marker, please.

5   Q   So that's your marker.  And that's like a little

6   black arrow on your marker?

7   A   Yes.  I'm pointing in the direction of the

8   evidence.  I don't want to touch the evidence with the

9   marker.  I just want to show you where it is.

10  Q   Now, I want to show you what's been marked as

11  Government's Exhibit 773-8.  Is that just a different

12  view of the same thing?

13  A   Yes, it looks like I would have moved a couple of

14  blades of grass out of the way so you can see my

15  entire marker with my item number, 773-1.  And to the

16  left it says, "Chesterfield County Police."  And

17  underneath it, that's the complaint number for this

18  case.  They issue you a complaint number every time

19  you go per case.  So it documents right above the

20  arrow my evidence, that shell case.

21  Q   Finally, I'm going to show you what's been marked

22  Government's Exhibit 773-7.

23  A   That's one.  That's the same one.

24  Q   What is that?

25  A   I had removed the shell case from the grassy area

1   of the yard.  And I actually just stepped to the

2   right.  This is one of those stepping stones.  I set

3   the shell case down and I put my scale right above it.

4   It's a little ruler.  And then underneath that's the

5   same label that I used to show it in the yard.  And I

6   just shot a closeup photo of it.

7          MS. NORMAN:  Now, Your Honor, at this time

8   the United States would move to admit Government's

9   Exhibits 773-1 --

10          MR. COLLINS:  No objection.

11          MS. NORMAN:  -- through 773-8.

12          MR. COLLINS:  No objection.

13          THE COURT:  They are admitted.

14          (Government's Exhibits No. 773-1 - 773-8 are

15   admitted into evidence.)

16   BY MS. NORMAN:

17   Q   Now, I believe you have a package in front of you

18   that's marked Government's Exhibit 28.

19   A   Yes.

20   Q   Now, can you --

21          THE COURT:  Is somebody going to tell us what

22   caliber shell that is?

23          MS. NORMAN:  Yes, sir.

24          THE COURT:  Okay.

25   Q   The package that's been marked Government's

BARRETT - DIRECT                    261

1   Exhibit 28, do you recognize that?

2   A    I do.

3   Q    Tell the ladies and gentlemen of the jury what

4   that is.

5   A    This is what we have the photograph up of.  It's

6   my 773-1, the shell case I removed from the front

7   yard.  And on it I've written my complaint number.  It

8   all corresponds to the marker in my photograph.

9   Shooting, my name, 773-1, and then a description on

10  the envelope.  I have, "One .45 auto Winchester

11  cartridge case."

12      Then I have an additional label that's put on it

13  with the detective's name, the complaint number, and

14  the description, one .45 auto Winchester cartridge

15  case.  And it all corresponds with the photo.

16  Q    Now, A lot of times when you guys go out to a

17  scene, there might be more than one forensic

18  investigator; is that correct?

19  A    Yes.

20  Q    In fact, in this case they were several?

21  A    Yes.

22  Q    So you sequentially number the evidence that you

23  recovered?

24  A    Yes.

25  Q    So when you submit it to evidence at the police

1  department, do they just continue to use your number

2  or do they give it a new number?

3  A    They give it their own number for their computer

4  cataloging system.

5  Q    So if two different forensic investigators collect

6  evidence at a scene, you might have 1 through 50 and

7  the other investigator has 1 through 50.  When it goes

8  to the evidence room, it becomes 1 through 100?

9  A    Yes.

10  Q    So what is the evidence number that was attributed

11  to your item 773-1?

12  A    Number 28.

13  Q    And, coincidentally, it's also marked Government's

14  Exhibit 28; is that right?

15  A    That's correct.

16  Q    It's evidence item 28 as well as Government's

17  Exhibit 28?

18  A    Yes, it is.

19  Q    Can you open that up and let us see what that is?

20  A    Sure.  Do you just want me to hold it up?

21  Q    If you can hold it up.

22       What kind of metal does that appear to be?

23  A    It's copper, I think.  It's a cartridge case.

24  It's the same one in the photo, but if you look at my

25  photo, the flash kind of lights up the stamp on it.

BARRETT - DIRECT                    263

1  Q   Okay.  And if we look at the photo, which is

2  marked Government's Exhibit 773-7, with the light, we

3  can see the indentation stamp on the bottom of that;

4  is that correct?

5  A   Yes, 773-1.  And you can see the stamp.  The stamp

6  is the marking.  It says "Winchester .45 auto."  It

7  kind of wraps around.  That's what they call the

8  stamp.  The head stamp of it.

9          MS. NORMAN:  Your Honor, at this time the

10 United States would move to admit Government's Exhibit

11 28?

12         THE COURT:  Any objection?

13         MR. COLLINS:  No objection.

14         THE COURT:  It's admitted.

15         (Government's Exhibit No. 28 is admitted into

16 evidence.)

17 Q   Finally, I want to direct your attention to two

18 other packets marked for identification as

19 Government's Exhibits 31 and 32.  Do you have those in

20 front of you?

21 A   I do.

22 Q   Can you tell the ladies and gentlemen of the jury

23 what Government's Exhibits 31 and 32 are?

24 A   31 is a GSR kit, a gunshot residue kit, of Keona

25 Peoples.

BARRETT - DIRECT                          264

1    Q    What is Government's Exhibit 32?

2    A    32 is a GSR kit of Anwan Jones.

3    Q    Did you take those GSR kits?

4    A    After I finished processing the scene, a detective

5    requested that I take GSRs for them.  So I went ahead

6    and did them.

7    Q    Did you do them there at the scene?

8    A    Yes.

9    Q    At 1453 Lockett Ridge?

10   A    Yes.

11   Q    The persons that you took these from, they

12   identified themselves as Anwan Jones.

13   A    Yes.

14   Q    And then Keona Peoples?

15   A    Yes.  There's an information packet that goes with

16   them.  So I fill out that information.  And they give

17   me their name and birth date.

18   Q    So when you submitted those, did you submit those

19   to the evidence room, too, to property?

20   A    Yes.

21   Q    What item number did the evidence room give those?

22   A    They gave them, let's see, Keona Peoples, her GSR

23   kit is No. 31, and Anwan Jones' GSR kit is No. 32.

24            MS. NORMAN:  Your Honor, at this time we are

25   not going to ask the investigator to open those, but

BARRETT - DIRECT                    265

1   we're going to move to admit those.

2              THE COURT:  Any objections?

3              MR. COLLINS:  No, sir.

4              THE COURT:  They are admitted.

5              MS. NORMAN:  And they are Government's

6   Exhibits 31 and 32 for the record.

7              (Government's Exhibits 31 and 32 are admitted

8   into evidence.)

9              MS. NORMAN:  And we have no further questions

10  of this witness.

11             THE COURT:  All right.

12             Any questions, Mr. Collins?

13             MR. COLLINS:  Very briefly, Judge.

14

15     CROSS-EXAMINATION

16  BY MR. COLLINS:

17  Q   Good afternoon, Ms. Barrett.

18      We heard Officer Chapman testify earlier.  He was

19  at the scene before you, correct?

20  A   Yes, sir.

21  Q   And he is pretty adamant that he saw two cartridge

22  casings.  You're pretty adamant that you saw one,

23  correct?

24  A   Yes.

25  Q   Any explanation for that?

BARRETT - CROSS                266

1   A    Well, my photo shows the one that I saw, and if

2   you look back, you don't see two in them.  So I know I

3   saw one.

4   Q    So it will forever remain one of life's great

5   mysteries, huh?

6   A    I could speculate to different things.

7            MR. COLLINS:  Thank you, ma'am.

8            MS. NORMAN:  One quick follow-up.

9

10       REDIRECT EXAMINATION

11  BY MS. NORMAN:

12  Q    Ms. Barrett, there were other items laying on the

13  ground around there; is that correct?

14  A    Yes.

15  Q    In fact, if we go back to Government's Exhibit

16  773-5, this was a picture you took before you actually

17  picked up and collected that cartridge case; is that

18  correct?

19  A    Yes.

20  Q    And there are other items there are laying around

21  there.  Did you check those items to make sure they

22  were not cartridge cases?

23  A    In every scene, you'll have non-evidentiary items.

24  So those are things that are of no value to me

25  evidence-wise.  For instance, if you look in this

1  photo -- when I arrive, and to show you what I see, I
2  take that picture.  So I'm standing there and you can
3  look just like I was.  You'll see the boot tread, like
4  a wet boot tread on one of the stepping stones kind of
5  close to my marker.
6  Q   You can use your finger and just show us.
7  A   Right here on the fifth stone from the porch
8  there's a boot tread.
9  Q   I'm going to erase your mark just so that now
10 people see where to look so they can see it without
11 the mark.  Okay?
12 A   Okay.  Then if you look up on the entire stoop,
13 which you really don't need me to draw, but you'll see
14 all these dark spots, water, blood, kind of mixed.  Do
15 you see the darker colors on the stones and the steps?
16 So you can see that in my picture.
17     Now, you can also see some little like lighter
18 colored items, like right here you see something
19 white.
20 Q   Okay.  Now that we have that highlighted, can you
21 enlarge that area?  Then I will take the highlight
22 off.
23     All right.  So that's the enlargement of that
24 area.  What was that?
25 A   If you look really close to this right here, that

1    looks like the filter tip of a cigar, like the plastic

2    part.  You can see the thin end and then the thicker

3    end of it.  And then you can see other little light

4    colored items.  Those are little pieces of leaves.

5    Q    Those are all items that without the benefit of

6    your light -- how do they compare in size to the

7    cartridge case?

8    A    They look very similar in size.

9    Q    You have the benefit of your light from your

10   camera and from your flash?

11   A    When I'm standing there, it's not raining right at

12   that moment.  You can see the wetness on the treads.

13   It had been raining.  So I'm shooting the picture in

14   much better conditions than when the officer started

15   processing the scene.

16   Q    So your whole purpose is to go and find what in

17   all these little various pieces that we see in this

18   photograph, all these little various pieces of stuff,

19   if there's actually something of evidentiary value in

20   there?

21   A    Yes, that's my function, my complete function

22   there.

23   Q    Later somebody said or you read that somebody said

24   that they saw two?

25   A    Right.

BARRETT - REDIRECT                269

1   Q    But you only saw the one?

2   A    Correct.  I would have collected -- if I saw two

3   there, I would have collected them.

4   Q    And that was it.  That was your whole area, and

5   you searched that, and that's what you found?

6   A    That's where the event occurred.  You can see with

7   the blood.  And the brief -- they only briefed me on

8   what has occurred.  That enables me to be able to

9   actually look.  That's my skill set to be able to look

10  for the evidence.  So I get a brief.  There was a

11  shooting.  There's blood.  Obviously, somebody bled at

12  some point on this steps, and I was advised that there

13  was something, a shell case, in the yard.

14  Q    As you said, you weren't allowed to go into the

15  house because there was no consent from the owners at

16  that time?

17  A    Yes, correct.

18  Q    Were you involved in going in later?

19  A    No, I wasn't.  It was a very minimal time frame

20  for me here.

21          MS. NORMAN:  We have nothing further, Your

22  Honor.

23          THE COURT:  All right.  Can she be excused

24  permanently?

25          MS. NORMAN:  Yes, except that I think she's

1   got a lot of the other evidence or is carting back and

2   forth the other evidence.  So I don't think she'll be

3   leaving us, but she can be excused.

4            THE COURT:  Well, I don't want to let

5   somebody go that's got evidence if we're going to need

6   them.  So please stay around in case we need you.

7            THE WITNESS:  Yes, sir.

8            (The witness was excused from the witness

9   stand.)

10           THE COURT:  Next witness.

11           MS. NORMAN:  Your Honor, before we get to the

12  next witness, the United States does want to make sure

13  I move to admit the photographs marked as Government's

14  Exhibits 773-1 through 773-8.

15           THE COURT:  You already did that.

16           MS. NORMAN:  Okay.  I just want to make sure

17  I moved to admit those.

18           THE COURT:  We don't have 224-8.

19           MS. NORMAN:  And we would move to admit

20  224-8.

21           THE COURT:  Any objection?

22           MR. COLLINS:  No, sir.

23           (Government's Exhibit No. 224-8 is admitted

24  into evidence.)

25           MS. NORMAN:  Your Honor, the government's

271

1    next witness is the forensic investigator that

2    processed the inside of the house, and we believe that

3    she will probably take some time.

4            THE COURT:  I'm sure she will.  Let's get

5    started.  I have a previous obligation.  Today is Law

6    Day and I'm obligated to do something with the

7    Richmond Bar Association at Law Day.  I will leave

8    here at 12:15, and we'll resume at 1:30, and so that

9    will be your lunch hour today.  We're going to try to

10   get some testimony in before 12:15.

11           We can get the identification information,

12   and a lot of more basic things in, and then we'll

13   stop.

14           MS. NORMAN:  Yes, sir.

15

16

17       SANDRA SIMMONS, called by the United States, first

18   being duly sworn, testified as follows:

19

20       DIRECT EXAMINATION

21   BY MS. NORMAN:

22   Q    Good afternoon.

23   A    Good afternoon.

24   Q    Can you please tell the ladies and gentlemen of

25   the jury your name and where and how you're employed?

SIMMONS - DIRECT                    272

1   A   My name is Sandra Parrish Simmons.  I'm a forensic

2   investigator with Chesterfield County Police.

3   Q   Now, how long have you been with Chesterfield

4   County Police?

5   A   It will be 15 years in October.

6   Q   Have you served your entire time with Chesterfield

7   Police Department as a forensic investigator?

8   A   Yes, ma'am.

9   Q   Now, I want to direct your attention to May 15 of

10  2009 in the morning hours.  Were you called to respond

11  to the Southside Regional Medical Center in

12  Petersburg?

13  A   Yes, ma'am.

14  Q   Why were you called out there?

15  A   I was called to photograph injuries on a male that

16  was at the hospital.

17  Q   All right.  Did you in fact find the individual

18  and photograph him?

19  A   Yes, ma'am.

20  Q   I want to show you what has been marked as

21  Government's Exhibit 768-12.  And let me ask you,

22  what's your unit number?

23  A   My unit number at Chesterfield is Unit 768.

24  Q   So if there's a photograph that's marked 768-12,

25  that's a photograph you took?

SIMMONS - DIRECT                    273

1   A   Yes, ma'am.

2   Q   Is this a photograph that you took at the hospital

3   that day?

4   A   Yes, ma'am, it is.

5   Q   Please tell the ladies and gentlemen of the jury

6   what's the significance of this picture?

7   A   The individual I took photos of had what appeared

8   to be bullet holes in his arm, in his left arm, and in

9   his left shoulder area, left upper arm.

10  Q   So does this accurately depict what you saw there

11  at the hospital that day?

12  A   Yes, ma'am.

13  Q   I'm going to show you now what's been marked as

14  768-14.  Is that the individual you took the picture

15  of?

16  A   Yes, ma'am, it is.

17  Q   At that time had the individual identified

18  himself?

19  A   I don't remember if he had or not.

20  Q   Do you recognize the individual you took the

21  pictures of today?

22  A   I've never met the individual before other than

23  taking photographs.  It appears to be the same

24  individual.

25  Q   Okay.  Now I'm going to show you a picture that's

1    been marked Government's Exhibit 768-17.  What's this

2    a picture of and what was the significance?

3    A    It's a tattoo that's on his back.

4    Q    I see that you have your ruler there.  Did you put

5    the ruler there for a reason?

6    A    Yes, I did.  Just for scale purposes, just to show

7    the scale, give you an idea a little bit of how the

8    size of the tattoo is.

9    Q    There's a little item that appears to be not a

10   tattoo located there.  Can you highlight that?

11       Was that of any significance to you when you saw

12   that?

13   A    I wasn't sure what that was, but I took a close-up

14   of whatever that was.

15   Q    Okay.  Did it appear to be an organic or a

16   nonorganic object?

17   A    It appeared something was there, but I couldn't

18   tell what it was.  So just took a close-up of it.

19   Q    I'm going to show you one more picture marked

20   768-18.  Is that just a broader shot of the same

21   thing?

22   A    Yes, ma'am.

23           MS. NORMAN:  Your Honor, at this time the

24   United States would move to admit photo Exhibit

25   768-12, -14, -17, and -18.

SIMMONS - DIRECT                    275

1        MR. COLLINS:  Judge, I'm not sure what the

2   relevance of 17 and 18 is, but otherwise I have no

3   objection.

4        THE COURT:  What's the relevance of 17?

5        MS. NORMAN:  We had testimony earlier today,

6   Your Honor, from an officer that indicated that they

7   followed a track into the woods and found an area

8   where there was blood, and the vegetation had been

9   compressed or had been -- appeared that somebody had

10  fallen and had been there long enough to leave an

11  impression in the vegetation.

12       THE COURT:  This is pictures of tattoos.  How

13  does that show anything?

14       MS. NORMAN:  That's why I was highlighting

15  the item, Your Honor, in 768.

16       THE COURT:  Are you talking about the green

17  thing on the left?

18       MS. NORMAN:  Yes, Your Honor.

19       THE COURT:  You're offering it as probative

20  of being vegetative matter?

21       MS. NORMAN:  Yes.

22       THE COURT:  All right.  Objection overruled.

23  It's admitted.  So all of them are.

24       (Government's Exhibits Nos. 768-12, 768-14,

25  768-17 and 768-18 are admitted into evidence.)

SIMMONS - DIRECT                    276

1    Q    Now, when you finished taking the pictures at the

2    hospital, did you do anything else there?

3    A    After I took the photographs, I was told that I

4    needed to respond to an address I believe on Lockett

5    Ridge Road.

6    Q    Did you proceed from the hospital over to Lockett

7    Ridge at that time?

8    A    Yes, ma'am.

9    Q    Now, I'm going to go through a number of

10   photographs, and I want to show you, these are the

11   actual physical photographs that have been marked.

12   There's the notebook right there.  They are the

13   physical photographs that have been printed and

14   actually marked with the government exhibit sticker.

15   A    Okay.

16   Q    Can you just glance through those quickly and see

17   if you can identify if those are your photos that you

18   took at 1453 Lockett Ridge Road on May 15, 2009?

19         THE COURT:  What exhibits are you talking

20   about now?

21         MS. NORMAN:  These are all of the photographs

22   that the government has been referring to as

23   Government's Exhibit 768A dash and then all the series

24   of numbers after that.

25         THE COURT:  All of the 768A numbers?

SIMMONS - DIRECT

1          MS. NORMAN:  Yes, sir.  But, Your Honor, only

2     the ones listed in the government's proposed exhibit

3     list.

4          THE COURT:  How is anybody ever going to know

5     what those are?

6          MS. NORMAN:  For counsel's purpose, and for

7     the Court's purpose, and for the record's purpose,

8     it's not every photograph that the forensic

9     investigator took.  It's just the ones that we have

10    listed in the Government's exhibit list.  And the

11    Court had asked us --

12         THE COURT:  So all you're asking her to

13    identify is the ones that are on the list?

14         MS. NORMAN:  Yes.

15         THE COURT:  Okay.  That's fine.  Maybe I

16    misunderstood what you were saying.

17         There are others that she took that are not

18    being used as exhibits.

19         MS. NORMAN:  That's correct.

20    A    Yes, ma'am.

21    Q    And those are all photographs -- and the question

22    I asked and I think you just answered, those are all

23    the photographs or what's been presented to you are

24    photographs that you took depicting what you observed

25    at 1453 Lockett Ridge Road on May 15, 2009?

SIMMONS - DIRECT                    278

1    A    Yes, ma'am.

2         MS. NORMAN:  And, Your Honor, there was no

3    objection by defense earlier, but just for the record

4    at this time the United States would move to admit

5    photographs that have been marked as Government's

6    Exhibits 768A and with the numbers following on the

7    Government's exhibit list rather than just read every

8    number on the list.

9         MR. COLLINS:  It is still correct that I

10   don't object to any of the photographs.

11        THE COURT:  Okay.  So I gather there are

12   omitted numbers; is that right?

13        MS. NORMAN:  Yes.

14        THE COURT:  All right.  They are admitted.

15   BY MS. NORMAN:

16        (All Government's Exhibits starting with 768A

17   are admitted into evidence at this time.)

18   Q    Now, can you tell before we get into the very

19   specifics --

20        THE COURT:  I think it's 12:15 and I need to

21   go ahead and leave.

22        We'll excuse the jury for lunch.  If you'll

23   take your pads with you, ladies and gentlemen, and you

24   can go ahead and have lunch, and we'll resume at 1:30.

25        (The jury is out at 12:15 p.m.)

SIMMONS - DIRECT                    279

1          THE COURT:  All right.  We will be in recess.

2          (Luncheon recess at 12:15 p.m. to 1:35 p.m.)

3          THE COURT:  All right.  We'll resume with the

4    testimony of Forensic Investigator Simmons.

5          I remind you, you're under the same oath

6    which you took earlier today.

7          THE WITNESS:  Yes, sir.

8          MS. NORMAN:  Thank you, Your Honor.

9    BY MS. NORMAN:  (Continuing)

10   Q    Now, when we left off I think I was about to ask

11   you when you went into the house at 1453 Lockett

12   Ridge, did you do any sort of diagram of the house?

13   A    Yes, ma'am, I did.

14   Q    I want to show you what has been marked as

15   Government's Exhibit 10.  Tell us if you recognize

16   that.

17   A    Yes, ma'am, I do.

18   Q    What is that?

19   A    That's a rough sketch of the downstairs of the

20   residence on Lockett Ridge.

21   Q    Did you do that?

22   A    Yes, ma'am, I did.

23   Q    It's not to scale, though, is it?

24   A    No, ma'am.

25   Q    All right.  On your screen is that, in essence,

1  the document there?

2  A   Yes, ma'am, it is.

3  Q   All right.  Now, is that the layout of the house

4  as you walk in?  Can you just kind of orient us a

5  little bit about that?

6  A   Yes, ma'am.  You go up a couple of stairs here and

7  this is the front door right here.  You come in.  This

8  is the living room area.  And then over to your right,

9  this is the kitchen.  You walk through here.  This is

10 a hallway over here.  There's a laundry area here.

11 Straight back is a bathroom.  And this room back here

12 is what appeared to be a master bedroom.

13 Q   We're going to leave that up for a little while so

14 you can show us like where on that.  And I'm going to

15 take your marks off now so that as we talk about

16 things, you can mark it.

17 A   Okay.

18 Q   And also we're going to kind of go back and forth

19 because I'm going to show you some pictures as well.

20 Starting with what has been marked as Government's

21 Exhibit 768A-14, just tell us generally what that is.

22 A   That is the front of the residence.

23 Q   That's during the daylight hours now; is that

24 correct?

25 A   Yes, ma'am, it is.

1    Q    Approximately, what time did you arrive at this

2    residence on May 15?

3    A    I believe it was around 10:09 in the morning.

4    Q    When you arrived there at 10:09, does this picture

5    accurately depict what you saw?

6    A    Yes, ma'am, it is.

7    Q    Anything about what you see on these steps that

8    had any forensic value to you?

9    A    The steps had what appeared to be either blood or

10   red stains on them.

11   Q    Did you notice, did that stain, was it just

12   isolated to that area or were there other areas where

13   it was?

14   A    There was also red stains inside the residence.

15   Q    I'm going to show you what's been admitted as

16   Government's Exhibit 768A-25.  Tell us what this is.

17   A    That's as you're coming through the front door.

18   That's the foyer area.

19   Q    And we see sort of a linoleum or a tile area right

20   there at the doorway.  What is the significance of

21   that area there?

22   A    It had what happened to be either red staining or

23   blood.

24   Q    All right.  From your observations of the stairs

25   leading into the house and also this area, did it

1  appear to be sort of a trail?

2  A    Yes.

3  Q    Now, I'm going to show you what's been admitted as

4  Government's Exhibit 768A-26.  What is that a picture

5  of?

6  A    That's another view as you're coming through the

7  front door, but you're looking straight into the

8  living room area.

9  Q    Prior to you coming in and taking these pictures,

10  had the house been secured?

11  A    Yes, patrol officers had already secured the

12  residence.

13  Q    So people weren't allowed to come in and out any

14  longer?

15  A    That's correct.

16  Q    And then you-all obtained a search warrant to be

17  able to do this?

18  A    Yes, ma'am.

19  Q    At the bottom right-hand corner I'm going to

20  circle an item.  I'll put the arrow there.  What is

21  that right above to the right of the arrow?

22  A    It appears to be a set of keys.

23  Q    And those keys were not law enforcement's keys,

24  were they?

25  A    No, they were not.

1    Q    So those were just there when you got there and

2    started taking your pictures?

3    A    Yes, ma'am.

4    Q    And then also when we look at this picture, if we

5    looked farther up right toward that area, what is

6    that, if anything, on the carpet itself?

7    A    I believe those are red stains.  Looks similar to

8    the red stains in the doorway and coming up the steps

9    into the residence.

10   Q    Now, when you first go into the house, did you --

11   tell the jury, what is the first thing that you do

12   when you come into the house?

13   A    You mean as far as documenting, taking

14   photographs?

15   Q    Yes, in general.  Do you just take photographs of

16   everything or do you start in one room and just do

17   that room?  What's your procedure?

18   A    It depends, but basically I come in and I'll take

19   overalls of each room, take overall photos of each

20   room, and look for anything that might potentially be

21   evidence that's obviously out in front of me.

22   Q    Once you've done the overview, do you then go back

23   and photograph more specific items that are of

24   interest to you as a forensic investigator?

25   A    Yes, ma'am.  Then I'll take what we call mid-range

1    photos.   Then eventually I'll take closer up photos.

2    Q    So that you've got basically an overall view of a

3    particular area?

4    A    Right.

5    Q    You move in a little bit more so you can see it

6    better, whatever item that is of interest to you, and

7    then you might also take a much closer shot of that?

8    A    Yes, ma'am.

9    Q    Okay.   So with that in mind, let's start looking

10   now at what's been admitted as Government's Exhibit

11   768A-27.   What is this area here and what if anything

12   of significance did you note here?

13   A    Okay.   This is still the front door kind of pushed

14   back, but if you're coming in and you go to your

15   right, this is the kitchen area.

16   Q    And this wall that we see, the open doorway kind

17   of thing between what appears to be the living room

18   and the kitchen, is that wall shared?   What's on the

19   other side of that wall?

20   A    The wall -- this area is a living room, and if you

21   go to this area, this will lead you back to the

22   bedroom.

23   Q    And farther down along this wall, what's on the

24   other side of that wall?

25   A    It had some sort of hole in it.

SIMMONS - DIRECT                    285

1   Q    And the room on the other side of that wall, one

2   side is the living room the other side is the bedroom

3   there?

4   A    You're talking about this wall back here?

5   Q    Yes, that wall and farther down this wall.

6   A    If you go down this hallway, the master bedroom

7   will be on the left.  This is actually -- on the other

8   side of this wall is the master bedroom.

9   Q    Okay.  So when we look at -- briefly, go back to

10  Government's Exhibit 10 for a moment.  That wall we

11  were just looking at, is it this wall here?

12  A    That is correct.

13  Q    Now, I'm going to direct your attention now to the

14  photograph admitted as 768A-28.  And you took this

15  overview as well of the living room.

16       And if we could zoom in, please, at the bottom of

17  the carpet.  Was there anything of significance toward

18  the bottom of that blow-up?  Is that the red stain

19  that you were referring to earlier?

20  A    Yes, in this area right here and here.

21  Q    Now, turning to Government's Exhibit 768A-29, we

22  also see down at the bottom of this photo on the left

23  side of the bottom, also that's just a different view

24  of the same stain; is that correct?

25  A    That is correct.

SIMMONS - DIRECT                286

1  Q    All right.  In the living room, you took a picture

2  here.  What was the significance of taking a picture

3  of this overview here?

4  A    I noticed what looked like red stains on the wall

5  towards the left of the pool table over here.

6  Q    All right.  You just basically put the dot right

7  where the box is, right?

8  A    Yes, ma'am.

9  Q    So if I remove it, those are the stains that

10 you're referring to.  If you're looking at it, the

11 right-hand side of the pool cues?

12 A    Correct.

13 Q    Turning to Government's Exhibit 768A-32, what's

14 the significance of taking this shot?

15 A    I see what appears to be possibly a bullet hole

16 underneath the poster, the Scar Face poster.

17 Q    Okay.

18 A    And you can also see the red stains on the right

19 side of where the pool sticks are hanging.

20 Q    If we look to the farther point to the left of

21 that picture, is that the back door there?

22 A    It was like a sliding glass door, yes.

23 Q    Then if we turn to Government's Exhibit 768A-33,

24 is that the close-up or a closer shot of the same

25 hole?

SIMMONS - DIRECT

1   A    Yes, ma'am.

2   Q    That's the one that's under the Scar Face poster

3   that we looked at the bigger picture of?

4   A    Correct.

5   Q    Then turning to Government's Exhibit 768A-35, this

6   was the mid-view, is that the mid-view of the red

7   stain you saw?

8   A    Correct.

9   Q    Now, at some point did you take a sample of that?

10  A    Yes, ma'am, I did.

11  Q    How did you take the sample and what did you do

12  with that?

13  A    Basically, you take a swab similar to a Q-Tip, and

14  I swabbed the wall, and then I place it in a little

15  paper container.  It looks like a little cardboard

16  paper container.  And sealed it as evidence.  I

17  believe it was submitted to the lab.

18  Q    And you don't -- generally, you're not the one who

19  would submit it to the lab.  You just package it and

20  put it in the evidence room; is that correct?

21  A    Correct.

22  Q    I want to ask you to take a look at what I believe

23  may be in front of you and marked Government's Exhibit

24  25 in your exhibit.  It's only been marked for

25  identification purposes as Government's Exhibit 25.  I

SIMMONS - DIRECT                    288

1  think it's the swabs themselves.

2  A   Here it is.  Yes.

3  Q   From looking at that envelope, can you identify

4  what that is that has been marked as Government's

5  Exhibit 25?

6  A   Yes, ma'am.  It says "red stain swab from living

7  room wall."

8  Q   If you look at that envelope, is that the one that

9  you prepared?

10  A   Yes, ma'am, it is.

11  Q   It's complete with your unit number and from where

12  it was taken?

13  A   Correct.

14  Q   Okay.  And the item number that was assigned to it

15  by the evidence room, what number is the item number?

16  A   The property item number is No. 25.

17  Q   And it also happens to be marked as Government's

18  Exhibit 25 as well; is that correct?

19  A   Correct.

20        MS. NORMAN:  Your Honor, at this time we'd

21  move to admit that, Government's Exhibit 25, the swab

22  of the red stain from the living room wall.

23        THE COURT:  Any objection?

24        MR. COLLINS:  No.

25        THE COURT:  It's admitted.

1          (Government's Exhibit No. 25 is admitted into

2    evidence.)

3    Q    All right.  Now, sticking for a moment to the

4    living room, I want to turn to what's been marked as

5    Government's Exhibit 768A-37.  Now, this is a

6    different hole.  This is also in the living room?

7    A    Yes, ma'am, it is.

8    Q    And can you just use your finger to kind of give

9    us an idea of which hole we're talking about in the

10   living room?

11   A    It's a hole right here.

12   Q    All right.  Why did you document that?  What was

13   significant of that?

14   A    It looked like an entrance hole.  The hole on the

15   other wall in the living room had like the sheetrock

16   was protruding outward, so it kind of looked like it

17   was going in an outward position.  This particular

18   hole looked like it was going inward.  So that's why I

19   took a photo of that.

20   Q    So we'll call it the Scar Face hole because it's

21   below the Scar Face poster.

22   A    Okay.

23   Q    You're saying it looked like it had come out of

24   the wall?

25   A    Correct.

1          THE COURT:  What's on the other side of the

2   wall?

3          THE WITNESS:  There's a bedroom on the other

4   side.

5          THE COURT:  What's on the other side of the

6   wall here where this one looks like it's going in?

7          THE WITNESS:  This wall is on the same wall

8   where the rear sliding glass door is.  I'm sorry.  I

9   didn't hear your question, sir.

10          THE COURT:  What's on the other side of this

11   wall?  In other words, where did the bullet go that

12   went through that wall?  You have said it was going in

13   the wall.

14          THE WITNESS:  The bullet was inside this wall

15   once I removed the sheet rock from it.

16          THE COURT:  You found it inside the wall?

17          THE WITNESS:  Yes, sir.

18   BY MS. NORMAN:

19   Q    Okay.  We'll come back to the recovery of that in

20   a moment.

21   A    Okay.

22   Q    Was there anything else of significance in the

23   living room that you recall?

24   A    In the living room?

25   Q    Yes.

1   A    Other than the two bullet holes and the red

2   staining?

3   Q    Yes.

4   A    I believe that was it for the living room, yes.

5   Q    I want to turn now to what was admitted as

6   Government's Exhibit 768A-100 and ask you if you could

7   tell us what that's a picture of?

8   A    That's as you're coming in the front door to the

9   residence.  That is the wall that's directly on your

10  right.

11  Q    As you're coming in?

12  A    Correct.

13  Q    Did that show, that kind of big indentation, did

14  that have any forensic value to you?

15  A    I just -- other than I noted that it looked like

16  something had happened there.  There was an

17  indentation.  It looked like a lot of force had been

18  applied.

19  Q    That's a drywall wall or a sheetrock wall?

20  A    Correct.

21  Q    When you observed it, you said it looks like a lot

22  of force was applied.  What makes you consider that?

23  A    Just -- I mean, just the size of it, and, you

24  know, just the way that it was pushed in like that, I

25  guess.  It just caught my attention.

SIMMONS - DIRECT                    292

1    Q    Because of how far it was pushed in?

2    A    Correct.

3    Q    It doesn't look like -- it was too big to be a

4    door knob handle or something like that?

5    A    Right.  It's not something I would think from

6    slamming the door into it would have done that.

7    Q    You photographed the vent.  Why the vent?

8    A    I believe the detectives that were on scene with

9    me were searching, and I believe some sort of

10   container with I think it ended up being money was

11   inside that area.

12   Q    I'm going to show you what's been admitted as

13   Government's Exhibit 768A-103.  Is that the photo of

14   the contents of the vent?

15   A    Correct.

16   Q    All right.  From there, let's take a look again at

17   Government's Exhibit 10, which is your diagram.  And

18   you took a number of pictures in the bedroom that's on

19   this floor; is that correct?

20   A    Correct.

21   Q    And, according to your diagram, there's only this

22   one bedroom there?

23   A    On the bottom floor, correct.

24   Q    So now let's turn to that.  I want to show you

25   what was admitted as Government's Exhibit 51.  What is

1  that a picture of?

2  A    That's the downstairs what I call the master

3  bedroom.

4  Q    Okay.  What is the perspective that you took that

5  picture from?  Where were you standing when you took

6  that picture?

7  A    That was the entrance to the bedroom, the bedroom

8  door.

9  Q    There appears to be something bright and white to

10  your right.  Is that the wall or is that something

11  else?

12  A    This area right here, is that what you're talking

13  about?

14  Q    No, the other side here.

15  A    This is the doorway, I guess.  I'm just outside

16  the doorway.

17  Q    And is that basically how you found it when you

18  arrived there to take the pictures?

19  A    That is correct.

20  Q    Now, I direct your attention to what's been marked

21  as Government's Exhibit 55.  What was the significance

22  of taking this shot?

23  A    This was just another view of the same bedroom.

24  It's just showing the trash can's been knocked over.

25  Q    Next to the trash can laying next to the trash can

SIMMONS - DIRECT                294

1    appears to be a mirror.  Was there anything

2    significant about that mirror?

3    A    I think it was broken.  There were some broken

4    pieces of mirror on the floor.

5    Q    Let's look at Government's Exhibit 768A-57.

6            MR. COLLINS:  What was the number on that

7    last one?

8            MS. NORMAN:  55.

9            MR. COLLINS:  Thank you.

10   Q    What is the significance of this picture?

11   A    This one, I don't know if you can see it in this

12   particular picture, but kind of at the bottom where

13   the bottom mirrors are is what looked like a bullet

14   hole.

15   Q    Can you kind of put a big circle around the area

16   you're referring to?

17   A    (Complying.)

18   Q    All right.  So if we turn to 768A-58, is that a

19   close-up of the same mirror?

20   A    Yes, it is.

21   Q    Then 768A-59, what is that?

22   A    It appears to be a bullet hole.

23   Q    And that's the same mirror we were just looking at

24   in the master bedroom?

25   A    Yes.  There were several mirrors in there, but

1  yes, that's a closer up.

2  Q    Based on your investigation, did it appear that

3  that bullet hole was coming into the bedroom or going

4  out?

5  A    It appeared to be going out, going into the wall.

6  Q    Now, I want to turn now to the closet in the

7  master bedroom.   Turning to 768A-61, is that the

8  depiction of the closet there?

9  A    Yes, ma'am, it is.

10  Q    At the top here there appears to be the corner

11  where I'm trying to the draw arrow.   Is that where the

12  closet ends, sort of?

13  A    Yeah.

14  Q    So that's how big the closet is?   That picture

15  kind of depicts that with the ceiling there?

16  A    Correct.

17  Q    Okay.   Now, did you find anything of significance

18  inside that closet or document anything of

19  significance inside the closet?

20  A    Yes, I believe there were five cartridge casings

21  and two bullets located inside this closet.

22  Q    Okay.   Let's start with, and we'll just kind of go

23  through your pictures as we go, did you document each

24  of these as you found them?

25  A    Yes.   Actually, the detectives searched the area,

SIMMONS - DIRECT

1  and as they found things, I would paragraph them and

2  collect them.

3  Q   So let's start with the photograph that's been

4  admitted as 768A-106.  Was that one of the shell

5  casings that were found?

6  A   Yes, ma'am.

7  Q   I want to direct your attention to what's been

8  marked as Government's Exhibit 8.  Do you have that?

9  A   Yes, ma'am.

10 Q   What is Government's Exhibit 8?

11 A   It's a Speer .45-caliber cartridge case GAP.

12 Q   All right.  Now, just to sort of help us out a

13 little bit, I'm going to ask you to take a look at

14 what's been marked as Government's Exhibit 23.  And

15 I'm going to hand you a hard copy.  Then we'll put it

16 up on the screen.  What is the document I've just

17 handed you?

18 A   It's a sketch.

19 Q   Who did the sketch?

20 A   I did.

21 Q   What's it a sketch of?

22 A   It's of the downstairs bedroom wall.

23 Q   There's sort of two sketches on there; is that

24 correct?

25 A   And the bottom is of the downstairs bedroom.

1    Q    Were these sketches that you did at the time of

2    your investigation?

3    A    Yes, it is.

4              MS. NORMAN:  Your Honor, at this time the

5    United States would move to admit Government's Exhibit

6    23.

7              THE COURT:  Any objection?

8              MR. COLLINS:  No objection.

9              THE COURT:  It's admitted.

10             (Government's Exhibit No. 23 is admitted into

11   evidence.)

12   BY MS. NORMAN:

13   Q    By looking at the item that's been marked as

14   Government's Exhibit 8, can you tell us where you

15   located what's been marked as Government's Exhibit 8?

16   And I'm going to put your diagram up on the screen

17   now.

18   A    Okay.

19   Q    This is kind of hard to read for us.  That's why I

20   wanted to hand you your physical copy.

21   A    It's -- this is, this bottom sketch, is just kind

22   of like a rough sketch of the bedroom layout.  This is

23   if you're coming in the bedroom, and this particular

24   item is, on this particular sketch, it's going to be

25   item No. 2.  I don't know if you can see that.

SIMMONS - DIRECT                    298

1   Q    So item No. 2 is -- and you don't have the bed

2   drawn on here, but, in essence, it would be found at

3   basically the foot of the bed?

4   A    Correct, it was at the foot of the bed.

5   Q    And now --

6         THE COURT:  Where is that on this?  Circle

7   it.  Circle item No. 2.

8         There you go.  Sometimes it doesn't work

9   right, does it?

10        THE WITNESS:  (Complying.)

11  Q    So what has been marked as Government's Exhibit 8

12  was found there in the middle of the room where you

13  just circled where the number 2 is?

14  A    Correct.

15  Q    Now, I want to turn to what's been marked as

16  Government's Exhibit 9, the physical exhibit.  Could

17  you tell the ladies and gentlemen of the jury what

18  that item is?

19  A    This is what appeared to be a shotgun wad and

20  pellets.

21  Q    Looking at your diagram, can you tell us what

22  number that is on your diagram and where it was found?

23  A    On this bottom diagram, it's what's labeled on

24  this one as item 3.

25  Q    We drew it right next to 2; is that correct?

SIMMONS - DIRECT                    299

1    A    Correct.

2    Q    And just so that when we're going back through the

3    evidence, you have applied your recovery number,

4    right, the number that you assigned each piece of

5    evidence, and so it's listed as 768-whatever?

6    A    Correct.

7    Q    And so that item that you're holding that's marked

8    for identification purposes as Government's Exhibit 9,

9    what is your unit number and recovery number on that?

10    A    On this particular item, I labeled it 768-3.

11    Q    And then the number 9 is the Government's Exhibit

12    number, but is that also the evidence room number?

13    A    Correct.

14    Q    So both those numbers appear on that document?

15    A    Yes, ma'am.

16    Q    And that's the actual shotgun wad that was

17    recovered?

18    A    Yes, ma'am.

19    Q    Can you open that and let us see what that looks

20    like, please?

21    A    Yes, ma'am.  (Complying.)

22         MS. NORMAN:  Your Honor, at this time while

23    she's doing that, the United States would move to

24    admit Government's Exhibit 8, which was the casing

25    that was found in the middle of the room, and then

SIMMONS - DIRECT                    300

 1   Government's Exhibit 9, which is the shotgun wad that
 2   she's opening.
 3           THE COURT:  Any objection?
 4           MR. COLLINS:  No objection.
 5           THE COURT:  All right.
 6           (Government's Exhibits No. 8 and No. 9 are
 7   admitted into evidence.)
 8           THE COURT:  Have you offered 10?
 9           MS. NORMAN:  I believe I've already offered
10   10, but we'll move to admit it at this time.
11           THE COURT:  Any objection?
12           MR. COLLINS:  No.
13           MS. NORMAN:  And I believe 23 was admitted as
14   well.
15           THE COURT:  Yes.
16           (Government's Exhibit No. 10 was admitted
17   into evidence.)
18   BY MS. NORMAN:
19   Q   Can you kind of hold it up and show us what
20   exactly that looks like?
21   A   Yes.  There are some fibers on it, but --
22           THE COURT:  That's the wad?
23           THE WITNESS:  Yes, sir.
24   Q   And I'm going to now show you a photograph that is
25   Government's Exhibit 768A-114.  Tell us what we're

1   looking at in this picture.

2   A    That's a close-up of the wadding, and I think you

3   can see some of the pellets as well.

4   Q    And there's a ruler here at the bottom, and the

5   item number says "Item No. 768-," and then there's a

6   little piece of paper on there that says "3."

7   A    Correct.

8   Q    So that's your recovery number, so to speak?

9   A    That's correct.

10  Q    Turning to what's been admitted as Government's

11  Exhibit 768A-125, in that photograph did you note

12  something of forensic value in that picture?  I'm

13  sorry.  Let me try a better picture.  Let me show you

14  what's been marked as Government's Exhibit 129 and

15  admitted.  What is that item?

16  A    It appeared to be a bullet.

17  Q    Where was that located?

18  A    That's as you're walking right into the closet.

19  It's like the little, I guess, I don't know what you

20  call those little things that separates -- when you go

21  into different rooms, the little piece of -- like the

22  threshold area.

23  Q    And it was just laying there in between the closet

24  and the room?

25  A    Correct.

SIMMONS - DIRECT                    302

1   Q    Do you have that bullet with you?

2   A    Yes, ma'am, I do.

3   Q    And it should be marked for identification

4   purposes as Government's Exhibit 5.

5   A    Is it Government's Exhibit 11?

6   Q    I'm sorry.  Yes.  Government's Exhibit 11.  My

7   apologies.

8   A    Did you want me to open it?

9   Q    Without opening it, can you check and look and see

10  if that's, in fact, the same bullet that was

11  recovered?

12  A    Yes, ma'am, it is.

13        THE COURT:  How many bullets did you find?

14        THE WITNESS:  Two in the closet and one in

15  the wall.  So three.  We recovered three.

16        THE COURT:  Three?

17        THE WITNESS:  Yes, sir.

18        THE COURT:  How many shell casings did you

19  find?

20        THE WITNESS:  Seven.

21        THE COURT:  Have you got some diagram that

22  shows exactly where you found each one of them?

23        THE WITNESS:  There's several diagrams.

24  BY MS. NORMAN:

25  Q    And we can turn now then to Government's Exhibit

SIMMONS - DIRECT                    303

1  23.

2         THE COURT:  Were they all the same caliber or

3  different calibers?

4         THE WITNESS:  They were all the same caliber.

5         THE COURT:  What caliber was that?

6         THE WITNESS:  .45 Speer GAP.

7         THE COURT:  Now, if you have a diagram or

8  something that shows where they are were, maybe we can

9  get to that and it may go a littler faster.

10 Q   If you look at what's been marked as Government's

11 Exhibit 23, does that diagram depict where each of the

12 shell casings were found?

13 A   Yes, it does.

14        THE COURT:  What are the numbers on there of

15 the shell casings?

16        THE WITNESS:  The shell casings were -- let's

17 see.

18        THE COURT:  You're on Government's Exhibit

19 10?

20        MS. NORMAN:  No, 23, Your Honor.

21        THE WITNESS:  Seven, 8, 9, 11, 14, No. 2, and

22 No. 20.

23        THE COURT:  Those are casings, right?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  What about the bullets

1  themselves?

2        THE WITNESS:  The bullets themselves?

3        THE COURT:  There were three of them, you

4  said.

5        THE WITNESS:  Yes, sir.  Fifteen, No. 5, and

6  then the one that was in the living room, and the one

7  in the living room is going to be Exhibit No. 19.

8  BY MS. NORMAN:

9  Q   Is that your No. 19 or is it Government's Exhibit

10 19?

11 A   It's Government's Exhibit and Property No. 19.

12 Q   Okay.

13       THE COURT:  Okay.  So those are the bullets?

14       THE WITNESS:  Yes, sir.

15 Q   So if we could go back to the casings that were

16 recovered.

17 A   Okay.

18 Q   According to your diagram, there was a 20 that's

19 circled in the middle of the bottom picture there next

20 to 3 and 2 that we've already talked about.

21 A   Correct.

22 Q   And then there's also all the rest of the numbers

23 appear to be in the closet itself; is that correct?

24 A   Yes, ma'am.

25 Q   Where were they located within the closet itself?

1      THE COURT:  Why are you talking about 20?

2  She said the casings were 7, 8, 9, 11, 14, 2 and 3.

3  Is 20 a casing?

4      MS. NORMAN:  No.  7, 8, 9, 11 --

5      THE COURT:  14, 2 and 3.

6      THE WITNESS:  Two and 20.

7      THE COURT:  Two and 20?

8      THE WITNESS:  Yes, sir.

9      THE COURT:  Okay.  How many of the casings

10  were located in the closet?

11      THE WITNESS:  Five were in the closet.

12  Q   I want to show you what has been marked or has

13  been admitted as Government's Exhibit 768A-144.  What

14  does that picture show us?

15  A   That's a picture of three cartridge casings.

16  Q   Where was that bin?  Was that the bin that was in

17  the closet?

18  A   Yes, that was a purple tub, plastic tub, in the

19  master bedroom closet.

20  Q   And you noted that it was -- if you could pull,

21  please, what's been marked as Government's Exhibit 13,

22  14 and 15.

23  A   Okay.

24  Q   Government's Exhibit 13, what is that?

25  A   It's a Speer .45-caliber GAP cartridge case.

SIMMONS - DIRECT                    306

1  Q    What number on your diagram No. 23 does that

2  correspond to?

3  A    It's my No. 768-7 or No. 7.

4  Q    And then Exhibit 14, what is that?

5  A    That's going to be a Speer .45-caliber cartridge

6  case GAP.

7  Q    What number does that correspond to on your

8  diagram?

9  A    On my diagram it's No. 8.

10  Q    And then Government's Exhibit 15, what is that?

11  A    Government's Exhibit 15, that's going to be my

12  item No. 9, and it's a .45-caliber Speer cartridge

13  case GAP.

14          MS. NORMAN:  Your Honor, at this time the

15  United States would move to admit Government's

16  Exhibits 13, 14 and 15.

17          MR. COLLINS:  No objection.

18          THE COURT:  It's admitted.

19          (Government's Exhibits No. 13, 14 and 15 were

20  admitted into evidence.)

21  Q    And now, if you could, take a look at what's been

22  marked as Government's Exhibit 17 and what's been

23  marked as Government's Exhibit 20.

24  A    Okay.

25  Q    Can you tell us what those two items are?

1    A    .45-caliber Speer GAP cartridge case.

2    Q    And what's been marked for identification as

3    Government's Exhibit 17, what number does that

4    correspond to on your diagram?

5    A    No. 11.

6    Q    And that's also there and shows in the closet; is

7    that correct?

8    A    Correct.

9    Q    And what's been marked as Government's Exhibit 20,

10   what number does that correlate to, if any, on your

11   diagram?

12   A    It's my No. 14, which was in the purple tub.

13            MS. NORMAN:  Your Honor, at this time the

14   United States would move to admit Government's Exhibit

15   17 and 20.

16            MR. COLLINS:  No objection.

17            THE COURT:  It's admitted.

18            (Government's Exhibits No. 17 and 20 are

19   admitted into evidence.)

20            THE COURT:  What is Government's Exhibit 11?

21            THE CLERK:  That's the bullet.

22            THE COURT:  Is that admitted?

23            THE CLERK:  Yes, sir.

24            THE COURT:  All right.  Thank you.

25   Q    Now, I want to turn to what has been marked as

SIMMONS - DIRECT                    308

1    Government's Exhibit 19.  What is that?

2    A    That is a bullet.

3    Q    Then also I would like you to take a look at what

4    has been marked as Government's Exhibit 21.  What is

5    that?

6    A    That is a bullet.

7    Q    Let's start with Exhibit 21.  Can you tell the

8    ladies and gentlemen of the jury where you found

9    Exhibit 21?

10   A    It was in a black shoe in the top of the closet,

11   the master bedroom closet.

12   Q    What is your corresponding number that's on your

13   diagram for that exhibit?

14   A    Number 15.

15   Q    All right.  If we look at what's been admitted as

16   Government's Exhibit 23, there's a 15 that is down in

17   the corner of the closet; is that correct?  Can you

18   put a mark where it is?

19   A    Where the 15 is?

20   Q    Yes, please.

21   A    (Complying.)

22   Q    And I want to show you what has been admitted as

23   Government's Exhibit 768A-193.  What does that picture

24   depict?

25   A    That's a picture looking into the black shoe and

1   there's a bullet in it.

2   Q    Okay.  And I'm going to take it out and look at

3   Government's Exhibit 768A-192.  Had you taken the shoe

4   out of the closet to take that picture?

5   A    I believe I had, yes.

6   Q    Now, what's admitted as 768A-190, is that where

7   the shoe was when you first found it?

8   A    Yes, it is.

9             MS. NORMAN:  Your Honor, the government moves

10  to admit Government's Exhibit 21, which is the bullet

11  from the shoe.

12            MR. COLLINS:  No objection.

13            THE COURT:  It's admitted.

14            (Government's Exhibit No. 21 is admitted into

15  evidence.)

16            MS. NORMAN:  One moment, Your Honor.

17  Q    Now, I want to show you a photograph that has been

18  admitted as Government's Exhibit 768A-133.  What is

19  that?

20  A    That is a picture of the handgun.

21  Q    Where was that located?

22  A    It was located in the bottom of the master bedroom

23  closet.

24  Q    And I want you to look at what's been previously

25  marked for identification as Government's Exhibit 12.

SIMMONS - DIRECT                310

1    What is that?

2    A    This was the handgun that was found in the master

3    bedroom closet.

4    Q    And that box has been opened now; is that correct?

5    A    Yes.  Downstairs they opened it.

6    Q    And explain to the jury why it gets opened

7    downstairs.

8            THE COURT:  Downstairs here in the

9    courthouse?

10           MS. NORMAN:  Yes.

11           THE COURT:  It's opened for security.  Our

12   security officers opened it and took care of it.

13           MR. COLLINS:  And it raises no issues.

14   BY MS. NORMAN:

15   Q    Can you take the item out of the box and show the

16   jury?

17   A    (Complying.)

18   Q    So the item that's in your right hand, that was in

19   the firearm when you found it?

20   A    Yes, it was.

21   Q    And the firearm is locked back now for safety, but

22   was it in that condition when you found it?

23   A    When the detective found it in the closet, it

24   was -- what he told me, it was back.  The slide was

25   back.

SIMMONS - DIRECT                            311

1        THE COURT:  How many rounds does that

2   magazine hold?

3        THE WITNESS:  I believe it holds eight.

4   Q   How many shell casings did you recover from that

5   bedroom?

6   A   Seven.

7        MS. NORMAN:  Your Honor, at this time we'd

8   move to admit Government's Exhibit 12, which is the

9   pistol and magazine.

10        THE COURT:  No objection?

11        MR. COLLINS:  No.

12        THE COURT:  It's admitted.

13        (Government's Exhibit No. 12 is admitted into

14   evidence.)

15   BY MS. NORMAN:

16   Q   When you collected that item, did you also have to

17   fill out a form that described the weapon?

18   A   Yes, ma'am, I did.

19   Q   What's the purpose of that?

20   A   Just to describe, as we found it, simple things

21   like was it loaded, were there any cartridges in it,

22   anything in the chamber.  It's just a procedure we do

23   to document how we find a handgun.

24   Q   I'm going to show you what's been marked as

25   Government's Exhibit 45.  Is that the form that you

1  filled out?

2  A   Yes, ma'am.

3         MS. NORMAN:  Your Honor, at this time the

4  United States would move to admit Government's Exhibit

5  45.

6         MR. COLLINS:  Without objection.

7         THE COURT:  It's admitted.

8         (Government's Exhibit No. 45 is admitted into

9  evidence.)

10 Q   Now, turning to what's been admitted as

11 Government's Exhibit 768A-197, it's a photograph.  Can

12 you tell us where that hole is?

13 A   That's in the master bedroom.  I don't know if you

14 can tell.  This is the doorway right here of the

15 master bedroom.  So if you were walking in that

16 bedroom, it's directly on your left.

17 Q   Now, at some point did you-all have the

18 opportunity to --

19        THE COURT:  Excuse me.  What hole are you

20 talking about?  There's an indentation.  Is that the

21 big indentation or those two little dark spots?

22        THE WITNESS:  It's this indentation right

23 here.  At the time we didn't know if it was a bullet

24 hole or not, but we documented it.

25 Q   Did you check to see if it was a bullet hole?

SIMMONS - DIRECT                    313

1   A   Yes, ma'am, we did.

2   Q   Did you guys find anything?  Tell the jury first

3   how you investigated to see if it was a bullet hole.

4   A   We removed the sheetrock.  Well, we photographed

5   it and looked to see if we could see anything sticking

6   out of it.  Then we removed the sheetrock and we did

7   not locate a bullet within that area.

8   Q   Finally, I think we may have missed one item, and

9   I would ask you to take a look at what's been marked

10  as Government's Exhibit 26.  What is that?

11  A   It's a .45 Speer caliber cartridge case GAP.

12  Q   What item number of yours was that?

13  A   That's my item No. 20.

14  Q   Is that what is depicted in your diagram and

15  circled as 20 in the middle of the bottom picture?

16  A   Yes, ma'am, it is.

17  Q   Okay.  Turning back for a moment to your diagram

18  --

19          MS. NORMAN:  And, Your Honor, we would move

20  to admit what's been marked as Government's Exhibit

21  26.

22          THE COURT:  Any objection?

23          MR. COLLINS:  No, sir.

24          THE COURT:  Is 19 in?

25          MS. NORMAN:  19 is not in yet, Your Honor.

SIMMONS - DIRECT                    314

1              THE COURT:  Okay.

2              (Government's Exhibit No. 26 is admitted into

3      evidence.)

4      Q    Now, looking --

5              THE COURT:  Excuse me.  Is there an exhibit

6      number for your casing marked No. 2?

7              THE WITNESS:  That was Exhibit No. 8, I

8      believe.

9              THE COURT:  Eight or A?

10             THE WITNESS:  Eight.

11             Government's Exhibit 8 is my No. 2.

12             THE COURT:  All right.  I see.  All right.

13     Thank you.

14     Q    What else in addition to the bullets and casings

15     that were recovered out of the closet, the shotgun

16     wad, the two casings there in the middle of the room,

17     what other items of forensic interest did you locate

18     in that room?

19     A    You mean the money that was -- I know money was

20     located in some of the vents.

21     Q    Okay.  Turning now to -- you have a little

22     triangle.  I'm going to circle it.  What is that mark

23     there?

24     A    That is what appears to be a bullet hole

25     underneath the broken mirror.

SIMMONS - DIRECT                    315

1  Q   Okay.  When you saw that bullet hole -- let's turn

2  now to a photograph that's been marked as 768A-167.

3  What does this picture show with regard to the holes

4  in the wall?  And tell us why this is a relevant

5  picture.

6  A   If you notice, there's a hole over here right

7  there.  That kind of matches up to the other side of

8  the wall where that's the master bedroom with the hole

9  that's underneath the broken mirror.  And then there's

10 another hole over here in this same sort of area.

11 Q   Okay.  So let's look -- I'm going to clear this

12 for a moment.  Let's look at photograph 768A-168.

13 Now, is this one of the holes there in the living

14 room?

15 A   Yes, that's the one directly to the left of the

16 sliding glass doors, like a little gaming console or

17 gaming thing.

18 Q   If you could, using this photograph, can you

19 explain forensically, what did you conclude from the

20 appearance of this hole?

21 A   It appeared as though something went into this

22 wall.

23 Q   Okay.  Did you investigate further?

24 A   Yes.  We removed the sheetrock and we located a

25 bullet.

1  Q    I'm going to turn to photograph 768A-183.  Is that

2  your handywork?

3  A    Yes, ma'am.

4  Q    And this picture shows that a piece of the drywall

5  has been removed; is that correct?

6  A    That's correct.

7           THE COURT:  What was the bullet in?  Was that

8  a stud that it was in?

9           THE WITNESS:  You'll see I think it's kind of

10 more so in the insulation.

11          THE COURT:  In the insulation?

12          THE WITNESS:  You can see it on the closer

13 up.  There it is.  You can see it closer.

14 Q    This is 768A-184.  And that shows the bullet sort

15 of shoved into the insulation there?

16 A    Correct.

17 Q    All right.  Can you take a look now at what's been

18 marked for identification purposes as Exhibit 19?

19 A    Yes, ma'am.

20 Q    Tell the ladies and gentlemen of the jury what is

21 Government's Exhibit 19?  What is that item?

22 A    It's a bullet.

23 Q    Which bullet is that?

24 A    It's the one that you're looking at a picture of

25 in the living room.  It came from the living room

SIMMONS - DIRECT                    317

1  wall.

2  Q    Okay.  I'm going to turn to the photograph that's

3  been marked 768A-228.  What are those?

4  A    Those are trajectory sticks.  We sometimes use

5  those and try to show the trajectory of a bullet.

6  Q    When you first look at the picture if you don't

7  know what you're looking for, it's kind of hard to

8  see.  Can you circle the trajectory sticks?

9  A    (Complying.)

10  Q    So in between there?

11  A    And there's one over here.

12  Q    When you-all did the trajectory sticks, were you

13  able to determine that the trajectory matched those

14  holes there?

15  A    It looked like it matched up.

16  Q    I'm going to show you what's been marked and

17  admitted as Exhibit 768A-229.  Is there also a

18  trajectory stick in that picture?

19  A    Yes, ma'am.  There's one right here.

20  Q    And when that stick was stuck through, did it go

21  through to the hole in the living room?

22  A    Yes, it did.

23  Q    Based on that, did you draw any conclusions based

24  on those findings?

25  A    It appears -- I'm not a trajectory expert, but it

1  appeared the bullet went through that wall and into

2  the living room and ended up in that adjacent wall

3  next to the sliding glass door.

4  Q   Other than those three holes we sort of focused on

5  just now, were there any other holes that you found

6  that you were able to confirm were bullet holes?

7  A   No.  There were two other holes.  One was as

8  you're entering the kitchen on the left across from

9  the refrigerator.  We removed the sheetrock, but we

10  did not locate any bullets.  There was one hole in the

11  upstairs ceiling.  One of the detectives went up into

12  the -- it's like a crawl space area.  And he said it

13  looked like if it had been a bullet hole, it had

14  exited through the roof.

15  Q   So there was no way to confirm that it was?

16  A   Correct.

17          MS. NORMAN:  I believe I moved Exhibit 19.

18          MR. COLLINS:  She didn't, but no objection.

19          THE COURT:  It's admitted without objection.

20          (Government's Exhibit No. 19 is admitted into

21  evidence.)

22  Q   I want to turn now, changing focus a little bit,

23  to what's been admitted as Government's Exhibit

24  768A-68, which is another photograph.  Turning now,

25  what was the significance of this photo for your

1    investigation?

2    A    It appeared to be possibly blood on the side of

3    the refrigerator right here.

4    Q    Let's zoom in for a moment and take a look at

5    what's been marked as Government's Exhibit 768A-209.

6    Is that the same stain, just closer?

7    A    Yes, ma'am.

8    Q    I'm going to direct you now to Government's

9    Exhibit 768A-211.  Is that a close-up of that item?

10   A    Yes, ma'am, it is.

11   Q    Because of the shadow it's kind of hard to see

12   that you have a number there.

13   A    Yes.

14   Q    I'm going to ask you to take a look at what's been

15   marked for identification purposes as Government's

16   Exhibit 24.

17   A    Okay.

18   Q    Can you tell us what that item is?

19   A    It's government's Exhibit 24, but it was my

20   No. 18, 768A-18.

21   Q    Okay.  Can you tell from that what the item is

22   that's contained in that envelope?

23   A    It's a red stained swab from the side of the

24   refrigerator.

25   Q    It also has a caution "bio hazard" on the back

SIMMONS - DIRECT                    320

1   because of what it potentially is?

2   A    Correct.

3   Q    So I'm not going to ask you to open that.

4        That item also has an evidence room item number on

5   it; is that correct?

6   A    That's correct.

7   Q    What is the evidence room number?

8   A    The evidence room item number is 24.

9            MS. NORMAN:  Your Honor, I believe I have

10  already moved to admit Government's Exhibit 25, and

11  now the United States would move to admit Government's

12  Exhibit 24.

13           THE COURT:  Any objection?

14           MR. COLLINS:  No, sir.

15           THE COURT:  It's admitted.

16       (Government's Exhibit No. 24 is admitted into

17  evidence.)

18  Q    Finally, turning to what's been marked as

19  Government's Exhibit 34 -- I'm sorry.  That's the

20  wrong exhibit.  Disregard that.

21           MS. NORMAN:  We have no further questions,

22  Your Honor.

23           MR. COLLINS:  Could I have 768A-55?

24           MS. NORMAN:  Yes.

25

1          CROSS-EXAMINATION

2   BY MR. COLLINS:

3   Q    Good afternoon, Ms. Simmons.

4   A    Good afternoon.

5   Q    The thing that Mr. Perkins had on his back that

6   you photographed, did you take a sample of that?

7   A    No, sir, I did not.

8   Q    So we don't have any idea what that is?

9   A    No, sir.

10          THE COURT:  Wait a minute.  What are we

11   talking about here?

12          MR. COLLINS:  Do you remember the photograph

13   of the tattoo?

14          THE COURT:  I thought you were talking about

15   this exhibit.

16          MR. COLLINS:  No.

17          THE COURT:  I see.  Okay.  Did she take a

18   sample of the tattoo and we don't have any sample of

19   it?

20          MR. COLLINS:  No, whatever the green thing

21   was.

22          THE COURT:  Oh, the green thing.  I see.

23   Q    This is the bedroom, correct?

24   A    Yes, sir.

25   Q    I'm a little bit confused.  You said you found a

SIMMONS - CROSS                    322

1    total of seven cartridge casings?

2    A    Yes, sir.

3    Q    Five of them in the closet, correct?

4    A    Correct.

5    Q    Where were the other two?

6    A    The other two were on the bedroom floor kind of

7    near the foot of the bed.

8    Q    Okay.  What does this sign here say up in the

9    right-hand corner?

10   A    "Marijuana Way."

11   Q    The hole in the wall by the front door that you

12   showed some interest in, how long had that been there?

13   A    I don't know, sir.

14   Q    When you were in the closet, did you notice a pile

15   of clothes in the closet?

16   A    There were many clothes in the closet.

17   Q    Hanging or in a pile?

18   A    They were hanging.

19            MR. COLLINS:  That's all I have.  Thank you.

20            Judge, I would like about 10 minutes if I

21   could.

22            THE COURT:  All right.

23            MS. NORMAN:  We have no --

24            THE COURT:  Can she be excused?

25            MS. NORMAN:  She can be excused, yes, sir.

SIMMONS - CROSS                    323

1          THE COURT:  All right.

2          (The witness was excused from the witness

3    stand.)

4          THE COURT:  Ladies and gentlemen, there's no

5    such thing as a 10-minute recess.  We'll take 15

6    minutes.

7          (The jury is out at 2:38 p.m.)

8          THE COURT:  All right.  You want to take a

9    recess now?

10          MR. COLLINS:  Pardon?

11          THE COURT:  You want to take a recess?

12          MR. COLLINS:  Yes, sir.

13          MS. NORMAN:  Yes.

14          THE COURT:  All right.

15          (Recess taken.)

16          THE COURT:  Next witness, please.

17          MS. NORMAN:   The United States calls

18    Detective Brad Conner.

19

20       BRAD CONNER, called by the United States, first

21    being duly sworn, testified as follows:

22       DIRECT EXAMINATION

23    BY MS. NORMAN:

24    Q    Good afternoon.

25    A    Good afternoon.

CONNER - DIRECT                           324

1   Q    Can you please tell the ladies and gentlemen of

2   the jury your name and where and how you are employed?

3   A    Detective Brad Conner.  I'm a detective with

4   Chesterfield County Police Department.

5   Q    Detective Conner, how long have you been with the

6   Chesterfield County Police Department?

7   A    About 12 and a half years.

8   Q    Back on May 15 of 2009, what was your position

9   with the Chesterfield Police Department?

10  A    I was a detective in our Crimes Against Persons

11  Unit.

12  Q    Okay.  On May 15 of 2009, there was an incident at

13  1453 Lockett Ridge Road in Chesterfield County,

14  Virginia.  Did you respond to that call?

15  A    That is correct.

16  Q    When did you arrive there?

17  A    I don't have my exact time of arrival.  I believe

18  the call came in somewhere around 1:30, 1:55.  1:58 is

19  when we received it.  So I would have been called out

20  somewhere within an hour, an hour and a half.

21  Q    When you got to the scene, did you speak to

22  anybody who was there?

23  A    I was briefed by the officers on the scene.  Then

24  I conducted interviews with the two victims on the

25  scene.

1   Q    Who were the two victims on the scene?

2   A    Anwan Jones and Keona Peoples.

3   Q    In essence, what did they tell you happened that

4   day or that morning, early morning hours?

5   A    They indicated that they had been at a place in

6   the city of Richmond called The Foot Locker.  I'm not

7   familiar with it.  So I'm not quite sure if it's a

8   club, but they had been there.  They came back home.

9   As they were getting ready to enter the residence,

10  they heard somebody come up behind them, forced their

11  way --

12          THE COURT:  What are we doing listening to

13  him tell what they said?  How does that get in?

14          MS. NORMAN:  Your Honor, we can move on from

15  there.

16          THE COURT:  Yeah.  Besides that, we've heard

17  it all once, twice or three times.

18          MS. NORMAN:  Yes, sir.

19          THE COURT:  The jury is paying attention.

20          MS. NORMAN:  Yes, sir.

21  Q    Based on that, was there any allegation made at

22  that time that there had been gunshots at that

23  residence?

24  A    There had.

25  Q    Later in the day on May 15 of 2009, did you

1  receive information that there was someone potentially

2  with a gunshot wound in a nearby hospital?

3  A    Correct.

4  Q    Please tell the ladies and gentlemen of the jury

5  based on receiving that information, what did you do?

6  A    Detective Clayton and myself responded to

7  Southside Regional Medical Center where an individual

8  had been pointed out that had come into the hospital

9  with a gunshot wound to the arm.

10  Q    At that time on May 15, 2009, did you attempt to

11  speak to the individual?

12  A    Detective Clayton and myself both attempted to

13  speak with the individual, and he indicated that he

14  did not wish to speak with us at that time.

15  Q    Is that individual you attempted to speak with, is

16  he in the courtroom today?

17  A    He's sitting with counsel.

18  Q    For the record, that would be the man in the

19  striped shirt who is the defendant?

20  A    Correct.

21  Q    At some point after that did you go back to the

22  hospital on a different day?

23  A    Yes, I responded to the hospital I believe it was

24  the 20th of May to collect a buccal swab, which is a

25  DNA sample, a Q-Tip that's used on the interior of the

1  mouth to collect saliva to obtain DNA.

2  Q   Is that the same incident or the same trip to the

3  hospital that -- did you take that with Detective

4  Clayton?

5  A   Yes, ma'am.

6  Q   Did you all actually take the swab?

7  A   Yes, ma'am, and it was turned over to Detective

8  Clayton.

9  Q   Once you turned it over to Detective Clayton, at

10 that point did something else happen while you were

11 there at the hospital?

12 A   Mr. Pernell indicated that he wished to speak with

13 us and so I listened to what he had to say.

14 Q   All right.  Well, before we get to that, and we'll

15 get to that in one moment, I do want to direct your

16 attention to what has been marked as Government's

17 Exhibits 2, 3, 4, 5, 6, 7, and 30.  I'm going to have

18 the court security officer hand them to you.

19     Before we get into the rest of it, if you could

20 tell me what the document that's been marked as

21 Government's Exhibit 2, can you tell us what that is,

22 please?

23 A   It's a certificate of analysis by the Virginia

24 Department of Forensic Science dated September 29th of

25 2010.

1  Q    According to that exhibit, what does the

2  certificate of analysis pertain to?

3  A    It's a certificate of analysis for items that were

4  submitted to the lab, which indicate a red stain that

5  was obtained from the refrigerator, a red stain that

6  was obtained from the living room, as well as those

7  buccal swabs previously mentioned taken from Mr.

8  Pernell.

9  Q    Okay.  Then Government's Exhibit 3, what document

10  is that?

11  A    That's a certificate of analysis from the Virginia

12  Department of Forensic Science dated August 12, 2009.

13  And this certificate of analysis is in relation to a

14  firearm as well as several cartridge cases of bullets

15  that were submitted to the Department of Forensic

16  Science.

17  Q    On that certificate of analysis, is that your case

18  number there at the top of it, it says your case

19  No. 2009?

20  A    Correct.

21  Q    150036?

22  A    Yes, ma'am.

23  Q    In fact, if we look back for a moment at

24  Government's Exhibit 2, that also is related to your

25  case; is that correct?

CONNER - DIRECT                           329

1   A    Yes, ma'am.

2   Q    Now, turning to Government's Exhibit 4, what is

3   that document?

4   A    It's a certificate of analysis from the Virginia

5   Department of Forensic Science dated July 16, 2009, in

6   reference to the gun cartridge cases that were

7   submitted for fingerprint analysis.

8   Q    Turning now to what's been marked as Government's

9   Exhibit 5, for the record what is that document?

10  A    The certificate of analysis from the Virginia

11  Department of Forensic science Dated November 3, 2009,

12  and this is in relation to a case from the City of

13  Richmond.

14  Q    Okay.

15  A    Involving cartridge cases.

16  Q    Involving six cartridge cases?

17  A    Correct.

18  Q    And then turning now to Government's Exhibit 6,

19  what is that document?

20  A    It's a certificate of analysis from the Virginia

21  Department of Forensic Science dated November 3, 2009,

22  pertaining to one cartridge case.

23  Q    Okay.  Does that cartridge case, the item number,

24  does that refer back to your case number in

25  Chesterfield County?

CONNER - DIRECT                    330

1   A   Yes, it does.

2   Q   Now turning to Government's Exhibit 7, what is

3   that document?

4   A   This is a certificate of analysis from the

5   Virginia Department of Forensic Science dated July 7,

6   2009, for a primer residue kit from a Frank Williams.

7   Q   Finally, turning to Government's Exhibit 30, can

8   you tell us what that document is?

9   A   It's a certificate of analysis from the Virginia

10  Department of Forensic Science dated August 4, 2009,

11  and it's for a primer residue kit from Keona Peoples

12  as well as Anwan Jones.

13  Q   As the lead investigator in this case, did you

14  receive a copy of each of these certificates of

15  analysis?

16  A   Yes.

17  Q   With the exception of what -- all of them, excuse

18  me, came directly from the Division of Forensic

19  Science with the exception of the one pertaining to

20  the Richmond case; is that correct?

21  A   Correct.  Exhibit No. 5 would have gone straight

22  to the Richmond Police Department.

23  Q   But as the lead investigator, you were able to

24  obtain a copy of this?

25  A   Correct.

CONNER - DIRECT                    331

1          MS. NORMAN:  Your Honor, at this time the

2    United States would move to admit Government's

3    Exhibits 2, 3, 4, 5, 6, 7, and 30.  They are the

4    subject of a stipulation, which will be entered after

5    this witness, but because he's the one who can

6    identify specifically what those documents are, we

7    would go ahead and admit them now.

8          MR. COLLINS:  No objection.

9          THE COURT:  They are admitted.

10         (Government's Exhibits No. 2, 3, 4, 5, 6, 7

11   and 30 are admitted into evidence.)

12   Q    So when you went back to the hospital on May 20 of

13   2009, you said that the defendant, Mr. Pernell, told

14   you that he wanted to talk to you?

15   A    Correct.

16   Q    So tell the ladies and gentlemen of the jury what

17   Mr. Pernell told you that day.

18   A    Mr. Pernell indicated that he had been called by a

19   friend to come and "cover his back" while they went to

20   the residence on Lockett Ridge to straighten out

21   Anwan.  Mr. Pernell stated that Anwan had some "messed

22   up money and product," that his friend was going over

23   there to take care of it.

24         Mr. Pernell indicated that when he got there,

25   Anwan as well as his girlfriend, who he did not know

1  the name of, were there at the residence and that they

2  went inside the residence and did not actually break

3  into the residence.

4      Mr. Pernell indicated that the female, who was

5  later identified as Keona Peoples, started going off

6  about some stuff.  Wasn't quite sure what was going

7  on.  And at some point she left and went to the rear

8  of the residence.

9      Mr. Pernell indicated that several minutes later

10  he was directed to go back and figure out what

11  Ms. Peoples was doing.  As he was walking down the

12  hall, he noticed that there was a shotgun in the

13  hallway.  Mr. Pernell indicated that he picked up the

14  shotgun due to the fact that he did not want the gun

15  behind him.

16      Mr. Pernell stated that he then went into the

17  bedroom and saw a female with a firearm.  Mr. Pernell

18  indicated that he started backing up at which time the

19  female fired a shot at him.

20      Mr. Pernell indicated that he didn't know how his

21  arm had gotten shot, but that he had realized that he

22  was shot, fell to the ground with a shotgun in his

23  right hand.  Mr. Pernell stated that he didn't fire

24  the gun at the female and never pointed the gun at

25  her.  Indicated that he fell to the ground and that

1  the gun may have gone off, however, that it was

2  pointed in an upward position or upright position.

3     Mr. Pernell indicated that he picked himself up

4  and ran out of the residence.

5  Q   Now, without getting into any additional --

6        MS. NORMAN:  Nothing further on that point.

7  Q   Finally, as a part of your investigation, did you

8  receive -- well, let me ask you to take a look at

9  Government's Exhibit 48.  Do you have that in front of

10 you?

11 A   Yes.

12 Q   Through your work as the lead investigator, did

13 you receive Government's Exhibit 48?

14 A   I did.  I responded to MCV Hospital and was given

15 this item by a forensic nurse at the hospital.  It was

16 turned over to our property unit and eventually made

17 its way to the Virginia Department of Forensic

18 Science.

19 Q   Is that item, Government's Exhibit 48, was that

20 the bullet that was removed from Mr. Pernell's arm?

21 A   It is.

22        MS. NORMAN:  Your Honor, at this time we

23 would ask to admit Government's Exhibit 48.

24        MR. COLLINS:  Without objection.

25        THE COURT:  It's admitted.

1              (Government's Exhibit No. 48 is admitted into

2    evidence.)

3    BY MS. NORMAN:

4    Q    Now, when you went to Lockett Ridge, did you

5    actually go through house?

6    A    I did.

7    Q    Based then on what Mr. Pernell told you at the

8    hospital on May 20, 2009, when you went through the

9    house five days earlier on May 15, did you note that

10   there was evidence of discharge of a shotgun inside of

11   that house?

12   A    There appeared to be a shotgun wad as well as

13   pellets from a shotgun in the floor of the main master

14   bedroom, which was that back bedroom that Keona

15   Peoples was located at, and the area in which she

16   indicated she had confronted Mr. Pernell with her

17   firearm.

18   Q    And Mr. Pernell said in his statement to you that

19   he had fell to the ground and that the gun might have

20   gone off, but it was pointed in an upright position?

21   A    Correct.

22   Q    So did he explain what he meant by "upright"?

23   A    My understanding of upright is the barrel would be

24   towards the ceiling in an upright position, not

25   pointed down at the ground.

CONNER - DIRECT                                    335

1   Q    Was there any indication that there was any

2   shotgun shell, shot, or anything in the ceiling of

3   that room?

4   A    Not that I recall.  Not that was documented.

5   Q    As a police officer, have you ever shot a shotgun?

6   A    I have.

7   Q    Are you right handed or left handed?

8   A    Right-handed.

9   Q    So can you show the jury, please, if you were

10  holding a shotgun, what position your arms would be

11  in?

12  A    Sure.  Your left hand would be towards the front

13  of the barrel and your right hand would be down where

14  the trigger is and holding it upright at your shoulder

15  in order to fire it.  Your arm and hand at an angle.

16  Q    So for a right-handed shooter, then typically,

17  with a shotgun, your left hand would be extended in

18  front of you?

19  A    Correct.

20  Q    With your forearm --

21  A    Somewhat bent.

22  Q    Bent at the elbow with your forearm facing out?

23  A    Correct, yes.

24  Q    Okay.  Going back again to something that Mr.

25  Pernell told you, he said that -- did he say that he

CONNER - DIRECT                    336

1  went with someone else to the house?

2  A    He did.    He stated that he went with a friend to

3  cover his back.

4  Q    To cover his friend's back?

5  A    Correct.

6  Q    And he also indicated that he was going to go

7  straighten somebody out?

8  A    He stated that they were going to straighten out

9  Anwan because he had some messed up money and product.

10 Q    Now, did he actually call Anwan "Anwan"?

11 A    I don't recall.    I have it written in the report,

12 but I don't recall.

13 Q    But not in quotes?

14 A    Yeah.

15 Q    Did he indicate to you what he meant by "messed up

16 money and messed up product"?    Did Mr. Pernell specify

17 that?

18 A    At this point in time I don't believe I knew

19 what --

20 Q    But --

21 A    I guess I assumed what he had meant, but there was

22 no explanation.

23            THE COURT:    Wait a minute.    One at a time.

24 A    There was no explanation of it.

25 Q    And he also said that -- but did he indicate any

1   further to you what he meant by what his friend was

2   going to do?

3   A   He did not.

4   Q   He said he was just going to go over and take care

5   of it?

6   A   Correct.

7   Q   But didn't give any further explanation?

8   A   No.

9   Q   Okay.  Did Mr. Pernell tell you that he had gone

10  to the residence with the firearm?

11  A   He did not indicate that he had shown up there

12  with a firearm.

13  Q   And then where did he explain to you that he got

14  the shotgun from then?

15  A   He stated that the shotgun was in the hallway of

16  the house, and as he was walking towards the back

17  bedroom to where Ms. Peoples was located, that he

18  noticed it.  He picked it up and carried it with him

19  because he didn't want it behind him.

20  Q   Okay.  And you've been in the house?

21  A   I have.

22  Q   Is there only one hallway to the bedroom?

23  A   There is.

24  Q   So anybody going back to the bedroom has to go

25  through that hallway if they're inside the house?

CONNER - DIRECT                338

1   A    Correct.

2         MS. NORMAN:  We have nothing further of this

3   witness, Your Honor.

4

5         CROSS-EXAMINATION

6   BY MR. COLLINS:

7   Q    Good afternoon, detective.

8   A    Good afternoon, sir.

9   Q    All right.  So for all you know you could have

10  given him the name "Anwan" and that's how it got in

11  your report?

12  A    He might have said "he."  I don't recall him ever

13  saying "Anwan" at this particular time.

14  Q    So I've straightened you out about that, correct?

15  A    I mean, it's not routine that I give individuals

16  I'm interrogating the victim's name.  So I would not

17  have provided that to him, but I don't recall if he

18  used "Anwan" or if he just said "he."

19  Q    All right.  Thank you.

20       Now, if I'm carrying a shotgun just in my right

21  hand, might I not carry it pointed down to the ground?

22  A    Sure.

23  Q    And if I see somebody that's about to shoot at me

24  or is shooting at me, might I not go like that?

25  A    Sure.

CONNER - CROSS                    339

1   Q    You said he didn't shoot at anyone, correct?

2   A    I believe that was his statement, yes, sir.

3   Q    Is it your understanding that Keona Peoples was

4   shooting, at least most of the time, from the closet?

5   A    That is my understanding from what she told me,

6   yes, sir.

7   Q    Was there any indication that a shotgun was ever

8   shot in the direction of the closet?

9   A    No, the closet is to the right of the bedroom.

10  Q    The only indication of a shotgun being shot is on

11  the floor about three feet from the entrance into the

12  bedroom, correct?

13  A    Yes, sir.

14  Q    Now, when you spoke to Anwan, do you remember what

15  time in the morning it was?

16  A    This would have been the wee hours of the morning,

17  three, four, five, somewhere around in there.  I don't

18  know the exact time.

19  Q    What was his demeanor?

20  A    He was somewhat, in my experience, uncooperative.

21  Q    Would you call him hysterical?

22  A    No.

23  Q    Relatively calm?

24  A    Yeah.

25  Q    You felt he was not forthcoming with information;

CONNER - CROSS                    340

1    isn't that correct?

2    A    That's correct.

3    Q    What did he initially tell you about the gun that

4    it turns out Keona Peoples had?  He denied knowing

5    about it, didn't he?

6              MS. NORMAN:  Objection to the form of the

7    question, Your Honor, just because we need some time

8    frame of when.  I think there were multiple times that

9    he spoke --

10   BY MR. COLLINS:

11   Q    I'm still talking about this first interview, the

12   taped interview.  It's on page 87 of your incident

13   report.

14   A    Page 87?

15   Q    Uh-huh.  Middle of the page.

16   A    I don't have a page 87.  I guess yours is a little

17   different than mine.

18   Q    It's actually the second page of your narrative of

19   the incident report.

20   A    Yes.  I'm looking at it now.  I have it in my

21   report that --

22             THE COURT:  Wait a minute.  Can you give him

23   the paragraph in which it begins?  Give him the

24   opening sentence in that paragraph.

25   Q    Well, it's a large paragraph.  It starts with "I

1    next spoke with," and then mine is blacked out.

2          MS. NORMAN:  Your Honor, it's page 25 of the

3    police report.

4          THE COURT:  Does that help you?

5          THE WITNESS:  Yes, sir, I have found what I

6    believe --

7          THE COURT:  All right.  He's found it.

8    A    Mr. Jones stated at first or he denied knowing

9    anything about the gun.  After speaking with him for

10   several more minutes, Mr. Jones indicated that he

11   didn't want to get in trouble and asked if he was

12   going to jail.

13   Q    At that point you went and talked to the

14   commonwealth's attorney and got him immunity from a

15   charge of having a firearm by a convicted felon, did

16   you not?

17   A    That's correct.

18   Q    Was he then honest and forthcoming with you?

19   A    Jones then gave me information that indicated that

20   Ms. Peoples had given him the --

21          THE COURT:  That isn't the question.  The

22   question is:  Was he forthcoming?

23          MR. COLLINS:  That was my next question,

24   Judge.

25          THE COURT:  Well, I don't know, but --

CONNER - CROSS                    342

1      MS. NORMAN:  I would object to the form of

2  the question just because honest and forthcoming may

3  be two different things.

4      THE COURT:  All right.  So --

5      MR. COLLINS:  I'll retract that question.

6  Q   Who did he then tell you the gun belonged to?

7  A   Mr. Jones then indicated that Ms. Peoples had

8  given him the gun as a gift.  He then later stated

9  again that it was Peoples' gun and that it was over at

10 his residence due to the fact that she had been

11 staying there a lot.

12 Q   So in the one brief interview, you got three

13 different stories about that gun, correct?

14 A   Yes, sir.

15 Q   And he's not allowed to have a gun because he's a

16 convicted felon, right?

17 A   That's correct.

18 Q   What did he tell you about whether or not he had a

19 shotgun?

20 A   I don't remember talking to him about a shotgun

21 specifically.

22 Q   He wouldn't be allowed to have a shotgun either,

23 would he?

24 A   No, sir.

25 Q   What did he tell you, what kind of weapons did he

1    tell you the two assailants had?

2          THE COURT:  Ladies and gentlemen, just so you

3    understand, this testimony is admitted for the purpose

4    of testing the validity of Mr. Jones's testimony.  It

5    can't be considered for whether it's true or not.  It

6    can be considered for whether Mr. Jones was telling

7    the truth when he said what he said earlier.  Do you

8    understand?

9          THE JURY:  Yes.

10   A    Mr. Jones indicated that one of the males had a

11   shotgun; however, he was unable to tell me what the

12   other suspect had.

13   Q    So he didn't tell you the other suspect had a long

14   gun of some sort?

15   A    That's not in my notes and I don't recall him --

16   Q    The bullet that was found outside of the house,

17   what kind was that?

18   A    I believe that was a .45 caliber.

19   Q    So that would not have been from the long gun,

20   would it?

21   A    My knowledge of guns, no, sir.

22   Q    It would have been from a .45-caliber pistol most

23   likely?

24   A    Yes, sir.

25   Q    Did Mr. Jones allow you to search his house?

CONNER - CROSS                    344

1   A    He did not.

2   Q    So that's why you had to get a search warrant?

3   A    That's correct.

4   Q    Did Mr. Jones mention anything about anybody

5   saying "You know what it is"?

6   A    Not that I recall.

7   Q    Was this the only time you ever talked with him?

8   A    This was the interview that I had with him.  I did

9   sit in on some other interviews.

10  Q    With him?

11  A    With him with other detectives, but I don't have

12  any notes.

13  Q    Did you ever hear him say those words?

14  A    No, sir.

15  Q    What sort of time period did those various

16  interviews cover?

17  A    This particular interview that we're referring to

18  now was --

19  Q    No, I'm sorry.  My bad.

20       All of the various interviews that you had, was it

21  over a period of weeks?

22  A    Several months.

23  Q    Several months?

24  A    Yes.

25  Q    Is it correct that he said he didn't know the

1  suspects, but one might have been involved in the

2  cutting of Taj, Taj Gregory?

3  A    That's correct.

4  Q    Mr. Pernell, as a result of this incident, was

5  charged in Chesterfield County, was he not?

6  A    He was.

7  Q    What happened to those charges?

8              MS. NORMAN:  Objection.  Relevance, Your

9  Honor.

10             THE COURT:  Sustained.

11 BY MR. COLLINS:

12 Q    Were there also some inconsistencies in what Ms.

13 Peoples told you about the gun?

14 A    I believe that she indicated that it was Anwan's

15 firearm.

16 Q    Initially, correct?

17 A    She said it was her boyfriend's gun and that she

18 saw it approximately a week and a half.

19             THE COURT:  But the question is:  Do you

20 remember whether she was inconsistent during your

21 interview with her of what she said about the

22 ownership of the gun?  Do you remember that:  Yes or

23 no?

24             THE WITNESS:  I don't see anything in my

25 notes and I don't recall.

CONNER - CROSS                    346

1    Q    Well, turn two pages.

2            THE COURT:  See if that will help refresh

3    your memory.  Read that to yourself.

4    Q    And the paragraph starts "I next interviewed."

5            THE COURT:  Read that and see if it helps

6    refresh your memory of whether she gave inconsistent

7    statements to you about the ownership of the gun.

8            THE WITNESS:  Yes.

9    Q    What did she tell you the second time?

10   A    Peoples stated that the gun was hers, and that she

11   leaves the gun at Jones's house, and that Jones has

12   seen the gun and has also picked up the gun.

13   Q    Why did she say she had gotten the gun?

14   A    A friend gave it to her for protection.

15   Q    Did you ask her what she would need protection

16   from?

17   A    No.

18   Q    And she didn't volunteer that, of course?

19   A    No.

20           MR. COLLINS:  That's all I have, Judge.

21   Thank you.

22

23       REDIRECT EXAMINATION

24   BY MS. NORMAN:

25   Q    Anwan Jones told you different variations of

CONNER - REDIRECT

1    whether he owned the gun or knew about the gun that

2    Keona Peoples used in his house; is that correct?

3    A    That's correct.

4    Q    Did Anwan Jones ever deny that the gun was in the

5    house, that pistol was in the house?

6    A    No, ma'am.

7    Q    I mean, he may have said it wasn't his, but he

8    never denied --

9              MR. COLLINS:  Object to the leading, Judge.

10             THE COURT:  Yes.

11   Q    Did Keona Peoples ever say that she didn't have

12   that gun?

13   A    No, ma'am.

14   Q    So her inconsistencies about the gun was whether

15   it belonged to her or it belonged to Anwan?

16   A    Correct.

17   Q    But neither party ever denied that it existed?

18   A    Correct.

19   Q    Now, Keona Peoples, was she a convicted felon at

20   the time?

21   A    Not that I recall, no, ma'am.

22   Q    So she wouldn't have been prohibited from

23   possessing the firearm as a convicted felon?

24   A    No, ma'am.

25   Q    But Anwan Jones was a convicted felon?

CONNER - REDIRECT                    348

1   A    To my recollection, yes, ma'am.

2   Q    So if he admitted to you it was his gun, he would

3   be admitting that he committed a crime leading up to

4   or prior to this incident?

5   A    Yes, ma'am.

6   Q    And Mr. Collins asked you about Anwan Jones

7   refused to allow y'all to go back into the house to

8   search; is that correct?

9   A    That's correct.

10  Q    What procedure did you take to be able to get back

11  into the house?

12  A    A search warrant was obtained in order to collect

13  the evidence that we needed to collect for the crime.

14  Q    And a search warrant was obtained based on the

15  crime of the shooting; is that correct?

16  A    That's correct.

17  Q    Was a second search warrant also obtained?

18  A    That is correct.

19  Q    What was the purpose of that search warrant?

20  A    While executing the first search warrant, what was

21  found to be drugs or which was believed to be drugs

22  was found and a second search warrant was obtained for

23  the drugs.

24  Q    And any other evidence of drug trafficking?

25  A    Yes, ma'am.

1   Q   So if Anwan Jones had said yes, you can search the

2   house -- you searched it with the search warrant and

3   found the drugs.  If he had said yes, you can search

4   the house, wouldn't that be evidence of a crime he

5   committed, the drugs and the money?

6   A   Yes, ma'am.

7   Q   So allowing you consent would be saying, Go ahead

8   and get evidence of a crime I committed?

9   A   Yes, ma'am.

10  Q   At any point in talking to you about what happened

11  that night about the specifics of what the two men

12  allegedly did, did Anwan Jones give you any

13  inconsistent statements about what the two men who

14  came to his house actually did?

15  A   No, ma'am.

16  Q   And did Keona Peoples ever in the times you spoke

17  with her, ever give you inconsistent statements about

18  what the two men who came to the house did?

19  A   No, ma'am.

20  Q   Now, Mr. Jones told you he did not know the two

21  men that came to his house; is that correct?

22  A   That is correct.

23  Q   Has he ever changed that to you?  Has he ever told

24  you anything inconsistent with that?

25  A   Not to me, no, ma'am.

1    Q    When he offered that one of the suspects may have

2    been involved in cutting Taj, was he stating that as a

3    fact or was he just providing some possible leads for

4    you?

5    A    Oftentimes victims are asked for anybody that

6    they've had a problem or an issue with that can give

7    us a direction to go in and his response would have

8    been to that type of questioning.

9    Q    So it wasn't that he just volunteered that, he was

10    questioned who might have done this?

11    A    Yes, ma'am.

12    Q    Okay.  Now, finally, I want to turn to what was

13    marked and admitted as Government's Exhibit 768A-50,

14    and it's a photograph.  I think my batteries have worn

15    out.

16           THE COURT:  I'm sure they're exhausted.  What

17    size are they?

18           MS. NORMAN:  Possibly not large enough, Your

19    Honor.

20           THE COURT:  I was going to try to offer you

21    some more, but now I've rethought it.

22           MS. NORMAN:  Yes, that's probably not wise.

23           THE COURT:  Mr. Collins seemed to be

24    objecting.

25    BY MS. NORMAN:

1   Q    If you look at what has been admitted as

2   Government's Exhibit 768A-50, do you recognize

3   entryway into the bedroom?

4   A    That appears to be the back bedroom on the first

5   floor that was the master bedroom that I believe

6   belonged to Anwan Jones, and Keona Peoples stayed

7   there.

8   Q    And they have seen at the picture over and over

9   again, but the significance that I want to ask you

10  about here is there are two door knobs to your right?

11  A    Correct.

12  Q    And the door knob that is the farthest to the

13  right, which seems to be the closest to the person

14  taking the picture, that's to the door to the bedroom

15  itself, correct?

16  A    Correct.

17  Q    And the door right behind it is the door to the

18  closet you were describing?

19  A    Correct.

20  Q    I think your testimony on cross was the closet

21  sort of behind the entryway as you come in.

22  A    As soon as you come in, if you look immediately to

23  the right, there's the closet.  There's probably maybe

24  16, 18 inches of actual wall from this side of the

25  room to the closet.

CONNER - REDIRECT                    352

1   Q    But when that door is opened, such as depicted in

2   this picture, and you look in, the person standing

3   when they took this picture, you can't see what's

4   behind that open closet door, can you?

5   A    No, ma'am.

6   Q    And when we look at this picture and we enlarge

7   the section of -- I'm sorry.  Slightly over from

8   there.  That's the area of the shotgun wad underneath

9   cover rug; is that correct?

10  A    From what I remember, yes, ma'am.

11  Q    So we'll back back out of the picture.  As you're

12  looking from the perspective of the picture and you

13  look from the person standing in the doorway, the

14  shotgun wad is that roughed up spot of the carpet

15  right there?

16  A    Yes, ma'am.

17  Q    With the closet door open, you can't see who's to

18  your right?

19  A    Correct.

20  Q    Or what if anything is there?

21  A    Correct.

22        MS. NORMAN:  We have no further questions,

23  Your Honor.

24        MR. COLLINS:  Nothing else?

25        THE COURT:  Can he be excused?

CONNER - REDIRECT                    353

1          MS. NORMAN:  Yes, Your Honor.

2          THE COURT:  Thank you for being with us,

3    Detective Conner.  You're excused.

4          THE WITNESS:  Thank you.

5          (The witness was excused from the witness

6     stand.)

7          MS. NORMAN:  We do have one housekeeping

8    issue with regard to the forensics and Detective

9    Conner, so we would ask that he just stay until we

10   close the case.

11         THE COURT:  You're not excused.  Sorry.  I

12   was wrong.

13         MS. NORMAN:  It just has to do with the

14   firearm.  We can't leave it here, but they'll need to

15   take it back and return it tomorrow.

16         (The witness was excused from the witness

17    stand.)

18         MS. NORMAN:  Your Honor, finally, the

19   government also would present the stipulation of the

20   parties.  It is a stipulation of facts, and it's

21   marked for identification as Government's Exhibit 49.

22         THE COURT:  Ladies and gentlemen, you're

23   going to have read to you what's called a stipulation

24   of fact.  That means that the lawyers and the parties

25   have agreed that certain things have been established

1    as facts.  They agree to that.  So there won't be any

2    testimony to prove those things.

3         You can accept what's in the stipulation as

4    having been proved as a factual matter if you so

5    choose, and she will now read it to you.  You'll have

6    a copy of it when you get back because it will help

7    you understand the evidence in the case.

8         MS. NORMAN:  Thank you, Your Honor.

9         THE COURT:  "When you get back" meaning when

10   you're in deliberations.

11        MS. NORMAN:  The stipulation of facts reads

12   as follows:

13        Comes now the United States of America by

14   Neal H. McBride, United States Attorney, and Olivia L.

15   Norman, Assistant United States Attorney, for the

16   Eastern District of Virginia and the defendant, Robert

17   Lee Pernell, by his attorney, Christopher J. Collins,

18   and stipulate as follows:

19        (1)  Chesterfield County, Virginia, is

20   located in the Eastern District of Virginia.

21        (2)  Robert Lee Pernell was shot in the arm

22   on May 15, 2009, and treated at Southside Regional

23   Medical Center in Petersburg Virginia.

24        (3)  On May 15, 2009, law enforcement

25   recovered Robert Lee Pernell's blood, which are

1  Government's Exhibits 24 and 25, from inside the

2  residence located at 1453 Lockett Ridge Road,

3  Chesterfield, Virginia, as determined by DNA analysis.

4  Government's Exhibit 2 is admissible and is proof that

5  Government's Exhibits 24 and 25 were Robert Lee

6  Pernell's blood.

7        On May 15, 2009, law enforcement recovered

8  eight cartridge cases, which are Government's Exhibits

9  8, 13, 14, 15, 17, 20, 26 and 28, and a pistol, which

10  is Government's Exhibit 12, from inside the residence

11  and outside the front door of the residence of 1453

12  Lockett Ridge Road, Chesterfield, Virginia.

13        Government's Exhibit 3 is admissible and is

14  proof that Government's Exhibits 8, 13, 14, 15, 17, 20

15  and 26 were fired in the pistol marked Government's

16  Exhibit 12.

17        And Government's Exhibit 28, which was a

18  Winchester brand caliber .45 auto cartridge case, was

19  not fired in the pistol marked Government's Exhibit

20  12.

21        (4)  Government's Exhibit 4 is admissible and

22  is proof that the pistol and cartridge cases recovered

23  from 1453 Lockett Ridge Road, Chesterfield, Virginia,

24  on May 15, 2009, were analyzed for fingerprints, but

25  no prints of value were present or developed.

1    (5)  On April 18, 2009, Robert Lee Pernell

2  discharged his firearm in the city of Richmond.   Among

3  the items recovered by police following that discharge

4  were six .45-caliber cartridge cases listed in

5  Government's Exhibit 5 collectively as item 5.

6    Government's Exhibits 5 and 6 are admissible

7  and are proof that the six .45-caliber cartridge

8  cases, collectively referred to in Government's

9  Exhibit 5 as item 5, were each a Winchester caliber

10  .45 auto cartridge case, all fired in the same

11  firearm, and fired in the same firearm that fired the

12  cartridge case marked Government's Exhibit 28, which

13  is listed in Government's Exhibits 3 and 6 as item 28.

14    (6)  Government's Exhibit 30 is admissible

15  and is proof that primer residue was found on the

16  hands of Keona Peoples and Anwan Jones on May 15,

17  2009.

18    Government's Exhibit 7 is admissible and is

19  proof that primer residue was found on the hands of

20  Robert Lee Pernell who had provided the name Frank

21  Williams at the time the shotgun residue kit was taken

22  on May 15, 2009.

23    Primer residue can be deposited on the hands

24  by circumstances such as firing a weapon, handling a

25  weapon, being in the proximity to the charge of a

1    weapon, or coming into contact with an object that has

2    primer residue on it.

3            The examinations documented in Government's

4    Exhibits 7 and 30 themselves cannot determine the

5    relative likelihood of these listed circumstances.

6            On May 15, 2009, law enforcement recovered

7    approximately 116 grams of cocaine base, commonly

8    known as crack, and $125,805 in United States currency

9    from the residence located at 1453 Lockett Ridge Road,

10   Chesterfield, Virginia.

11           Cocaine is not manufactured in the

12   Commonwealth of Virginia.

13           And it is signed by me, Olivia L. Norman, and

14   by Christopher J. Collins on behalf of our clients.

15           THE COURT:  That's admitted as Government's

16   Exhibit 49.

17           (Government's Exhibit No. 49 is admitted into

18   evidence.)

19           MS. NORMAN:  And, Your Honor, if I may have

20   one brief moment, I want to ensure we have admitted

21   all of our presented exhibits.

22           THE COURT:  All right.

23           MS. NORMAN:  Your Honor, my records indicate

24   that the government has moved to admit and the

25   following exhibits have been admitted.  I want to

358

1   ensure that's correct before we rest.

2          Government's Exhibits 1 through 15.

3          THE CLERK:  I have seven pages to look at.

4          MS. NORMAN:  I'm going to try to go in order.

5          THE CLERK:  I don't have 14.  Do you have 14

6   in?

7          MS. NORMAN:  Item 14 was a cartridge case.

8          THE CLERK:  That is in.  That's correct.  All

9   right.  They're in.

10          MS. NORMAN:  Item 17, which is another

11   cartridge case.

12          THE CLERK:  It's in.

13          MS. NORMAN:  Items 19, 20 and 21.

14          THE CLERK:  In.

15          MS. NORMAN:  Items 23, 24, 25 and 26.

16          THE CLERK:  23 and 24 are in.  25 and 26, you

17   say?

18          MS. NORMAN:  Yes, sir, which was another

19   cartridge case.

20          THE CLERK:  It's in.

21          MS. NORMAN:  Item 28.

22          THE CLERK:  In.

23          MS. NORMAN:  Item 30, a certificate of

24   analysis.

25          THE CLERK:  I'm looking.

1          THE COURT:  They came in through Conner?

2          MS. NORMAN:  Yes, sir.

3          THE CLERK:  In.

4          MS. NORMAN:  Government's Exhibits 31 and 32.

5          THE CLERK:  Both in.

6          MS. NORMAN:  Government's Exhibits 37 through

7     44, which were the clothing items.

8          THE COURT:  They came in through Clayton?

9          MS. NORMAN:  Yes, sir.

10         THE CLERK:  They're in.

11         MS. NORMAN:  Item No. 45, which came in

12    through Investigator Simmons, Exhibit 45.

13         THE CLERK:  In.

14         MS. NORMAN:  Exhibits 46A through D.

15         THE CLERK:  Correct, they're in.

16         MS. NORMAN:  Government's Exhibit 48 was

17    presented, 48, 49, 50, 51 and 52.

18         THE COURT:  So was the inventory, 47.

19         MS. NORMAN:  Yes.  And 47 also.

20         THE CLERK:  Give me those numbers again.

21         MS. NORMAN:  Item 47 was the first one.  It

22    was the inventory through Corporal Reed.

23         THE COURT:  47 through 52.

24         MS. NORMAN:  Through 52.

25         THE CLERK:  Yes.  Yes, they're in.

360

1          MS. NORMAN:  And then without objection the
2     photographs that are specifically listed in the
3     Government's proposed exhibit list.
4          THE COURT:  All of the photographs?
5          MS. NORMAN:  Yes.
6          THE COURT:  Which run for the next --
7          MS. NORMAN:  Three or four pages.
8          THE COURT:  Several pages.  There have been
9     no objections to those and they are all in.
10         MS. NORMAN:  Yes, sir.  With that, the United
11    States rests, Your Honor.
12         THE COURT:  All right.
13         MR. COLLINS:  I'd have a motion, Judge.
14         THE COURT:  Do you want to reserve it?
15         MR. COLLINS:  No, sir.  I'd like to make it
16    now if I might.
17         THE COURT:  All right.  Come on up.
18         MR. COLLINS:  Do we need to do it outside the
19    presence of the jury?
20         THE COURT:  I was going to do it with the
21    white noise.  They can go home, I guess, can't they,
22    because it's four o'clock and we've got things to do.
23    We can do it that way.
24         MR. COLLINS:  That's fine.
25         THE COURT:  All right.

1           Ladies and gentlemen, the evidence looks like

2    it's finished in the case.  There's a motion that I

3    need to take up.  By the time I do that and consider

4    instructions, you-all can go on home and come back and

5    be here at 9:30 in the morning.

6           In the morning at 9:30, you'll hear the

7    closing arguments of the lawyers, the instructions and

8    then deliberate the case.  So remember my admonitions

9    not to discuss the matter with anyone.  And if you

10   will leave your notepads.

11          What do you do?  Have them leave them in

12   there and lock them up?

13          THE CLERK:  Yes, sir.

14          THE COURT:  All right.  Leave them in there

15   with your names on them, and Mr. Neal will lock them

16   up and give them back to you in the morning.

17          Okay.  Drive carefully and we'll see you in

18   the morning at 9:30.

19          (The jury is leaving the courtroom at 3:50

20   p.m. to return in the morning at 9:30 a.m.)

21          THE COURT:  All right, Mr. Collins.

22          MR. COLLINS:  Side bar or here?

23          THE COURT:  No, you can stand there now.  I

24   was going to do it here because the jury was going to

25   be here, but they're gone.  There's no need to worry

362

1    about that.

2          MR. COLLINS:  Judge, I'm going to move for a

3    judgment of acquittal on two grounds.

4          Had Mr. Pernell robbed Taj Gregory, I think

5    we would have a nexus between his conduct and

6    interstate commerce as is required in these cases.  I

7    don't see that there's any evidence of such a nexus in

8    the cases in which he's charged.  There's not even an

9    indication, A, that he knows Anwan Jones or, B, that

10   he knowns what Anwan Jones is doing.

11         There's absolutely not an iota of evidence

12   that they were going to rob these individuals.  So I

13   think the nexus hasn't been made.

14         And then, secondly, I think the jury could

15   only convict on pure conjecture.  There's no evidence

16   upon which a reasonable juror could find beyond a

17   reasonable doubt that the intent of these individuals

18   was to rob anybody.  I think if the evidence points at

19   anything, it might point at an attempt to harm them,

20   but there's certainly no evidence of an attempt

21   robbery.

22         MS. NORMAN:  First, with regard to the issue

23   of interstate commerce, as the law states, the

24   defendant does not have to intend to affect interstate

25   commerce.  It is sufficient just that the crime would

 1    have an impact on or would affect interstate commerce,

 2    No. 1.

 3         Number 2, that impact only need be de minimis

 4    at best.  The facts in this case presented by both Taj

 5    Gregory and Anwan Jones was that they were in business

 6    together and had been in business for some period of

 7    time.  And the fact that Mr. Pernell knew at least one

 8    of them, Taj Gregory, was involved in drug

 9    trafficking, and the fact that Mr. Pernell himself

10    was, albeit in a much smaller level, involved in

11    purchasing small amounts of crack cocaine, shows that

12    he had knowledge that crack cocaine was something, a

13    commodity, if you will.  It was something that was

14    traded in commerce.

15         In any event, in Mr. Pernell's own statement,

16    you're listening to what he told the detective, he was

17    going over to back his friend up to straighten out

18    Anwan because he had messed up product and messed up

19    money.  So that shows an impact.

20         Now, Mr. Pernell may have not realized the

21    legal implication of interstate commerce, but he

22    doesn't have to.  That's not the element of the

23    offense.  The evidence very clearly supports a

24    finding, and frankly would support a finding of beyond

25    a reasonable doubt, on the element of interstate

364

1   commerce.  And so on that basis the motion should be
2   denied.
3          Now, with regard to the second issue, it
4   basically comes down to a credibility question,
5   whether or not the jury believes Anwan Jones and Keona
6   Peoples, who are the victims of this attempted robbery
7   and attempted conspiracy to commit robbery, and,
8   frankly, the firearms.  Even by Mr. Pernell's own
9   statements, there was messed up money and messed up
10  drugs, and they were going to go straighten it out.
11  Well, what that means is that he and his buddy are
12  going to go take what his buddy believes he's entitled
13  to.
14         THE COURT:  You mean that's an inference?
15         MS. NORMAN:  It is a proper inference that
16  they were going to go take what -- they couldn't call
17  the law and say "he ripped us off, the cocaine was no
18  good," so they were taking matters into their own
19  hands.
20         Well, robbery doesn't mean that you don't
21  feel like you have some personal justification for
22  robbing someone.  Robbery means that you're going to
23  take something by force.  And the facts are that the
24  two men, one of them being Robert Pernell, went into
25  the house with weapons, fought their way into the

1   house with weapons, and the reasonable inference from

2   that at 2 o'clock in the morning is that -- and Mr.

3   Pernell knowing by his own statement to law

4   enforcement that Anwan had messed up product and

5   messed up money is that they had knowledge that he had

6   product or money, either one available, and that that

7   was the purpose of going there.

8           And at this point the evidence is viewed in

9   the light most favorable for the government at this

10  point.  But even if the defense had rested, there is

11  certainly more than sufficient evidence for a

12  reasonable trier of fact to find the necessary

13  elements of robbery, or attempted robbery rather, and

14  of conspiracy to commit robbery, and the carrying of

15  firearms in the commission of those offenses.

16          So we would ask that the motion be denied.

17          MR. COLLINS:  Judge, I really don't think we

18  can mingle Taj Gregory and Anwan Jones.  There's no

19  connection between the two of them that Mr. Pernell

20  was aware of as far as the evidence that's come out in

21  this case.

22          So he had messed up product and money.  What

23  is product?  Product doesn't have to be cocaine.

24  Product can be methamphetamine made in southwest

25  Virginia.  Product can be marijuana made all over

1    Virginia.  I know the nexus doesn't have to be much,

2    but there has to be some.  And there's got to be some

3    evidence that whatever he intended to do was going to

4    interfere with that.

5          If they went over to have it out with Anwan

6    Jones, beat the tar out of him, maybe even shoot him

7    because he was cheating people, that would not affect

8    interstate commerce unless the government would say

9    putting him out of business would affect commerce.  I

10   don't think that's the law.  I just don't think the

11   evidence is there.

12         THE COURT:  Well, it looks to me like the

13   controlling case here is United States against

14   Williams.  If it weren't for the breadth of the

15   *Williams* decision, there might be some difficulty with

16   the proofs, but the evidence is sufficient to show

17   that the defendant knew that Gregory was a drug

18   dealer.

19         It's a reasonable inference to draw that he

20   knew that Jones was a drug dealer because he was going

21   over to straighten out both money and product, and the

22   testimony is that product means drugs.  It may not

23   have meant it to him, but that's a credibility fact

24   issue to be decided.

25         And his own statements, I think, together

367

1  with the other evidence in the case would permit a

2  jury to find beyond a reasonable doubt that he was

3  interfering with interstate commerce by intending to

4  deprive the owner of assets that were used in the drug

5  dealing trade.  And that's the import and meaning of

6  *Williams*.  And it seems to me that the government's

7  evidence is satisfied.

8          As to the intent to rob, it is permissible to

9  infer that they had guns, that they went there to

10  straighten out a problem with money and product, and

11  there's a reasonable inference that that means take

12  money and satisfy or rectify the money problem by

13  taking the money.  And that's permissible.  And the

14  government gets all the inferences at this stage of

15  the proceedings, and a reasonable jury could find

16  beyond a reasonable doubt an intent to rob.  So the

17  motion under Rule 29 is denied.

18          MR. COLLINS:  Thank you.  Note our exception,

19  please.

20          THE COURT:  All right.

21          You've got the instructions.  Let's go over

22  them and get them ready.

23          MS. NORMAN:  Your Honor, I may have missed

24  it, and I was just asking Mr. Collins, but just so our

25  record is clear that the defense wasn't presenting any

368

1  evidence.  That was my understanding, but I never

2  heard it on the record.

3          MR. COLLINS:  That's correct, Judge.

4          THE COURT:  The defense will rest in the

5  morning and not present evidence.

6          MS. NORMAN:  Yes, sir.

7          THE COURT:  All right.  Let's go over the

8  instructions.  You don't have to stand up, but you do

9  have to speak up so we can hear you.

10         MS. NORMAN:  Your Honor, may all of my kind

11  people be allowed to leave unless they want to stay?

12         THE COURT:  I can't imagine they don't want

13  to stay and listen to the instructions, but they're

14  certainly welcome to leave if they would like to.

15         MS. NORMAN:  We do have one other slight

16  issue.

17         THE COURT:  Wait a minute.  Don't leave if

18  there's a slight issue.

19         MS. NORMAN:  It all has to do with the

20  firearm.  Apparently, the Marshal Service, we can't

21  keep this firearm here at the facility, I mean at the

22  courthouse, locked up.

23         THE MARSHAL:  I don't believe so.

24         THE CLERK:  It's normally given back to the

25  agents and they take it back with them at night.

1          MS. NORMAN:  I'll make arrangements.

2          THE CLERK:  I'll take the firearm under the

3    circumstances.

4          MS. NORMAN:  All right.  And I apologize.

5    Agent Spottswood thought he would be back, but

6    apparently his wife is still --

7          THE CLERK:  That's fine.  Do you have any

8    ammunition or just the gun?

9          MS. NORMAN:  Just the gun.

10          THE COURT:  That's Exhibit 12.  Is there any

11    ammunition in there?

12          MS. NORMAN:  No, sir.  And it was cleared by

13    the court security officers before it was allowed in

14    the courthouse.

15          THE COURT:  Well, there's no ammunition

16    because all of it was fired, right?

17          MS. NORMAN:  That's correct.

18          THE COURT:  According to your theory.

19          MS. NORMAN:  According to the evidence, yes.

20          THE COURT:  It held eight rounds, and they

21    found eight, and one of them was outside, but I

22    thought the one outside didn't match the striations in

23    the government's exhibit.  So there's one round

24    missing, right?

25          MS. NORMAN:  Not necessarily.  Just because

1    it holds eight doesn't mean it had eight.  They don't

2    come preloaded.  You have to sit there and load them

3    yourself.  And the last couple are kind of hard.

4         THE CLERK:  Often if you're fully loaded, it

5    ruins the spring.

6         THE COURT:  We have a lot of experts here,

7    but I don't know of any testimony on it.

8         THE CLERK:  Mine isn't fully loaded.

9         THE COURT:  Okay.  So now we've solved the

10   problem.  Mr. Neal is going to take the gun.

11        THE CLERK:  May I take it down while you're

12   doing the jury instructions?

13        THE COURT:  I thought you were going to take

14   it home with you.

15        THE CLERK:  Oh, no, sir, I have one.

16        THE COURT:  Put it in the safe.

17        THE CLERK:  I will.

18        THE COURT:  All right.  Then the rest of

19   them, they are excused; is that right?

20        MS. NORMAN:  Yes, sir.

21        THE COURT:  All right.  Well, let's go.

22    * * * * *

23         (The proceedings were adjourned at 4:43 p.m.)

24

25

371

1          I, Diane J. Daffron, certify that the

2    foregoing is a correct transcript from the record of

3    proceedings in the above-entitled matter.

4                        /s/

5          _____    _____

6          DIANE J. DAFFRON, RPR, CCR              DATE